# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FILED**

APR 2 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

COLONEL (RET.) CLIFFORD ACREE
2348 Caddie Court
Oceanside, CA 92056,

COLONEL MICHAEL CRAIG BERRYMAN
9294 Lilge Circle
Navarre, FL 32566,

STAFF SERGEANT (RET.) TROY DUNLAP
2417 Cosmic Drive
Joliet, IL 60431,

COLONEL (RET.) DAVID EBERLY
205 Roger Webster
Williamsburg, VA 23185,

LIEUTENANT COLONEL (RET.) JEFFREY FOX
1821 Windmere Way
Surfside Beach, SC 29575,

CHIEF WARRANT OFFICER (RET.) GUY HUNTER
125 Rock Creek Drive
Jacksonville, NC 28540,

SPECIALIST DAVID LOCKETT
401 Twin Creek Drive
Apartment 16H
Killeen, TX 76543,

COLONEL H. MICHAEL ROBERTS
452 Chandler Drive
Wright Patterson AFB, OH 45433,

LIEUTENANT COLONEL RUSSELL SANBORN
3503 Stanford Road
New Bern, NC 28562,

COMMANDER LAWRENCE SLADE
1536 Bay Point Drive
Virginia Beach, VA 23454,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NUMBER  1:06CV00723

JUDGE: Richard W. Roberts

DECK TYPE: General Civil

DATE STAMP: 04/21/2006

**COMPLAINT**

MAJOR (RET.) JOSEPH SMALL                           )
4539 Cloverdale Drive                               )
Racine, WI 53403,                                   )
                                                    )
STAFF SERGEANT DANIEL STAMARIS                      )
109 West Church Street                              )
Headland, AL 36345,                                 )
                                                    )
CAPTAIN (RET.) R. DALE STORR                        )
7018 North Elgin                                    )
Spokane, WA 99208,                                  )
                                                    )
LIEUTENANT COLONEL ROBERT SWEET                     )
4723 Misty Valley Circle                            )
Valdosta, GA  31602,                                )
                                                    )
LIEUTENANT COLONEL (RET.) JEFFREY TICE              )
8263 E. Knollwood Terrace                           )
Tucson, AZ 85750,                                   )
                                                    )
LIEUTENANT (RET.) ROBERT WETZEL                     )
20993 East Crestline Place                          )
Centennial, CO 80015,                               )
                                                    )
COMMANDER JEFFREY ZAUN                              )
353 7th Street                                      )
Apartment 2                                         )
Jersey City, NJ 07032,                             )
                                                    )
MRS. CYNTHIA ACREE                                  )
2348 Caddie Court                                   )
Oceanside, CA 92056,                                )
                                                    )
MRS. LEIGH BERRYMAN                                 )
9294 Lilge Circle                                   )
Navarre, FL 32566,                                  )
                                                    )
MRS. GAIL STUBBLEFIELD                              )
853 Rolling Hills Road                              )
Karnak, IL 62956,                                   )
                                                    )
MR. RONALD DUNLAP                                   )
865 Rolling Hills Road                              )
Karnak, IL 62956,                                   )
                                                    )

MRS. BARBARA EBERLY )
205 Roger Webster )
Williamsburg, VA 23185, )
)
MR. TIMM EBERLY )
205 Roger Webster )
Williamsburg, VA 23185, )
)
DR. ROBERT FOX )
111 Prosser Trail )
Charleston, RI 02813, )
)
MR. TERRENCE FOX )
3 Wren Way Court )
Stafford, VA 22554, )
)
MRS. PATRICIA BORDEN )
353 Arcade Avenue )
Seekonk, MA 02771, )
)
MRS. NANCY GUNDERSEN )
8952 South Tuscany Lane )
Highlands Ranch, CO 80130, )
)
MR. TIMOTHY FOX )
161 St. Ives Drive )
Savannah, GA 31419, )
)
MRS. MARY HUNTER )
125 Rock Creek Drive )
Jacksonville, NC 28540, )
)
MRS. LAURA REEVES )
1515 Apache Drive, Unit A )
Chula Vista, CA 91910, )
)
MR. WILLIAM (RAY) HUNTER )
USS Rhode Island, Gold Crew )
NAV SUB BASE )
Kings Bay, GA 31547, )
)
MS. MARY ELIZABETH (LILY) HUNTER )
125 Rock Creek Drive )
Jacksonville, NC 28540, )
)

MRS. PATRICIA ROBERTS )
452 Chandler Drive )
Wright Patterson AFB, OH 45433, )
)
MRS. STARR BARTON )
1958 Jamaica Drive )
Navarre, FL 32566, )
)
MRS. ANNA SLADE )
1536 Bay Point Drive )
Virginia Beach, VA 23454, )
)
MRS. LEANNE SMALL )
4539 Cloverdale Drive )
Racine, WI 53403, )
)
MR. DAVID STORR )
13753 Fleet Street )
Woodbridge, VA 22191, )
)
MR. DOUGLAS STORR )
11 Woodstock Lane )
Burlington, NJ 08016, )
)
MS. DIANE STORR )
1201 US Highway 93 )
Apartment 232 )
Polsen, MT 59860, )
)
MR. ARTHUR SWEET )
1 Dogwood Lane )
Washington, WV 26181, )
)
MRS. MARY ANN SWEET )
1 Dogwood Lane )
Washington, WV 26181, )
)
MR. MICHAEL SWEET )
350 March Lane )
Morgantown, WV 26508, )
)
MRS. JACQUELINE WETZEL )
20993 East Crestline Place )
Centennial, CO 80015, )

MR. WILLIAM WETZEL )
3554 Ocean Drive )
Apartment N901 )
Vero Beach, FL 32963, )
)
MR. JAMES WETZEL )
789 Wyeth Street )
West Melbourne, FL 32904, )
)
MR. EDWARD WETZEL )
62 Brunswick Avenue )
Metuchen, NJ 08840, )
)
MS. MARGARET WETZEL )
5665 Live Oak Avenue )
Melbourne Village, FL 32904, )
)
MR. PAUL WETZEL )
9461 South Hibiscus Drive )
Highlands Ranch, CO 80126, )
)
MRS. KATHLEEN FARBER )
4982 Dorsey Hall Drive )
Apartment C4 )
Ellicott City, MD 21042, )
)
MRS. ANNE KOHLBECKER )
73 Parker Avenue )
Little Silver, NJ 07739, )
)
MRS. SALLY DEVIN )
30 Wakefield Court )
Shrewsbury, NJ 07702, )
)
MR. CALVIN ZAUN )
19 Whitman Avenue )
Cherry Hill, NJ 08002, )
)
MRS. MARJORIE ZAUN )
19 Whitman Avenue )
Cherry Hill, NJ 08002, )
)
MS. LINDA ZAUN LESNIAK )
3005 Chapel Avenue West, #4F )
Cherry Hill, NJ 08002, )

Plaintiffs,                                          )
                                                     )
                                                     )
v.                                                   )
                                                     )
THE REPUBLIC OF IRAQ                                 )
c/o Ministry of Foreign Affairs                      )
Baghdad, Republic of Iraq,                           )
                                                     )
THE IRAQI INTELLIGENCE SERVICE                       )
c/o Ministry of Foreign Affairs                      )
Baghdad, Republic of Iraq,                           )
                                                     )
SADDAM HUSSEIN in his official capacity as           )
PRESIDENT OF THE REPUBLIC OF IRAQ,                   )
and in his individual capacity,                      )
c/o Ministry of Foreign Affairs                      )
Baghdad, Republic of Iraq                            )
                                                     )
and                                                  )
                                                     )
John Does 1-100                                      )
                                                     )
        Defendants.                                  )
                                                     )

## COMPLAINT FOR DAMAGES

*This Complaint is being filed at this time to ensure that the statute of limitations set out in*

*28 U.S.C. § 1605(f) of the FSIA does not preclude further action on the stated claims, should*

*such action become necessary. This Complaint is not intended to interfere with the pending*

*motion before this Court in Civil Action No. 02-0632 (RWR). Recovery in that Civil Action could*

*preclude the necessity of further action on the claims set out in this new action and Complaint.*

Plaintiffs, Americans held as prisoners of war (POWs) by the Republic of Iraq during the

Gulf War and their principally affected family members, bring this action against the Republic of

Iraq, the Iraqi Intelligence Service, and Saddam Hussein, in his official capacity as President of

Iraq, and in his individual capacity, and John Does 1-100 (the "John Doe Defendants")

(collectively "Defendants") for personal injury caused to the POWs by their torture while held by

Iraq in Kuwait and Iraq and personal injury to their family members in the United States and

elsewhere caused by these acts of torture against their loved ones. Plaintiffs seek redress for

bodily harm, emotional distress, economic damages, pain and suffering, solatium and punitive

damages to prevent future mistreatment of American prisoners of war and their families.

Plaintiffs, as and for their Complaint, allege as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over all matters in this action with respect to 28 U.S.C.

§ 1330 (1994) as a claim for relief with respect to a foreign state not entitled to immunity under

§§ 1605-1607 of that title, including particularly 28 U.S.C. § 1605(a)(7) (1994 & Supp. V 1999),

as amended, which provides a general exception from immunity of a foreign state for any case in

which money damages are sought for personal injury caused by an act of torture or the provision

of material support or resources for such torture by a state designated as a state sponsor of

terrorism at the time the torture occurred. Relevant to this provision, the Republic of Iraq was

designated as a state sponsor of terrorism on September 13, 1990, prior to its torture and

mistreatment of American POWs and their families during the Gulf War as specified in this

Complaint. Further, the claimants in this action are nationals of the United States and the

Defendants in this action have been afforded a reasonable opportunity to arbitrate the claims

herein for acts occurring in the Republic of Iraq in accordance with accepted international rules

of arbitration. A new offer to arbitrate the claims herein is being filed with this Complaint and is

attached hereto at Tab A.

2.      This action (brought pursuant to the Foreign Sovereign Immunities Act of 1976, as amended, 28 U.S.C. §§ 1330 & 1602-11 (1994 & Supp. V 1999)) is filed within the limitation period for actions under 28 U.S.C. § 1605(a)(7), as set out in § 1605(f).  The Government of the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein, in his official capacity as President of the Republic of Iraq, were immune from suit in this action prior to the 1996 Amendments to the Foreign Sovereign Immunities Act by the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1241 (1996) ("FSIA"), which added § 1605(a)(7) to the Foreign Sovereign Immunities Act.  As such, the limitation period is tolled until effective enactment of these amendments on April 24, 1996, and the ten-year limitation period begins in that month and year and runs until April 24, 2006.  Further, the 1996 Amendments adding § 1605(a)(7) were intentionally and specifically made applicable by Congress to "any cause of action arising before, on, or after the date of the enactment of this Act."  See FSIA § 221(c), 104-132, 110 Stat. (April 24, 1996), reprinted at 28 U.S.C.A. § 1605 note "Effective and Applicability Provisions."  Similarly, the September 30, 1996 "Flatow Amendment," enacted shortly thereafter to clarify the scope of causes of action and damages available to plaintiffs under the amended § 1605(a)(7), is to be read with the earlier amendment passed just five months before.  The Flatow Amendment is Public Law 104-208, Div. A, Title I, § 101(c) [Title V, § 589] (Sept. 30, 1996), 110 Stat. 3009-172, reprinted at 28 U.S.C.A. § 1605 note (West Supp. 2001).  See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 12-15 (D.D.C. 1998).  Specifically, this Court said in the Flatow case: "28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note apply retroactively for the purposes of establishing subject matter and personal jurisdiction."  999 F. Supp. at 13 (emphasis omitted).

3.     Venue is properly in this district pursuant to 28 U.S.C. § 1391(f)(4). Defendants are "foreign states" as defined by 28 U.S.C. § 1603(a) & (b). Defendant, the Republic of Iraq, is a foreign state and, as such, is a "foreign state" as defined by 28 U.S.C. § 1603(a). Defendants, the Iraqi Intelligence Service and Saddam Hussein, in his official capacity as President of the Republic of Iraq, are "agencies or instrumentalities of a foreign state" as defined by 28 U.S.C. § 1603(b) and, as such, are also "foreign states" within the meaning of 28 U.S.C. § 1603(a). Defendant, Saddam Hussein in his individual capacity during the time of his presidency while serving as an official of Iraq is an entity that is a separate legal person qualifying as an "agency or instrumentality of a foreign state" within the meaning of this same section. This Court also has jurisdiction over one or more of the Defendants, including the John Doe Defendants, under 28 U.S.C. §§ 1331 and/or 1332.

## PRELIMINARY STATEMENT

4.     On August 2, 1990, the Republic of Iraq invaded and occupied the State of Kuwait in an act of aggression in violation of the United Nations Charter. Subsequently, following United Nations Security Council authorization, an international coalition of thirty-three nations joined active hostilities against Iraq on January 16, 1991, to enforce the international rule of law and compel Iraq to leave Kuwait. Plaintiffs in this case are a group of American national POWs tortured by the Defendants in Kuwait and Iraq while in the custody and physical control of the Government of Iraq during the course of the international response against Iraq's aggression, as well as principally affected members of the POWs' families. Plaintiff POWs are truly American heroes who voluntarily placed themselves in harm's way so that others could live in peace and freedom. They, and their family members, have responded

with great courage, dignity and fortitude to the Iraqi government's brutality and its profound and long lasting effects on their lives.

5.    The American POW Plaintiffs fell into Iraqi hands on varying dates during the conflict but beginning as early as January 17, 1991. All such Plaintiffs were brutally tortured by officials of the Republic of Iraq during their captivity. Treatment while in the hands of Iraqi intelligence personnel was barbarous. As will subsequently be specified in this Complaint, the torture varied for each of the POW Plaintiffs, but the overall torture of American POWs by officials of the Republic of Iraq included severe beatings with pistols and rifles, weighted rubber hoses, truncheons, blackjacks, fists, belts, metal pipes, batons, and sticks, including an axe handle. It further included mock executions; threatened castration; threatened amputation of fingers and other dismemberment; threatened death; threats to send their body parts to their families in the United States; systematic starvation; systematic exposure to freezing cold; deprivation of medical care; purposeful aggravation of existing injuries; electrical shock with a device wrapped around a POW's head; injection of a mind altering substance; kicking, including with steel-toed boots; cupped hand blows to the ears; beating with a mallet on the knees; handcuffs and restraints so tight as to cut off circulation, damage nerves, and cause the hands to swell and turn purple; use of cattle prods and stun guns; being knocked unconscious, sometimes repeatedly; blows to the legs and neck with a heavy pendulum-like object; whipping with a cat-o'-nine-tails; confinement in darkness; confinement in filthy conditions exposing them to contagion and infection; burning with cigarettes and heated spoons; being led blindfolded into walls and stairwells; being urinated and spat upon; mental suffering about the agony that their families must be enduring when the POWs were not permitted by the Iraqi authorities to inform their families that they were alive; living in constant fear of death and torture, a climate intended

to create humiliation and degradation; and other atrocities causing great suffering and serious injury in clear violation of the internationally accepted obligations of the Government of Iraq.

6.    Injuries and illnesses sustained during this torture by American POWs generally included a fractured skull, broken bones, including a broken leg and broken vertebrae, broken tibia, broken facial structure, burns, torn muscles, chipped teeth, broken noses, a dislocated jaw, a dislocated shoulder, a torn rotator cuff, perforated eardrums, injuries to knees so severe as to cause lameness, painful joints, injury to kidneys, numbness and nerve damage, hearing impairment, impairment of the sense of smell, infections including eye infection, dysentery, nausea, severe weight loss, massive bruises (in one case so severe and extensive that the bruising was described "as if the body had been dipped in indigo ink"), and other injuries. In at least one case, a POW Plaintiff was so severely starved he ate the scabs off his own body. Pain and suffering of the POWs during this torture and their mental suffering and anguish resulting during their period of confinement by Iraq were intense and extreme. The effects of this brutal treatment by Defendants have continued in years since.

7.    The POWs suffered not only unspeakable and prolonged physical pain but also intense and prolonged mental anguish and harm, both during the actual infliction of torture and throughout their captivity. They lived constantly in terror of further torture of the type their captors had already inflicted upon them, new and unknown tortures, and the fear of death and dismemberment repeatedly threatened by their captors. They heard fellow prisoners' anguished cries during beatings, sometimes even recognizing the victims' voices. Hearing the terrorizing beatings gave the POWs a vivid preview of what they and their fellow POWs could expect and greatly contributed to their anguish. Even the sound of the jailers' keys filled them with fear. Iraq's forcing of video "confessions" for propaganda purposes not only generated fear and

anguish during the torture compelling these propaganda "confessions," but it also generated

tremendous guilt about any acquiescence to their captors' demands. The POWs also suffered

intense and prolonged mental anguish because of the suffering of their family members and the

effects upon their family relationships resulting from their torture by Iraq. Among other things,

POWs and their family members suffered prolonged mental anguish and harm from Iraq's

intentional and total failure to comply with its obligations designed to provide rapid notification

to family members of a detained POW. Some POW Plaintiffs have also suffered professional

set-backs and economic damages as a result of Iraq's tortious actions.

8.     This torture of American POWs, while they were in the custody and physical

control of the Republic of Iraq, producing severe pain and suffering, physical and mental, was

intentionally inflicted by Defendants for the purpose of obtaining information or a confession,

punishing the POWs for their lawful actions in support of the United Nations coalition or for

insisting on their rights as POWs while in Iraqi captivity, and in discrimination against them.

Iraqi actions against American POWs as set out in this Complaint are a paradigm of the meaning

of "torture" as that term is defined in section 3 of the Torture Victim Protection Act of 1991,

incorporated into 28 U.S.C. § 1605(a)(7) by § 1605(e)(1). Section 3 of the Torture Victim

Protection Act clearly mandates that "torture" includes not only severe pain or suffering for the

purpose of interrogation or in an effort to obtain a "confession," but also severe pain or suffering

for the purpose of "punishing that individual for an act that individual or a third person has

committed or is suspected of having committed," or "intimidating or coercing that individual or a

third person" or "for any reason based on discrimination of any kind," and further includes

"suffering" [the Act uses the disjunctive "or" rather than the conjunctive "and" in the phrase

"pain or suffering"] inflicted for any of the above purposes. The POW Plaintiffs' custody and

physical control by Iraq demonstrates a recurrent pattern implicating all of these meanings of torture under the Act, from beatings upon capture and during captivity as punishment and discrimination against them for carrying out their lawful military duties as members of the United Nations Coalition, beatings and other tortures during interrogation and efforts at forcing verbal and video "confessions," efforts to use them as human shields to coerce the United Nations Coalition, and severe suffering inflicted in barbarous conditions of captivity.

9.      The POW Plaintiffs' claims for money damages against Defendants for personal injury caused by torture and the provision of material support or resources for such acts of torture, including claims for economic damages, solatium, and pain and suffering fall squarely within 28 U.S.C. § 1605(a)(7), as amended.

10.     The Plaintiffs who are close family members of the POW Plaintiffs have suffered prolonged mental anguish and harm as a result of Iraq's brutal torture of their loved ones and, in the case of many family members, direct injury in the United States as a result of elements in that torture.  Their anguish resulted from the Government of Iraq's lack of notification as required by international law that their spouse or loved one had been taken prisoner by Iraq and was still alive, their knowledge of Defendants' general disregard of humanitarian standards (including particularly their knowledge of Iraq's past record of brutal torture of POWs), Defendants' placing of certain injured POWs on public display, Defendants' publicly announced policy of placing American POWs as hostages at strategic military targets, Defendants' refusal to let the International Committee of the Red Cross (the "ICRC") check the prisoners' conditions, and Defendants' chilling public taunts and threats to coalition forces, such as "we will drink your blood!," "show no mercy toward them," and "we will send you back to your kinfolk as lifeless corpses." The tortious mistreatment of POW loved ones by Defendants, both when originally

suspected and when it became fully known to close family members, caused further prolonged

mental anguish about the well-being of their loved ones. The omission by the Government of

Iraq of its internationally accepted obligations to comply with provisions of the Geneva

Convention Relative to the Treatment of Prisoners of War designed for the prompt notification of

family members that a loved one has been taken prisoner and is not simply missing in action,

was part of the Republic of Iraq's intentional effort at physical and mental torture of American

POWs. It produced not only personal injury to the POWs as part of their torture, but also

personal injury to their close family members in the United States and elsewhere. Indeed, the

spouses of POW Plaintiffs who did not know the fate of their loved ones quite literally did not

know whether they were wives or widows. Iraq's January 21, 1991 announcement through

Baghdad Radio that allied POWs would be placed in strategic sites was not only an announced

violation of the POW Convention but it further added to the concern for the POWs' safety.

Every day brought more anguish and disappointment for family members as they waited for the

ICRC to be allowed access and to hear the fate of their loved ones. Subsequently, the residual

effects of Iraq's torture of their loved ones, and their own mental anguish resulting from Iraq's

mistreatment, have had lasting effects on family relations. This has, in some cases, included

effects on the marriages and parent/children relations of tortured POWs. Similarly, for some

family members, Defendants' brutal torture of the POWs has had harmful effects on health and

well-being, has impacted their professional choices, and has even created a continuing condition

of fear, particularly with respect to terrorism, foreign travel and personal safety.

      11.    Plaintiff family members' claims for money damages against Defendants are not

only covered as solatium under 28 U.S.C. § 1605(a)(7), as amended, but they also fall squarely

within the personal injury contemplated by 28 U.S.C. § 1605(a)(7). Their personal injuries were

caused by acts of torture to their loved ones, and they are American national claimants within the meaning of 28 U.S.C. § 1605(a)(7).

12.     Plaintiffs in this case also seek substantial punitive damages. Creating incentives for terrorist nations, and their agencies and instrumentalities, such as Iraq, former President Saddam Hussein, and the Iraqi Intelligence Service to comply with their obligations not to torture prisoners of war serves an important public purpose. Plaintiffs are motivated in this case not only to obtain appropriate recompense for their own injuries but also to take action which will serve to deter the Iraqi Intelligence Service, the Republic of Iraq and any other nation in the future from torturing American prisoners of war. As such, Plaintiffs seek to establish a 501(c)(3) Foundation for the assistance of American and allied prisoners of war and missing in action and their families. Plaintiffs intend that, if feasible, a substantial amount of any punitive damages awarded in this case should go to the benefit of this Foundation.

13.     Punitive damages are specifically available in this case. The September 30, 1996, "Flatow Amendment" to § 1605(a)(7) expressly provides for money damages, including punitive damages, for "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency . . . ." See FSIA, Div. A, Title I, § 101(c), Pub. L. No. 104-208, 110 Stat. 3009-172 (1996) [Title V, § 589], reprinted at 28 U.S.C.A § 1605 note (West 1997 Supp.). And of relevance to an action under the Flatow Amendment, certainly an official of the United States would be liable for the torture of prisoners of war if such an act were carried out in the United States. Treatment of legally qualified prisoners of war consistent with the POW Convention is mandated by United States laws, directives and regulations. Similarly, 28 U.S.C. § 1606 contemplates the availability of punitive damages against an agency or instrumentality of a foreign state; and an "agency or

- 10 -

instrumentality of a foreign state" is defined by 28 U.S.C. § 1603(b) to include "a separate legal person, corporate or otherwise . . . which is an organ of a foreign state . . . ." Thus, individuals acting in their official capacities, and certainly the official in charge of a totalitarian state such as was Defendant Saddam Hussein, are not only officials and agents, but are also considered "agencies or instrumentalities of a foreign state" within the meaning of § 1605(a)(7) of the Foreign Sovereign Immunities Act, and on both counts are subject to causes of action including punitive damages. See Flatow, 999 F. Supp. at 26. Similarly, the Iraqi Intelligence Service is an "agency or instrumentality of a foreign state" within the meaning of § 1603(b) and is thus fully subject to punitive damages.

14. It is well known that punitive damages are meant both to punish for outrageous conduct and to deter the defendant and others from such conduct in the future. Thus, according to the Restatement (Second) of Torts § 908(1) (1977), punitive damages are "to punish . . . [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." In awarding punitive damages in this case, the Court should consider the exceedingly heinous nature of the acts of torture of American prisoners of war committed against these Plaintiffs and their families; the severe and continuing harm to Plaintiffs caused by Defendants' reprehensible actions; that such acts are repugnant to civilized society and are criminal acts banned by international law as "grave breaches" of the laws of war; that such acts were carried out by Defendants as part of a systematic effort to obtain information to carry out their war of aggression in defiance of the United Nations Security Council and to punish and intimidate Allied POWs for lawfully carrying out the United Nations mandate to defend against Iraqi aggression; that Saddam Hussein as the former President of Iraq was the dictator of a single party totalitarian state controlling substantial oil wealth and continuing to defy United Nations

sanctions agreed by him as a condition of ending the Gulf War; that the harassment of American POWs includes actions suggesting an intention to treat Jewish POWs more severely than POWs from other ethnic backgrounds; and that only very sizable awards would be likely to deter such torture of American POWs by agencies or instrumentalities of Iraq or other terrorist states in the future.

## PLAINTIFFS

15.     Plaintiff Colonel (Ret.) Clifford Acree is a United States citizen and a resident of the State of California. While holding the rank of Lieutenant Colonel in the United States Marine Corps, Colonel Acree was held as a prisoner of war by Iraq from January 18, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

16.     Plaintiff Mrs. Cynthia Acree is a United States citizen and a resident of the State of California. She is the spouse of Colonel Clifford Acree and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

17.     Plaintiff Colonel Michael Craig Berryman is a United States citizen and a resident of the State of Florida. While holding the rank of Captain in the United States Marine Corps, Colonel Berryman was held as a prisoner of war by Iraq from January 28, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

18.     Plaintiff Mrs. Leigh Berryman is a United States citizen and a resident of the State of Florida. She is the spouse of Colonel Michael Craig Berryman and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

19.     Plaintiff Staff Sergeant (Ret.) Troy Dunlap is a United States citizen and a resident of the State of Illinois. While serving in the United States Army, Staff Sergeant Dunlap

was held as a prisoner of war by Iraq from February 27, 1991, when his helicopter was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

20.      Plaintiff Mrs. Gail Stubblefield is a United States citizen and a resident of the State of Illinois. She is the mother of Staff Sergeant Troy Dunlap. She is a Family Member Plaintiff.

21.      Plaintiff Mr. Ronald Dunlap is a United States citizen and a resident of the State of Illinois. He is the brother of Staff Sergeant Troy Dunlap. He is a Family Member Plaintiff.

22.      Plaintiff Colonel (Ret.) David Eberly is a United States citizen and a resident of the State of Virginia. While serving in the United States Air Force, Colonel Eberly was held as a prisoner of war by Iraq from January 22, 1991, three days after his plane was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

23.      Plaintiff Mrs. Barbara Eberly is a United States citizen and a resident of the State of Virginia. She is the spouse of Colonel David Eberly and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

24.      Plaintiff Mr. Timm Eberly is a United States citizen and a resident of the State of Virginia. He is the son of Colonel David Eberly and Mrs. Barbara Eberly. He is a Family Member Plaintiff.

25.      Plaintiff Lieutenant Colonel (Ret.) Jeffrey Fox is a United States citizen and a resident of the State of South Carolina. While serving in the United States Air Force, Lieutenant Colonel Fox was held as a prisoner of war by Iraq from February 19, 1991, when his plane was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

26.    Plaintiff Dr. Robert Fox is a United States citizen and a resident of the State of Rhode Island. He is the brother of Lieutenant Colonel Jeffrey Fox. He is a Family Member Plaintiff.

27.    Plaintiff Mr. Terrence Fox is a United States citizen and a resident of the State of Virginia. He is the brother of Lieutenant Colonel Jeffrey Fox. He is a Family Member Plaintiff.

28.    Plaintiff Mrs. Patricia Borden is a United States citizen and a resident of the State of Massachusetts. She is the sister of Lieutenant Colonel Jeffrey Fox. She is a Family Member Plaintiff.

29.    Plaintiff Mrs. Nancy Gundersen is a United States citizen and a resident of the State of Colorado. She is the sister of Lieutenant Colonel Jeffrey Fox. She is a Family Member Plaintiff.

30.    Plaintiff Mr. Tim Fox is a United States citizen and a resident of the State of Georgia. He is the brother of Lieutenant Colonel Jeffrey Fox. He is a Family Member Plaintiff.

31.    Plaintiff Chief Warrant Officer (Ret.) Guy Hunter is a United States citizen and a resident of the State of North Carolina. While serving in the United States Marine Corps, Chief Warrant Officer Hunter was held as a prisoner of war by Iraq from January 18, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

32.    Plaintiff Mrs. Mary Hunter is a United States citizen and a resident of the State of North Carolina. She is the spouse of Chief Warrant Officer Guy Hunter and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

33.     Plaintiff Mrs. Laura Reeves is a United States citizen and a resident of the State of California. She is the daughter of Chief Warrant Officer Guy Hunter and Mrs. Mary Hunter. She is a Family Member Plaintiff.

34.     Plaintiff Mr. William (Ray) Hunter is a United States citizen and a resident of the State of Georgia. He is the son of Chief Warrant Officer Guy Hunter and Mrs. Mary Hunter. He is a Family Member Plaintiff.

35.     Plaintiff Ms. Mary Elizabeth (Lily) Hunter is a United States citizen and a resident of the State of North Carolina. She is the daughter of Chief Warrant Officer Guy Hunter and Mrs. Mary Hunter. She is a Family Member Plaintiff.

36.     Plaintiff Specialist David Lockett is a United States citizen and a resident of the State of Texas. While serving in the United States Army, Specialist Lockett was held as a prisoner of war by Iraq from January 30, 1991, when his two-truck convoy mistakenly crossed the Saudi Arabia-Kuwait border, until March 4, 1991, when he was released. He is a POW Plaintiff.

37.     Plaintiff Colonel H. Michael Roberts is a United States citizen and a resident of the State of Florida. While holding the rank of Captain in the United States Air Force, Colonel Roberts was held as a prisoner of war by Iraq from January 19, 1991, when his plane was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

38.     Plaintiff Mrs. Patricia Roberts is a United States citizen and a resident of the State of Ohio. She is the spouse of Colonel H. Michael Roberts and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

39.     Plaintiff Mrs. Starr Barton is a United States citizen and a resident of the State of Florida. She is the stepdaughter of Colonel H. Michael Roberts. She is a Family Member Plaintiff.

40.     Plaintiff Lt. Col. Russell Sanborn is a United States citizen and a resident of the State of Florida. While holding the rank of Captain in the United States Marine Corps, Lt. Col. Sanborn was held as a prisoner of war by Iraq from February 9, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

41.     Plaintiff Commander Lawrence Slade is a United States citizen and a resident of the State of Virginia. While holding the rank of Lieutenant in the United States Navy, Commander Slade was held as a prisoner of war by Iraq from January 21, 1991, when his plane was shot down over Iraq, until March 4, 1991, when he was released. He is a POW Plaintiff.

42.     Plaintiff Mrs. Anna Slade is a United States citizen and a resident of the State of Virginia. She is the spouse of Commander Lawrence Slade and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

43.     Plaintiff Major (Ret.) Joseph Small is a United States citizen and a resident of the State of Wisconsin. While serving in the United States Marine Corps, Major Small was held as a prisoner of war by Iraq from February 25, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

44.     Plaintiff Mrs. Leanne Small is a United States citizen and a resident of the State of Wisconsin. She is the spouse of Major Joseph Small and was his spouse throughout his period of captivity. She is a Family Member Plaintiff.

45.     Plaintiff Staff Sergeant (Ret.) Daniel Stamaris is a United States citizen and a resident of the State of Alabama. While serving in the United States Army, Staff Sergeant

Stamaris was held as a prisoner of war by Iraq from February 27, 1991, when his helicopter was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

46.     Plaintiff Captain (Ret.) R. Dale Storr is a United States citizen and a resident of the State of Washington. While serving in the United States Air Force, Captain Storr was held as a prisoner of war by Iraq from February 2, 1991, when his plane was shot down over Kuwait, until March 5, 1991, when he was released. He is a POW Plaintiff.

47.     Plaintiff Mr. David Storr is a United States citizen and a resident of the State of Virginia. He is the brother of Captain R. Dale Storr. He is a Family Member Plaintiff.

48.     Plaintiff Mr. Douglas Storr is a United States citizen and a resident of the State of New Jersey. He is the brother of Captain R. Dale Storr. He is a Family Member Plaintiff.

49.     Plaintiff Ms. Diane Storr is a United States citizen and a resident of the State of Montana. She is the sister of Captain R. Dale Storr. She is a Family Member Plaintiff.

50.     Plaintiff Lt. Col. Robert Sweet is a United States citizen and a resident of the State of West Virginia. While holding the rank of Lieutenant in the United States Air Force, Lt. Col. Sweet was held as a prisoner of war by Iraq from February 15, 1991, when his plane was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

51.     Plaintiff Mr. Arthur Sweet is a United States citizen and a resident of the State of West Virginia. He is the father of Lt. Col. Robert Sweet. He is a Family Member Plaintiff.

52.     Plaintiff Mrs. Mary Ann Sweet is a United States citizen and a resident of the State of West Virginia. She is the Lt. Col. of Major Robert Sweet. She is a Family Member Plaintiff.

53.     Plaintiff Mr. Michael Sweet is a United States citizen and a resident of the State of West Virginia. He is the brother of Lt. Col. Robert Sweet. He is a Family Member Plaintiff.

- 17 -

54.     Plaintiff Lieutenant Colonel (Ret.) Jeffrey Tice is a United States citizen and a resident of the State of Arizona. While holding the rank of Major in the United States Air Force, Lieutenant Colonel Tice was held as a prisoner of war by Iraq from January 19, 1991, when his plane was shot down over Iraq, until March 5, 1991, when he was released. He is a POW Plaintiff.

55.     Plaintiff Lieutenant (Ret.) Robert Wetzel is a United States citizen and a resident of the State of Colorado. While serving in the United States Navy, Lieutenant Wetzel was held as a prisoner of war by Iraq from January 17, 1991, when his plane was shot down over Iraq, until March 4, 1991, when he was released. He is a POW Plaintiff.

56.     Plaintiff Mrs. Jacqueline Wetzel is a United States citizen and a resident of the State of Colorado. She is the spouse of Lieutenant Robert Wetzel and was his fiancée throughout his period of captivity. She is a Family Member Plaintiff.

57.     Plaintiff Mr. William Wetzel is a United States citizen and a resident of the State of Florida. He is the father of Lieutenant Robert Wetzel. He is a Family Member Plaintiff.

58.     Plaintiff Mr. James Wetzel is a United States citizen and a resident of the State of Florida. He is the brother of Lieutenant Robert Wetzel. He is a Family Member Plaintiff.

59.     Plaintiff Mr. Edward Wetzel is a United States citizen and a resident of the State of New Jersey. He is the brother of Lieutenant Robert Wetzel. He is a Family Member Plaintiff.

60.     Plaintiff Ms. Margaret Wetzel is a United States citizen and a resident of the State of Florida. She is the sister of Lieutenant Robert Wetzel. She is a Family Member Plaintiff.

61.     Plaintiff Mr. Paul Wetzel is a United States citizen and a resident of the State of Colorado. He is the brother of Lieutenant Robert Wetzel. He is a Family Member Plaintiff.

62.    Plaintiff Mrs. Kathleen Farber is a United States citizen and a resident of the State of Maryland. She is the sister of Lieutenant Robert Wetzel. She is a Family Member Plaintiff.

63.    Plaintiff Mrs. Anne Kohlbecker is a United States citizen and a resident of the State of New Jersey. She is the sister of Lieutenant Robert Wetzel. She is a Family Member Plaintiff.

64.    Plaintiff Mrs. Sally Devin is a United States citizen and a resident of the State of New Jersey. She is the sister of Lieutenant Robert Wetzel. She is a Family Member Plaintiff.

65.    Plaintiff Commander (USNR) Jeffrey Zaun is a United States citizen and a resident of the State of New Jersey. While serving as a Lieutenant in the United States Navy, Commander Zaun was held as a prisoner of war by Iraq from January 17, 1991, when his plane was shot down over Iraq, until March 4, 1991, when he was released. He is a POW Plaintiff.

66.    Plaintiff Mr. Calvin Zaun is a United States citizen and a resident of the State of New Jersey. He is the father of Commander Zaun. He is a Family Member Plaintiff.

67.    Plaintiff Mrs. Marjorie Zaun is a United States citizen and a resident of the State of New Jersey. She is the mother of Commander Zaun. She is a Family Member Plaintiff.

68.    Plaintiff Ms. Linda Zaun Lesniak is a United States citizen and a resident of the State of New Jersey. She is the sister of Commander Zaun. She is a Family Member Plaintiff.

## DEFENDANTS

69.    Defendant the Republic of Iraq is a "foreign state" as defined by 28 U.S.C. § 1603, whose activities of torture and resulting tortious personal injury of American POWs and their families as set forth in this Complaint are within the exceptions to jurisdictional immunity of a foreign state pursuant to the Foreign Sovereign Immunities Act, as amended. On September 13, 1990, following its invasion of the State of Kuwait, Acting Secretary of State Lawrence

- 19 -

Eagleburger caused to be published in the Federal Register his determination that Iraq was a state sponsor of terrorism. See Determination Iraq, 55 Fed. Reg. 37, 793 (Sept. 13, 1990) (stating that "Iraq is a country which has repeatedly provided support for acts of terrorism") (originally to be codified at 15 C.F.R. § 785.4(e), now redesignated as 15 C.F.R. § 785A.4(e)); Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19, 25 (D.D.C. 2001). The Republic of Iraq was so designated throughout the period in which the acts complained of in this Complaint occurred. Its officials, employees and agents carried out the torture and related mistreatment of American POWs in Kuwait and Iraq, with the resulting personal injury to plaintiff POWs and their family members as set forth in this Complaint, while acting within the scope of their office, employment or agency. Irrespective of individual and institutional responsibilities that also exist, the Republic of Iraq is responsible for the torture of Plaintiffs.

70.     Defendant the Iraqi Intelligence Service is an "agency or instrumentality of a foreign state" as defined by 28 U.S.C. § 1603(b) and, as such, is a "foreign state" within the meaning of § 1603. The Service and its officials and employees are officials, employees or agents of the Republic of Iraq who participated in and provided material support and resources to the acts of torture and related mistreatment of American POWs and their families as set out in this Complaint. A Department of Defense Report to Congress, discussed subsequently in this Complaint at paragraph 80, notes that the POWs were held at the Iraqi Intelligence Service Regional Headquarters, which was apparently intended to be the POWs' main long-term incarceration site. Moreover, an official United States Report to the United Nations Security Council, discussed subsequently in this Complaint at paragraphs 81-87, notes that "the POWs' treatment while in the hands of Iraqi intelligence . . . personnel was barbarous, cruel, and in clear violation of the GPW."

71.    Defendant Saddam Hussein, former President of Iraq, was an "official" of Iraq within the meaning of § 1605(a)(7), as amended.  Similarly, for purposes of § 1605(a)(7), as amended, he was also an "agency or instrumentality of a foreign state" as defined by 28 U.S.C. § 1603(b) and, as such, is a "foreign state" within the meaning of § 1603.  Saddam Hussein was the President, and dictator, of a single-party totalitarian state and simultaneously the Head of the State, the Chair of the Governing Council, the Chairman of the Party, the exclusive appointing authority for all government offices, the director of the budget, the Commander-in-Chief of the Military, and at least the de facto head of the Intelligence Service and all other agencies and instrumentalities of Iraq.  See Hill v. Republic of Iraq, Civ. Act. No. 99-3346 (TPJ), Slip Op. at 20 (Dec. 5, 2001).  As President of Iraq at the time of the torture of American POWs, and the resulting injury to them and their family members as set out in this Complaint, Defendant Saddam Hussein is responsible for their tortious and unlawful treatment while acting within the scope of his office.  He is sued in his official capacity as President of Iraq.  In that office, he had both direct command responsibility for the torture and related mistreatment of American POWs in Kuwait and Iraq and responsibility for provision of material support to such acts by Iraqi forces.  Further, all of the assets of Iraq were ultimately subject to the direction and control of Defendant Saddam Hussein during his time as President of Iraq.  In addition, he is sued here in his individual capacity.  While serving as President of Iraq it is thought that Saddam Hussein hid billions in assets around the world in personal bank accounts.  In addition, the John Doe Defendants are all those, as yet unidentified or unknown to Plaintiffs who participated in, supported, or were otherwise responsible for the torture of Plaintiffs while acting under actual or apparent authority, or color of law, of the Republic of Iraq.

## STATEMENT OF FACTS

*General*

72.     On August 2, 1990, at the direction of Iraqi President Saddam Hussein, a massive

Iraqi force attacked the State of Kuwait. Within days, Kuwait was completely occupied.

Subsequently, Saddam Hussein ignored repeated binding United Nations Security Council

resolutions condemning the Iraqi invasion and demanding immediate and unconditional

withdrawal. In response, on November 29, 1990, the United Nations Security Council passed

Resolution 678, authorizing United Nation member states "to use all necessary means" to uphold

and implement these earlier Security Council resolutions and "to restore international peace and

security in the area."

73.     After an extensive effort to obtain Iraqi compliance without the use of force, on

January 16, 1991, an international coalition force of thirty-three nations led by the United States

commenced active hostilities against Iraq to enforce the rule of law. Initial actions by the

defensive coalition focused on air operations intended to gain air superiority, to reduce the

effectiveness of Iraqi ground forces, and to degrade the threat of Iraqi Scud missile and potential

nuclear, chemical and biological capabilities. On February 24, 1991, following expiration of a

coalition deadline for Iraq unconditionally to withdraw its forces from Kuwait, the coalition

forces began a ground campaign to force compliance by Iraq with the Security Council mandate.

74.     From January 17, 1991, until repatriation over several days from March 3-9,

1991, a number of coalition forces, including the American POW Plaintiffs in this Complaint,

fell into Iraqi hands as Allied POWs. Most were in planes that were downed over Iraq or

Kuwait. Some were severely wounded when captured. All told, a total of twenty-one American

service members were held in captivity by Iraq during the Gulf War. Seventeen of those American service members, and certain of their close family members, have joined in this action.

75.    The American POWs were physically abused by their Iraqi captors in violation of the Geneva Convention Relative to the Treatment of Prisoners of War, known widely as the "Third Geneva Convention" or simply the "POW Convention," and were otherwise mistreated in violation of the POW Convention or the Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, known as the "GWS Convention." All POWs joining in this Complaint were tortured by Iraq during their captivity, a grave breach of the POW Convention. The individual circumstances of that heinous torture, and the resulting physical injury, pain and suffering, and other damages, in the case of each of the POW Plaintiffs is subsequently set out in this fact section of the Complaint under the heading *Plaintiff Specific* from paragraphs 97 to 363.

76.    The American POWs generally were held by Iraq in unsanitary conditions, without adequate clothing or heat to protect them from the severe cold, and were subjected to starvation diets. They were required to sleep on concrete or tile floors with no bedding. Their cells were infested with large cockroaches. This severe mistreatment resulted in continuing pain and illness, including "bed sores" all over their bodies, aching and soreness on pressure points from sleeping on the hard floor, cramping, dysentery, giardiasis, and rapid and substantial weight loss, and such mistreatment was the cause of severe and prolonged suffering.

77.    The POWs were also placed by Iraq in legitimate military targets and used as human shields, in violation of the POW Convention. On January 21, 1991, Iraq brazenly announced this policy of discrimination and coercion over Baghdad Radio, presumably both as part of its overall climate of torture of the POWs and to coerce the Coalition into restricting its

- 23 -

legitimate defensive efforts. This intentional act by Defendants was also squarely within the meaning of "torture" as defined by section 3 of the Torture Victim Protection Act of 1991, as incorporated into § 1605(a)(7), which defines "torture" to include intentional infliction of suffering for the purpose of "intimidating or coercing that individual or a third person" or "for any reason based on discrimination." When Allied forces bombed the Iraqi Regional Intelligence Service Headquarters, a legitimate military target, on February 23, 1991 with 2000-pound bombs (not knowing that POWs were illegally being incarcerated by Iraq at that site), many of the POW Plaintiffs narrowly escaped death. Indeed, it may well have been the near miraculous cancellation of subsequent sorties against the Headquarters that thankfully spared the lives of many of the POW Plaintiffs.

78.     None of the American POWs was permitted the right of correspondence to notify their families of their "capture, address and state of health" as required by the Geneva POW Convention. The requests of both the American POWs and the ICRC for notification of capture pursuant to the provisions of the POW Convention were systematically turned down by Iraq, as a calculated part of their ruthless torture of the American POWs and their family members. Indeed, for the POWs, this was a special dimension of the torture and mental anguish as they worried about their loved ones. This worry for the well-being of family members was compounded by their tormentors' threats of more beatings if they did not disclose their family members' home addresses. This generated fear of plans to target family members with terrorism and further fear that the POWs would be chopped up and have their body parts sent home to their families, as had been threatened. For spouses and other family members in the United States, the tortious failure by Iraq to permit notification, as part of what was really an extraordinary overall ecology of torture for the POWs, produced further mental anguish as the fate of loved ones went

unanswered. For those who learned of their spouse's or relative's capture through released Iraqi

propaganda tapes or otherwise, the mental agony was in knowing of the likelihood that their

loved one was being subjected to torture. This was based on what was known from Iraqi

treatment of POWs during its previous eight-year war with Iran, estimates from the Defense

Intelligence Agency known to our military, information of torture and abuse then coming out of

occupied Kuwait, and the horrific condition of the POWs as revealed by Iraq's own propaganda

tapes. A further source of anguish for the POW family members was that their loved ones were

to be used as human shields at strategic targets, as had been announced by Iraq over Baghdad

Radio only five days after hostilities began. The individual circumstances and effects of this

mental anguish of the spouses and other principally affected family members during the captivity

of their loved ones is subsequently set out in this fact section of the Complaint under the heading

*Plaintiff Specific* from paragraphs 364 to 595.

79.     The American POWs and their families have continued to suffer over the years

since repatriation in many ways as a result of Iraq's brutal torture of their loved ones. For many

tortured POWs and family members, the physical and mental effect of the torture and mental

anguish produced lasting damage, with effects on their marriages, effects on relations with their

family members, effects in their employment and professional life, and other long-lasting effects.

Again, the individual circumstances of these lasting effects are subsequently set out in this fact

section of the Complaint under the heading *Plaintiff Specific* from paragraphs 97 to 595.

80.     Official confirmation of the torture and other mistreatment of United States

POWs by Iraq during the Gulf War appears in an April 10, 1992, U.S. Department of Defense

Report to Congress on the Conduct of the Persian Gulf War. Appendix O to this Report, entitled

"The Role of the Law of War" includes the following points about the Iraqi mistreatment and

torture: "[o]n arrival in Baghdad, most Air Force, Navy, and Marine POWs were taken immediately to what the POWs referred to as 'The Bunker' (most probably at the Directorate of Military Intelligence) for initial interrogation. They then were taken to what appeared to be the main long-term incarceration site, located in the Iraqi Intelligence Service Regional Headquarters (dubbed 'The Biltmore' by the POWs). Since this building was a legitimate military target, the detention of POWs in it was a violation of Article 23, GPW [the Geneva Prisoner of War Convention]; POWs thus were unnecessarily placed at risk when the facility was bombed on 23 February. In contravention of Article 26, GPW, all U.S. POWs incarcerated at the 'Biltmore' experienced food deprivation. U.S. POWs also were provided inadequate protection from the cold, in violation of Article 25, GPW. . . . All U.S. POWs suffered physical abuse at the hands of their Iraqi captors, in violation of Articles 13, 14, and 17, GPW. Most POWs were tortured, a grave breach, in violation of Article 130, GPW. Some POWs were forced to make public propaganda statements, in violation of Article 13, GPW. In addition, none were permitted the rights otherwise afforded them by the GPW, such as the right of correspondence authorized by Article 70. Although the ICRC had access to Iraqi EPWs [enemy prisoners of war] captured by the Coalition, ICRC members did not see Coalition POWs until the day of their repatriation." See Appendix O, "The Role of the Law of War," in U.S. Department of Defense Report to Congress on the Conduct of the Persian Gulf War (10 April 1992), reprinted in 31 Int'l Legal Materials 615, at 630 (1992).

81.    Further official confirmation of the brutal torture and mistreatment of American Gulf War POWs in violation of the most basic of civilized standards for the treatment of POWs is provided in a report of the United States Government transmitted by the Deputy Permanent Representative of the United States to the President of the United Nations Security Council on

March 19, 1993, entitled "Report on Iraqi War Crimes (Desert Shield/Desert Storm)." [U.N.

SCOR Rep., U.N. Doc. S/25441 (1993) ("Report")] This Report to the Security Council

prepared by the War Crimes Documentation Center of the Judge Advocate General of the Army

and dated January 8, 1992, includes the following with respect to the torture of American POWs:

"Specific Iraqi war crimes, which have been extensively documented by the War Crimes

Documentation Center include . . . [t]orture and other inhuman treatment of Coalition and U.S.

prisoners of war, in violation of Articles 13, 17, 22, 25, 26, 27, and 130, GPW . . . [and] [u]sing

Coalition prisoners of war as human shields to render military objectives immune from military

operations, in violation of Article 23, GPW." Report at 16-17; "Each American POW was

subjected to physical torture and/or mental abuse, and many of the types of torture projected by

DIA [Defense Intelligence Agency], including the use of electrical shocks and the holding of

mock executions, were frequently used." Report at 21. The Report concludes its discussion of

the mistreatment of POWs with the summary that "Iraq committed numerous grave breaches of

the GPW with regard to its treatment of U.S. POWs during the Persian Gulf War. As

summarized above, most of the male POWs endured torture and inhumane treatment, 'causing

great suffering or serious injury.'" Report at 38.

     82.    This Report also notes, of relevance with respect to a general climate of torture

and fear and pervasive discrimination against coalition force POWs, that not only were the

POWs subject to physical abuse during interrogation, but they were also routinely the victims of

abuse "because their captors felt like abusing them." Report at 25. In this connection, the

Report notes "[a]ll of the POWs suffered physical abuse which did not occur during

interrogation." Id. One POW, for example, described being "beaten constantly during transport,

including [being beaten] to the rhythms of a song on the radio." Id.

83. With respect to torture during interrogation, this Report says "[a]ll of the male POWs except two reported physical abuse or torture during interrogation. Typically, the POWs were tortured when they refused to answer questions such as: – the types of weapons carried on a pilot's aircraft . . . ." Report at 28. As a partial description of this torture during interrogation the report says: "The abuse or torture during interrogation included: . . . multiple beatings with sap mitts, blackjacks, batons, rifle butts . . . a pistol . . . dry-fired in his mouth . . .; hit on legs including broken leg, and neck with heavy pendulum-like object (he felt that his skull was going to crack . . .) . . .; threatened with dismemberment . . .; struck on right ear three times, perforating eardrum . . . beaten with mallet on both knees . . .; assaulted twice with cattle prod . . . assaulted with stun gun . . . shocked with 'Talkman' . . .; struck seventy to one hundred times with rubber hose and hit on ear with cupped hands over twenty times in two to three hour interrogation . . . automatic pistol dry-fired next to ear . . .; threatened with castration . . .; beaten severely with 4' long bamboo stick . . . beaten with cat-o'-nine-tails . . .; head ground into floor by interrogator . . .; and flogged with cat-o'-nine-tails . . . ." Report at 29-30.

84. As to living conditions during captivity, the Report says "[a]ll of the POWs reported harsh living conditions at odds with the mandates of the GPW. They described the cells as extremely cold and barren . . . . The POWs were not issued adequate clothing, blankets, or bedding to protect themselves against the cold. They suffered extreme food deprivation." Report at 34.

85. Further, with respect to Iraq's mental torture of POWs by not letting them notify their loved ones of their captivity, the Report says "Iraq 'provided no information regarding U.S. . . . POWs' during hostilities" and "Iraq . . . never complied with the POWs' requests . . . to fill out capture cards." Report at 37. The fear and anguish of family members either knowing or

- 28 -

hoping that their MIA loved ones had been taken as POWs would be considerably heightened by Iraq's announcement on January 21, 1991, over Baghdad Radio, that allied POWs would be placed in strategic sites. Report at 32. With respect to this announcement in flagrant disregard of the POW Convention, the Report states, "Iraq kept its promise." Id.

86.    With respect to the Article 16 obligation in the Geneva POW Convention not to discriminate in treatment of POWs based on "race, nationality, religious belief or political opinions or any other distinction founded on similar criteria," this Report on Iraqi War Crimes describes how "[a]t least six American male POWs were 'accused' or suspected of being Jewish by the Iraqis and underwent circumcision inspections and other forms of physical and psychological harassment as a result . . . . [One] POW . . . related one incident when, after having already been accused of being Jewish, he was told one afternoon that he would be executed that very evening. He was then asked whether he wanted to go to a Protestant or Catholic church to make his peace with God. He believes that the Iraqis were trying to trick him into saying that he wanted to go to a synagogue instead . . . . [Another] POW . . . reported that he became quite uneasy when he was quizzed on Christian doctrine . . . because he was suspected of being Jewish. The prevalence of this harassment implies an intention by the Iraqis to treat Jews more severely than POWs from other ethnic backgrounds . . . ." Report at 28.

87.    This official United States Report on Iraqi War Crimes also makes clear the responsibility of President Saddam Hussein, the Iraqi Intelligence Service, and the Government of Iraq for the torture of American POWs. Thus, the Report says "[t]he investigation concludes that Iraqi violations of the law of war were widespread and conducted pursuant to the orders or with the approval of the national leadership of Iraq." Report at 6. The Report further notes that "the Center [the War Crimes Documentation Center] has accumulated extensive circumstantial

- 29 -

evidence to support a *prima facie* case that the mistreatment of U.S. prisoners of war occurred

with at least the acquiescence, and probably at the direction, of the Iraqi leadership." Report at

11. Further, it points out "[r]esponsibility for the treatment of . . . prisoners of war in Iraqi hands

clearly lay with the Government of Iraq and its senior officials." Report at 18. In addition, it

says "Saddam's complete and pervasive control of his military as well as objective evidence of

that control in the form of orders signed by him or issued under his authority show that the

charged violations of the GPW were committed as a result of his orders, were carried out with

his knowledge and approval, or were acts of which he should have had knowledge." Report at

37-38. The Report also particularly notes the barbarous treatment of American POWs while in

the hands of Iraqi intelligence officials. Thus, it says "the POWs' treatment while in the hands

of Iraqi intelligence . . . personnel was barbarous, cruel, and in clear violation of the GPW."

Report at 35-36.

88.     The publicly available evidence consistently shows that Iraq's infliction of severe

and prolonged pain and suffering on the American POWs in Iraq's custody and physical control

was intentionally inflicted for the purpose of obtaining information or a confession, punishing

them for being members of the United Nations coalition defending against Iraq's aggression, or

discriminating against them as Americans or members of the coalition armed forces, thus

squarely meeting the definition of torture as defined in "section 3 of the Torture Victim

Protection Act of 1991" for purposes of 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1). For example,

in an interview taped on January 21, 2002, for Fox News' program "The O'Reilly Factor," Air

Force Major Robert Sweet described his torture by Iraq as: "they beat on you with some kind of

radiator hose. Hurts like hell . . . . you sit in a chair, and the guy's wailing on you . . . [and it

takes] . . . hours . . ." As to explanations for the torture by his captors: ". . . it was just . . . you're

American, criminal, and all that standard stuff . . . . every time I would get interrogated . . . they'd take you out, beat . . . you, ask you questions . . . ." It should be noted in this connection that it is not only the beatings and other horrors inflicted during interrogation that meet the relevant statutory definition of torture for purposes of §§ 1605(a)(7) and 1605(e)(1), but also the "revenge" beatings inflicting severe pain and suffering as "punishment" for an act that individual or a third person has committed or is suspected or having committed, or intimidating or coercing based on "discrimination of any kind" because the individuals were Americans or members of the United Nations coalition armed forces carrying out their legitimate military assignments. Both of these modes of torture repeatedly run through the Iraqi treatment of the American POWs, from their initial capture through interrogation and captivity. Nor is the legal definition of torture as the intentional infliction of severe pain or suffering for punishment or discrimination (that is, as including "revenge"), as well as for the obtaining of information or a confession, peculiar to the legal definition of the term. Webster's New World Dictionary (Third College Ed. 1988), also defines torture to include: "the inflicting of severe pain to force information or confession, get revenge, etc." Id. at 1412. This ordinary language use of the term also includes "any severe physical or mental pain; agony; anguish."

89.    The trauma of Iraqi torture for the coalition POWs and their families has produced a number of books by POWs or family members describing the terror and mental anguish. Because these books provide a publicly available detailed look at Iraq's torture from the POWs and family members themselves, this Complaint sets out a few excerpts from these books. Obviously, the fact that an individual Plaintiff has not had either the opportunity or the inclination to write about their horrific torture by Iraq, and its effects on themselves and their families, should not in any way affect their legal right to monetary damages in this action.

- 31 -

90.    A book by John Nichol and John Peters, two United Kingdom Royal Air Force POWs, entitled Tornado Down, presents a riveting description of the daily horror for coalition POWs held by Iraq. In an audio tape of the book, read by the authors, Nichol describes a brutal beating and mock execution of Commander Larry Slade, one of the Plaintiffs in this action, witnessed by Nichol when they shared the same cell and he and Commander Slade were punished for a communication with other prisoners. Nichol describes how he watched "frozen with horror" as Slade was "punched to the ground," receiving "a concerted, merciless avalanche of furious blows and thudding kicks." Nichol described how "when he [Commander Slade] stopped moving they kicked him viciously hard a few more times for good measure," and he concluded that "it was as bad, if not worse, than anything in the interrogation." Nichol goes on to describe the mock execution of himself and Larry Slade, as the Iraqis pulled their gun and pointed at Slade saying "you are dead" and "you are now going to die," moving closer to Larry until he could see down the barrel of the gun, and then pulling the trigger, "click." He described the setting as one in which they were "a heart beat away from death," and he indicated how the Iraqi "sneered at the expression on our faces [after the mock execution], and walked away laughing." See Tornado Down, read by John Nichol and John Peters (audio book Hodder Headline Audiobooks 1996, at tape 4); see also John Nichol & John Peters, Tornado Down, at 212-13 (Penguin Books 1998).

91.    Another book, The Gulf Between Us, A Story of Love and Survival in Desert Storm, written by Cynthia B. Acree with Colonel Cliff Acree, USMC, vividly describes both the horrifying torture endured by one of the American POW Plaintiffs and the agony of his wife through the continuing ordeal. Colonel Acree describes how his "trip to hell" began when his Marine OV-10 was shot down by a SAM missile over Kuwait on January 17, 1991. His torture

- 32 -

from the Iraqis began in Kuwait shortly after he was taken captive. He describes how he and his

back seat Aerial Observer and fellow Marine, Chief Warrant Officer Guy Hunter, were beaten

while still in Kuwait: "Eight to ten Iraqis descended upon Guy and me and began pummeling us.

They hit and kicked us in the head, the stomach, the groin, you name it. Handcuffed and

blindfolded, we never knew where the blows were coming from and were helpless to dodge

them. . . . Each blow to my head made my neck feel like it was being slashed with a knife.

Unable to shield myself, I gritted my teeth as more thugs joined in the beating frenzy. The men

shouted and laughed hysterically, relishing their chance at revenge. After several minutes of

gang battering, they took off our blindfolds. Blood trickled down to my chin." Cynthia B. Acree

with Colonel Cliff Acree, The Gulf Between Us, A Story of Love and Survival in Desert Storm,

63-64 (Brassey's 2001). He also describes the threat by his Iraqi interrogators, while he was still

being held in Kuwait, to kill or dismember him if he did not cooperate: "'You must answer this

question *immediately* or you will be shot . . . .'" Id. at 63. "'You must answer all questions or

you will be subject to extreme pain and torture.' He stared into my face. 'The last Iranian

prisoner of war I interrogated was a pilot who would not cooperate with us,' he said. I stiffened,

holding my breath. 'They removed one testicle from him – over a period of three days. Then

they removed his other.' He seemed to find the memory pleasing. 'Then they cut off his toes

and then they cut off his fingers. He begged them to kill him.' Sweat ran down my back." Id. at

66. Colonel Acree continues, describing the beating he and Guy Hunter received while in transit

from Kuwait to Iraq: "Periodically, and without warning, they beat Guy and me with their fists,

with the butts of their rifles, and with blackjacks, leather-covered bludgeons that act like spring-

loaded whips. For seven or eight hours they beat us. The awkward position of my wrists

cinched up behind my back was excruciating, but the cuffs tightened automatically if I tried to

move. By now my hands were swollen to twice their size. They had no feeling and were turning

blue. Metal prongs skewered my wrists; the handcuffs were severing nerves." Id. at 74.

92.     Colonel Acree's torture only got worse in Iraq. In chapters describing his

treatment at an Iraqi Interrogation Center on January 19 and 20, he writes how, after his

interrogators learned of a neck injury, they concentrated on beating his neck: "'You are lying! . .

. If you continue lying, you will soon die.' After the next blow, it took every ounce of my

control not to cry out. . . . The pain was unbearable. I had learned an important lesson: Conceal

your injuries." He continues: "Being savagely beaten for a minute would feel like Einstein's

idea of eternity. The minutes go on and on, and you have no idea if they'll ever stop – or stop

before you're dead." Id. at 79. "My turn at interrogation would come. The dread, the

apprehension, the fear – waiting to be hauled to my feet was pure terror." Id. at 85. "The

interrogations were gruesomely the same: me in a chair, blindfolded and handcuffed; an

interrogator; and three to five heavy-handed types with a gung-ho enthusiasm for brutality. That

first day at the interrogation center, the beatings continued around the clock. Every beating

started out with fists and then graduated to a variety of instruments." Id. at 85-86. Colonel

Acree further described how he was subjected to a terrifying inspection of his genitals. "I made

it through the inspection with my genitals intact. Much later I learned the purpose of this bizarre

inspection: The Iraqis were looking for pilots who were Jewish, unaware that many American

males are circumcised regardless of their religious beliefs." Id. at 87. In these Chapters about

the Iraqi interrogation center, Colonel Acree describes beating after beating, repeated mock

executions, injection with a drug which made the whole right side of his body numb, and other

tortures. Id. at 90-97. And he describes how he was forced to go in front of a television camera

for Iraqi propaganda: "I didn't have many options left. I had been knocked unconscious I don't

know how many times. My brain was jarred, my flesh was bruised and torn. My captors hit me so hard, so often, and with so many instruments, I expected the next blow to kill or cripple me. I didn't know that my skull was cracked and my facial bones were broken. All I knew was I hurt like hell and wouldn't survive this much longer. I had no choice but to face that camera." Id. at 93.

93.    This book also describes the mental agony of Colonel Acree's wife, Cynthia B. Acree, also a Plaintiff in this case, as she hears nothing from Iraq on her husband's capture as a POW. She learns of his captivity, rather than his death, only by the Iraqi propaganda film her husband was forced to make. She further describes her fear when the International Committee of the Red Cross had been unable to visit the POWs, and her awareness during her husband's captivity of Iraq's statements to the world that it would locate the POWs around potential bombing targets and use them as hostages. She writes: "After his appearance on Iraqi television, no word came on Cliff's condition. As the days passed, my euphoria over learning that he was alive faded. I began the long wait, filled with rumors of death and endless questions: Had the Iraqis kept him alive after the filming? Was he being starved or tortured? The International Committee of the Red Cross (ICRC), in charge of inspecting conditions of prisoners of war, had tried repeatedly – and unsuccessfully – to visit the POWs. Iraq's refusals made us even more fearful about the POWs' health and location. On January 21, Radio Baghdad had reported that Iraq intended to locate POWs in and around likely Coalition bombing targets. The day before, Iraqi radio claimed several U.S. pilots held as human shields had been wounded in air strikes." Id. at 121.

94.    This book by Cynthia and Colonel Acree also vividly illustrates how the pain and suffering from Iraq's torture of the POWs, and the suffering of their families, was not ended at

repatriation, but has continued. Following Colonel Acree's release, doctors at Bethesda Naval Medical Center "reported that he had suffered a 'chronic cervical strain from concussive trauma sustained while ejecting and during interrogative beatings . . . multiple recurrent episodes of head trauma with resultant loss of consciousness of unknown duration with associated post-traumatic periods of amnesia . . . nasal fractures . . . obvious flattening deformity and deviation of the nasal structures . . . airway obstruction caused by blunt trauma . . . olfactory nerve damage, smell ability impaired to all modalities . . . hearing loss . . . radial nerve injury and weakness of the interosseous, grip strength, and thumb extensors of both hands, right more than left, secondary to tightly bound handcuffs . . . expected complications of weight loss, malnutrition, and diarrheal disorders secondary to inadequate food intake and contaminated water sources . . .' He would need reconstructive surgery to restore his sense of smell and normal breathing." Id. at 256-57. The book goes on to describe the repeated reconstructive surgery of Colonel Acree and the additional challenges presented for him in his military career. In their dust jacket comment about this book, George and Barbara Bush sum it up for all of the POWs and their families: "we . . . add our own two voices to praise Cliff's devotion to duty and Cindy's quiet courage."

95.     Colonel David Eberly, the senior Coalition POW of the Gulf War, has also written a moving account of Iraq's torture during his captivity. In Faith Beyond Belief, Colonel Eberly describes how he was threatened with death during interrogation and the inhumane conditions of his incarceration. He relates how, during an interrogation "the guy put the gun to my head. 'You answer my questions or you die, here.' We had come to the end. In my mind I could picture a scene out of the movies where the side of my head would be blown out." David Eberly, Faith Beyond Belief, A Journey to Freedom, 57 (Brandylane Publishers, Inc. 2002). He writes of another interrogation: "one of their favorite tricks was to try and ease around to my

side and then smack the side of my head, trying to burst an eardrum.. . . [and] [w]ith some

Arabic expletive he slam-cocked an automatic pistol he must have been holding and jammed the

barrel against the side of my head. It all happened so quickly. My thoughts raced to *the valley of*

*the shadow of death* . . . ." Id. at 122-23. He also describes the terror of the bombing on

February 23, resulting from Iraq's policy of using the POWs as human shields: "[k]aboom! A

second stunning explosion from the other end of the building. They can't get any closer, I

thought. Are we going to die right here? I heard the ceiling in the hallway collapsing and from

deep underneath the floor, pipes burst and water gushed. Over and over, I prayed. . . . I sat tight

– frozen in a ball, hard-pressed against the wall. Another rocking explosion. This time

seemingly on the backside of the building. . . . Inside, it seemed as though the whole place was

collapsing." Id. at 131. In describing one of his jail cells he writes: "Inside the cell, conditions

were appalling. We would never have left Ted, our Airedale, in such a place. The space was

approximately four by five feet." Id. at 61. As Colonel Eberly was released into the custody of

the International Committee of the Red Cross on his forty-third day of captivity he described his

appearance following his starvation as: "I could see my pelvis area was sunken as though a

soccer ball had displaced a mud hole. Someplace I had seen that skeleton before – maybe in an

old WWII movie. The skin on my chest hung in folds on my ribs and, on my legs over my

knees." Id. at 178. In his remarks at Andrews Air Force Base on his hero's welcome home to

America he included a tribute to the family members of the POWs, who also suffered so much.

He said simply and powerfully: "And I saved the best for last. You need to know that those who

waited also served." Id. at 194.

     96.     The February 4, 1991, issue of *Newsweek*, featuring a cover photo of a battered

Lt. Jeffrey N. Zaun appearing in a coerced "confession" staged for Iraqi TV, poignantly suggests

the fear generated for "those who waited" by Iraq's staged TV "confessions," use of POWs as human shields, and other evidence as to Iraq's likely torture of their loved ones. Indeed, this article, which was read by family members of POWs and MIAs during the War, sharpened for many the fear that their loved ones, if still alive, were being brutally tortured. A feature article in this issue entitled "Torture and Torment" describes the coerced television appearances of coalition POWs, their use as human shields, and Iraq's past brutality to POWs in its war with Iran. It says: "Images told more than any word about the reality on the screen. Out of consideration for frightened relatives, the Pentagon refused to speculate on whether the prisoners had been beaten. Saddam refused to let the International Red Cross examine them. . . . The prevailing view was that during the first 48 hours after capture, the men had been beaten into [coerced "confessions"]. . . . Outraged, Under Secretary of State Robert Kimmitt summoned Iraq's charge d'affaires to the State Department and shoved a copy of the Geneva Conventions into his hand along with a formal diplomatic protest. . . . The more serious warning came from Defense Secretary Dick Cheney, who said Saddam would not be able to obstruct the air war by using POWs as human shields. . . . Some [American pilots] were worried that Iraqi agents would get their home addresses and organize terrorist attacks on their families. . . . Saddam didn't let the Red Crescent inspect his prisoner-of-war camps until his war with Iran was almost over; but a United Nations study reported many head wounds among POWs, with scars, bruises, broken teeth and other signs of frequent brutality. . . . Iraqi interrogators will probably try to pry sensitive military data from Saddam's POWs as fast as they can. . . . Saddam and other thugs can use torture in all shapes and sizes. . . . Saddam's prisoners, are now scattered and deployed as human shields [but the Pentagon does not know where he is holding them.] . . . . This article

also vividly described the brutal torture of American POWs in Vietnam. See Tom Mathews, Torture and Torment, *Newsweek*, at Feb. 4, 1991, at 50-54.

*Plaintiff Specific*

## POW PLAINTIFFS

97.    The following specific information as to each POW Plaintiff is presented in alphabetical order.

### Colonel Clifford Acree

98.    Then-Lt. Col. Clifford Acree – the Commanding Officer ("CO") of his Marine squadron – was flying a twin-engine, two-seat plane for light attack, air control and reconnaissance with Marine Chief Warrant Officer Guy Hunter when the two were shot down over Kuwait on January 18, 1991 (the second day of the Gulf War). Iraqi soldiers wielding AK-47 rifles picked up Acree about ten minutes after he had landed in Southern Kuwait.

99.    Shortly after his initial capture, a group of soldiers pushed him face down on the ground and wrenched his arms behind his back as one of them handcuffed him. Then, to get the device as tight as possible, the Iraqi stood on Acree's handcuffs, forcing the metal claws into his wrist bone. The handcuffs were clamped so tightly around Acree's wrists that they cut off his circulation. His hands turned purple and swelled to three times their normal size.

100.    After being blindfolded, Lt. Col. Acree and Hunter were driven in a large SUV for about eight to ten hours to Baghdad. Iraqi soldiers were seated in front of, beside, and behind them, and they beat the two airmen the entire way, at times with the butts of rifles and blackjacks. Along the way to Baghdad, they were taken to underground bunkers for interrogations and more beatings.

101.    The next three days in Baghdad were the most brutal for Acree.  Interrogations continued around the clock, separated into episodes of twenty minutes to an hour each.  During the interrogations, Acree endured violent beatings from hands, feet, and instruments.  He sustained blows and kicks to his head and torso.  Blindfolded and handcuffed, Acree could not see the instruments, but at times they created a swishing noise before they hit him.  Other times, they were larger and packed a more devastating punch, with a telltale "whoosh" preceding each blow.

102.    Lt. Col. Acree's neck, injured during ejection from his plane, was a particular focus of his captors, who attacked it repeatedly over his first three days in Baghdad.  Acree's interrogators beat him into unconsciousness numerous times.  This was a preferable result for him given the treatment he endured while awake.

103.    On one occasion, he remembers hearing a sound indicating something large was about to strike him.  He envisioned a 4x4 post hitting the front and right side of his head.  The blow lifted him up and out of his chair and onto the floor.  Before he fell unconscious, he thought this blow had killed him.  When he came to, the side of his head was bleeding and rested on top of one of his captors' boots.  It was likely in this series of interrogations that Lt. Col. Acree suffered a skull fracture just below his sinus cavity.  His nose was broken during this attack, as well as on several subsequent occasions.

104.    Several times over the first few days of his captivity, Acree's captors held mock executions in an attempt to extract information from him.  During one of his early interrogations, he was asked for strategic information, and when he did not supply it, a guard put a pistol to his head.  Thinking his life was about to end, Acree asked to be allowed to pray.  The interrogation then continued without bullets being fired.  On another occasion, an interrogator held a pistol to

his head, pulled the hammer back, and asked him a tactical question. As Acree repeatedly

refused to answer his interrogators' questions, they became increasingly angry and more severe

beatings ensued.

105.    These episodes led Lt. Col. Acree to believe with certainty he would be killed. In

fact, for these first four days, he maintained a constant sense that he had less than an hour to live.

During one interrogation at this location, his captors lifted his blindfold. He saw an Iraqi soldier

holding an AK-47 rifle and a brass bullet. The blindfold was replaced, and Acree heard the

bullet being loaded into the chamber. He then felt the rifle against his chest and could tell the

soldier was shaking. The possibility that the jostling rifle might discharge by accident provided

more torment to the prisoner than he had already endured. The interrogator told Acree if he did

not cooperate, he would be killed. Still, Lt. Col. Acree refused to cooperate with the

interrogator's demands.

106.    During an interrogation on Acree's third day in Baghdad, he felt someone rubbing

his left arm, and then a needle being injected into it. The left side of his body grew warm and he

entered a drugged state. He was determined to reveal no information that could hurt allied forces

and it required all his mental effort to discern which answers contained classified information.

Only through extreme effort and sacrifice was he able to withstand their efforts to extract such

information.

107.    For several days after these initial interrogations and beatings, Lt. Col. Acree

could not walk or lift his head, and any movement was extremely difficult and painful.

108.    On the night of January 31, 1991, Lt. Col. Acree was transferred to the "Biltmore"

prison. At the Biltmore (as at the other prisons), he was kept in solitary confinement. His cell

was just eight feet by twelve feet. The only light entering was through a slit in the steel door and

a narrow window high on the back wall. A broken toilet stood toward the back of the wall, filled not with water, but with excrement. He was given only two thin blankets to sleep with on a red tile floor. The blankets provided almost no protection against the "bone-chilling" cold. As described by Acree, the cold and damp from the floor penetrated the lower blanket as if it were thrown over a block of ice. Early in his captivity, Iraqis had taken his flight suit, underwear, and warm socks and boots and replaced them with a canvas uniform and cloth shoes.

109.    Severely malnourished at the Biltmore, Acree lost thirty pounds during his captivity as a prisoner in Iraq. While he was fed nothing for his first two days at the Biltmore, Lt. Col. Acree was soon forced to endure a starvation diet of one bowl of broth per day, sometimes with a piece of small, thin bread. At times, he ate scabs off his body to reduce his intense hunger and to stop his stomach from churning. On one occasion, Lt. Col. Acree found a piece of moldy bread lying in dirt beneath the toilet in his cell. He held it up to his face, but the bread's stale urine smell nauseated him and he threw it back to the floor. He realized he was being methodically starved. Many days later, he again picked up the moldy bread. This time, he shoved it in his mouth and swallowed it as fast as he could. Lying in his cell he could "feel his body consuming itself."

110.    During every moment of his time at the Biltmore, the fear of death hung over him. The worst violence occurred during interrogations. Because of his senior rank, his status as a pilot and a CO, the timing of his capture at the beginning of the war, and his resistance to interrogation, Lt. Col. Acree suffered especially savage beatings. Acree felt panic every time he heard the guards' footsteps, as he knew he could be taken into another interrogation.

111.    Throughout his imprisonment at the Biltmore, guards engaged in forms of torture other than physical assaults. They frequently insulted, threatened, tormented, and terrorized him.

- 42 -

Guards spat on him and woke him when he slept. He was often told the Allies were being defeated and he would never leave the prison, even after the war was over. During his last interrogation at the Biltmore, he was told that if he did not cooperate with them the next day, they would use a new form of torture on him. Specifically, the guard said: "Tomorrow there will be ten questions. If you have ten good answers, you will have ten fingers. And if there are ten bad answers, you will have no fingers." He continued: "The torture will continue, and we will send your body home in pieces to your wife."

112.    Fortunately for Lt. Col. Acree, that night Allied forces – not knowing of the presence of the POWs in this lawful military target – dropped four 2,000-lb. bombs on the Biltmore, an Iraqi intelligence headquarters. The bombing reduced much of the Biltmore to rubble and the POWs were transferred to the "Joliet." There, Lt. Col. Acree received one meager meal per day. While at the Joliet, Acree developed conjunctivitis and had to deal with lice infestation.

113.    Soon, Acree was transferred to a prison termed the "Bat Cave" by the POWs. Here he developed a severe intestinal disorder, likely due to the unsanitary conditions in which he was held. Shortly thereafter, he was released to the Red Cross. Given the brutal treatment he had endured, Lt. Col. Acree remained convinced he could still be killed at any moment. It was not until he was safely out of Iraqi airspace that he believed he was truly free.

114.    At no point during his forty-seven days in captivity did Iraq notify the ICRC, or any other organization of Lt. Col. Acree's status as a POW. Lt. Col. Acree was virtually certain his wife had been given no information about his well-being and this caused him great concern for her emotional health. He also worried about her personal safety, as he feared his captors could locate her and cause her harm.

115.    Even after his return to the United States, Col. Acree has not escaped the effects of the abuse inflicted upon him by Defendants. Among other things, he has undergone four painful reconstructive surgeries to repair his shattered nose and align airways in his skull. Each surgery has brought back vivid flashbacks of his interrogations.

116.    For months after his release, Col. Acree had no feeling in his hands – a condition that caused him great concern about his ability to resume his full duties as CO and resume flying. To this day, Acree suffers ongoing numbness in two fingers of his right hand that began during his days as a prisoner in Iraq.

117.    He has had hearing loss, and sudden noises – such as the crashing of ice cubes in a hotel icemaker or a window slamming shut – still startle him. Tomato-based soup evokes memories of his starvation diet.

118.    Col. Acree's neck often becomes stiff and painful, leaving him incapacitated – typically for two to five days at a time – until the problem resolves itself.

119.    Acree has been diagnosed with Post-Traumatic Stress Disorder that arose from his experiences in captivity. He has also been diagnosed with "posttraumatic headaches" that are similar to migraine headaches and are traceable to the torture he endured in Iraq. He describes his quality of life, during the twelve years since his release, as "significantly degraded."

120.    Several years after his return from captivity, Colonel Acree experienced a major depressive episode. He was placed on medical leave and required seven months of treatment.

### Colonel Craig Berryman

121.    Then-Marine Corps Capt. Craig Berryman was shot down near Kuwait City on January 28, 1991. Capt. Berryman's wingman saw his plane hit the ground and explode, but did not see a parachute emerge. Nevertheless, Berryman did eject from his aircraft. After landing,

he checked himself for broken bones and noticed that his neck was cut during his ejection. He attempted to evade capture before eventually being picked up by Iraqi troops. He was unable to make radio contact with U.S. military personnel before being captured.

122.    Upon apprehension, Iraqi soldiers immediately began beating Capt. Berryman with their fists and rifle butts.

123.    During his subsequent transport to Kuwait City, Capt. Berryman was taken to two bunker complexes where he received a bandage for his neck and underwent mild interrogations. Before leaving the first bunker, he was blindfolded. The third bunker was in Kuwait City itself, and the interrogations became much more serious. Here, an Iraqi officer asked Capt. Berryman tactical questions, which Berryman refused to answer, giving only his name, rank, and serial number in response. The interrogator pointed out to Capt. Berryman that his failure to make radio contact with any military personnel meant that he was assumed dead and that the Iraqis could therefore kill him with impunity. Berryman was extremely concerned that his family would have to go through life never knowing what happened to him. Indeed, Iraq never notified the ICRC or any other organization of Capt. Berryman's status as a POW. This thought preyed on him during the entire period of his captivity.

124.    When Capt. Berryman still declined to answer further questions, the interrogator said, "You've just made a big mistake." The interrogator then stepped out of the room and the two remaining guards began to beat him. They slammed rifle butts to his shoulder blades and beat his head with their fists. The guards knocked Capt. Berryman facedown on the ground, cuffed his hands behind his back, and then jerked him back up by the chain linking his handcuffs, making them as tight as they could possibly go.

125.   Soon, the guards brought him out of the bunker and a dozen Iraqi soldiers punched, kicked, and spat on him on his way to the Armored Personnel Carrier (APC) that would take him to Basra, Iraq. Capt. Berryman tried to imagine ways he could escape. While waiting for the APC to move, he soon felt a guard running his fingers through his hair, as if to make a sexual advance toward him. This worried Berryman greatly, but before long two other guards jumped in for the trip north, and the suggestive touching stopped. The guards then began beating Capt. Berryman's head. A boxer in college, Berryman had learned how to take a punch so the blow could be absorbed with minimal damage. Eventually, the guards figured out his strategy. Then the guard who had been running his fingers through Capt. Berryman's hair held Berryman's head against his knee while the other two guards alternately punched him. This technique ensured Capt. Berryman would have to take the full impact of each punch. The APC stopped at several checkpoints along the way to Basra, and Capt. Berryman was beaten by the guards at these stops.

126.   Iraqi Republican Guard soldiers interrogated Capt. Berryman in an old school house in Basra. They asked him what religion he practiced. When Capt. Berryman answered that he was a Baptist, they accused him of being a Jew and expressed anger that he would lie to conceal this "fact." A guard then hit his left leg with an instrument that felt like a heavy stick below his knee. Berryman immediately collapsed in excruciating pain, as this blow had broken his fibula in his left leg. Another guard then used a similar club to attack his right leg. The two guards continued beating him as he rolled around on the floor, trying to protect his left leg. At one point, Capt. Berryman caught a glimpse of the guards from under his blindfold. The guard on the left had a metal pipe, and the one on the right had what appeared to be a wooden axe handle. Capt. Berryman realized that, if they kept beating him like this, he would soon die. Still,

he lied when his interrogators asked questions about Allied military strategy and when they insisted that pleading ignorance was not a sufficient response.

127.    Two guards then took Capt. Berryman to another room.  The interrogator waiting in this interrogation room explained to him that they would break his other leg if he did not answer their next questions.  He stalled as long as possible by claiming not to understand the interrogators' accented English and saying that he needed to use the bathroom.  The interrogator became frustrated and then allowed him to go to the bathroom.  However, stopping just outside the bathroom, the two guards were joined by four other guards, who surrounded Capt. Berryman.  Two guards pinned him to the wall and one of them kicked Capt. Berryman's left leg, causing him to collapse to the ground in pain.  The others swarmed, kicking and beating him.  One guard used a steel-toed boot to kick a chunk of muscle out of Berryman's leg.  After several minutes, the guards picked him up and put him against a wall.  One guard lit a cigarette and pressed it against Capt. Berryman's forehead.  He repeated this three times and then burned Berryman's nose with the lit cigarette.  He eventually put the cigarette out in the ejection wound in Berryman's neck.

128.    An Iraqi officer then came to collect Capt. Berryman and drive him to Baghdad. Once in the Iraqi capital, guards put him into a prison cell, where he tried to protect his leg as best he could.  Berryman also listened closely to his environment, and he could clearly hear other American POWs being beaten by their Iraqi captors.  This was among the worst sounds Capt. Berryman remembers from his experience as a POW – both because it was excruciating to hear a comrade suffering and because he knew that his turn to be beaten was just around the corner.

129.    Soon his cell door opened and two guards entered.  The larger one kicked Capt. Berryman's left leg and punched him as hard as he could.  After about five minutes of

continuous beating, the two guards left. From the sounds, it appeared to Berryman that they were moving down the hallway and entering the cells of other POWs to beat them. This cycle repeated itself two more times. At the last session, Capt. Berryman asked the two guards what they wanted, and they replied that they wanted to kill him.

130.    The next day, Capt. Berryman was driven to downtown Baghdad and taken to what he initially believed was either an abandoned warehouse or a part of a high value target, which he feared was a possible bombing target for Allied aircraft. He later learned it was a prison camp, which came to be known as the "Bungalows" by the POWs.

131.    On the night of January 31, Capt. Berryman was taken to the "Biltmore" prison, where he was kept in solitary confinement in a six-by-ten-foot cell with almost no light and a non-functioning toilet at the back. Berryman was fed two scoops of broth and two small pieces of pita bread each day. Guards gave Berryman two thin blankets, which offered little protection against the freezing Baghdad nights. After a couple of weeks, he began to lose feeling in his hands and feet because of the severe cold. Capt. Berryman lost twenty-five pounds in thirty-seven days due to the systematic starvation and brutal cold he endured as a POW in Iraq.

132.    The interrogations for Capt. Berryman continued at the Biltmore. They varied in length from five minutes to several hours, depending on how persistent his questioners were determined to be. The beatings during these interrogations continued as well. After a time, these beatings became almost an out-of-body experience for Capt. Berryman, as the pain was so overwhelming that his body would become numb and he seemed to watch the interrogation from a third-person's viewpoint. In addition to fists, the guards often used instruments, including rubber hoses, clubs, and pistol barrels, in beating Capt. Berryman. During one of these interrogations, a guard put a pistol to Berryman's head and told him that if he did not answer the

remaining questions correctly, he would die. There was not a time that Capt. Berryman did not fear for his life when he was held as a POW in Iraq.

133.    On February 23, Capt. Berryman's interrogation was proceeding normally until the guards suddenly unlocked his handcuffs and held his hands on the table in front of him. The interrogator then stuck a knife between two of his fingers and announced that Berryman would have to answer five questions. For each insufficient answer, the interrogator would cut off one of his fingers. The fear overloaded Capt. Berryman to the point that almost any answer he gave was nonsensical. The interrogator eventually realized the tactic was not working and had the guards put the handcuffs back on before promising they would have a similar interrogation several days later.

134.    Later that night, Allied planes bombed the Biltmore, and Capt. Berryman was transported with the other POWs to the "Joliet" civilian prison. There, a large trough served as a source for drinking water and general cleaning up, so it quickly became contaminated and unsafe to drink. Capt. Berryman contracted dysentery that severely plagued him for two years after his return to the United States and continues to cause problems today.

135.    Capt. Berryman was released into the hands of the Red Cross on March 5, 1991. Only then did he receive appropriate medical attention for his broken leg and other injuries.

136.    Colonel Berryman thinks about the torture he experienced in Iraq every day of his life. Nightmares about his time there continued for about three months after returning to the United States. He was grounded from flight status during this time as well. To this day, he cannot stand to have anyone touch his wrists, as nerve damage from the handcuffs he wore has never fully healed.

137.    Colonel Berryman believes that he is more withdrawn and solitary now than before he was captured as a POW. This emotional shift inward caused great strain to his marriage that he and his wife have resolved only with significant effort.

### Staff Sergeant (Ret.) Troy Dunlap

138.    On February 27, 1991, U.S. Army Staff Sergeant Dunlap was on a search-and-rescue mission in a Blackhawk helicopter when it was shot down over Iraq. He survived the violent crash, along with U.S. Army Major Rhonda Cornum and U.S. Army Staff Sergeant Daniel Stamaris. Iraqi troops quickly captured Sgt. Dunlap and Maj. Cornum, abandoning Sgt. Stamaris at the crash cite. Dunlap was handcuffed, tied, spat upon, and kicked.

139.    Shortly after being captured by Iraqi soldiers, a higher-ranking Iraqi officer approached, said something in Arabic, and then said in English, "Kill him." One of the soldiers put a pistol to Dunlap's head and pulled the trigger. Fortunately, the pistol was not loaded. Then the soldiers loaded Dunlap and Cornum into the back of a truck with two armed guards.

140.    The truck drove Sgt. Dunlap and Maj. Cornum about five miles to an underground bunker complex, where Dunlap underwent his first interrogation. The questions concerned the details of his mission, and the interrogators pounded Dunlap's head with a pistol when he gave answers they did not like. Meanwhile, a child of about ten years of age pointed an AK-47 rifle at Dunlap to keep him from moving. He spent the next two days in this room, after which he was put in the back of another truck and taken to a town, where the guards allowed civilians to hit him and spit on him.

141.    That night, guards locked Sgt. Dunlap in a room, tied him to a chair, and tied his hands behind his back. They then covered him with a blanket that had been soaked in kerosene and left him for the night.

142.    The next day, Sgt. Dunlap was taken to a prison, where he remained for the next three days. At one point, guards approached Dunlap in his cell and told him to stand up. When he refused, the guards kicked his legs repeatedly until he did. Guards at the prison took numerous opportunities to kick Dunlap and slam his head with guns.

143.    Dunlap was then taken to another prison, where more interrogations followed. During these sessions, the guards put scorching hot spoons to the back of his neck to draw more information out of him. Every time during his interrogation that they did not believe his answers, they put these hot spoons on him. The spoons burned his neck and caused blisters. The guards also repeatedly threatened to kill him, kicked him, and hit his head with pistols and rifle butts during these interrogations.

144.    Sgt. Dunlap lost eighteen pounds in his seven days as a prisoner in Iraq due to the starvation diet he was afforded during his time there. The unsanitary conditions he endured also resulted in severe intestinal problems, including dysentery, which manifested itself several days before his release.

145.    At no point did Iraq notify the ICRC or any other organization of Sgt. Dunlap's status as a POW. While Dunlap requested the opportunity to send a card or a letter to his family to let them know his whereabouts, Iraq never allowed him to do so.

146.    Sgt. Dunlap continues to have nightmares – on average twice every week – about his torture in Iraq. He indicates that these usually include Arabic shouting, gunfire and bright lights. This image can also be triggered during the day. He also suffers from sleeplessness and a loss of patience that did not haunt him before his time as a POW. Dunlap has been diagnosed with Post-Traumatic Stress Disorder, and he experiences flashbacks that take him back to his

- 51 -

time as a POW. He also believes that his torture by Iraq may also have played a part in his subsequent divorce.

### Colonel (Ret.) David Eberly

147.    Col. David Eberly – the highest ranking Gulf War POW – was shot down while flying at 21,000 feet and 580 knots over northwest Iraq on January 19, 1990. Forced to eject at high altitude, Col. Eberly and his crewmember, Major Thomas Griffith, suffered from the effects of rapid cockpit decompression and hypoxia (the loss of consciousness due to lack of oxygen in the brain). Compounded by exposure to the high-speed windblast and the missile fragmentation wounds, Col. Eberly lost consciousness.

148.    After regaining consciousness, Col. Eberly fearfully avoided an armed enemy search team and then rejoined Major Griffith. Together, they spent three nights evading detection by Iraqi troops. In fear for their lives, they headed toward the Iraq-Syrian border. At the border, as they approached an apparently deserted shack to get relief from the cold, they were surrounded and targeted by a barrage of automatic weapons fire. Eventually, the Iraqi soldiers ceased firing and dragged them into the shack.

149.    The soldiers knocked them around and then took them outside where they ran them through a gauntlet of six troops who spit on them and kicked and hit them repeatedly before throwing them in the back of a pickup truck. Taken to an area commander's house, they were chained to a cot for the night.

150.    After more threatening interrogations, they were paraded through a small town and exposed to angry mobs. Handcuffed in the back seat of a small car, they were attacked by civilians waving sticks and attempting to overturn the vehicle. A grapefruit-sized rock was used to smash the rear window.

151.    Col. Eberly and Maj. Griffith were then driven to Baghdad. Along the way, they were again exposed to angry civilians.

152.    After arriving in Baghdad, Col. Eberly's captors put him in a dirt-floored, wooden stall with no heat. The guards punched him at random; one in particular threatened to kill him with a knife. He was then taken to an underground bunker for more formal interrogation. Again, they threatened to kill him. This time, one interrogator put a nine-millimeter pistol to his temple and pulled the trigger when Col. Eberly refused to denounce the Allied invasion of Iraq. The videotape of this interrogation was broadcast in the United States on January 25, 1991. Interrogations continued nearly every day for a week.

153.    Late at night on January 31, Col. Eberly and other prisoners were taken to the maximum-security area of the Iraqi Intelligence Headquarters (nicknamed the "Biltmore"). Here, no provisions were made for toilet facilities, and the prisoners were forced to urinate and defecate in their cells. Additionally, there was no heat, and Col. Eberly was forced to sleep on the cement floor with minimal protection from the cold. Col. Eberly's daily diet was one ladle of broth and a piece of pita bread. Water was often withheld.

154.    Col. Eberly entered Iraq weighing 145 pounds, but dropped below 100 pounds due to the starvation diet he suffered as a POW. Asking for more food or water often resulted in a smaller portion. One guard often spit at him and uttered a pejorative regarding "George Bush." Col. Eberly believed that he and the other POWs were being held as human shields against prospective allied aircraft targets.

155.    Guards at the Biltmore put Col. Eberly through numerous psychologically-oriented interrogations. In one of these, an interrogator told him that Iraq had won a major battle to the south, that Iraqi forces had captured 20,000 POWs, and that they would make an example

of him as the senior prisoner. They told him they were going to take him "downtown" and let the angry civilians kill him. With the video of the hanging of Lt. Col. William R. Higgins (who was murdered on a U.N. mission to the Middle East in 1990) fresh in his mind, Col. Eberly was severely tormented by this possibility. On two other occasions during interrogations, guards pulled the trigger on a pistol held at his head.

156.    As the senior officer, Col. Eberly persisted in his efforts to seek better treatment for his fellow prisoners by repeatedly asking that they be given water, food, and blankets. His requests were met with threats and more harsh treatment.

157.    On February 21 and 22, the guards dragged a sobbing prisoner from his cell, chained him near Col. Eberly's door, and beat him unmercifully. Col. Eberly heard them kick the man, slam his head against the floor, and beat him with a chain. They did not stop despite the prisoner's screams. This was extremely unnerving to Col. Eberly and the other prisoners. During the beating the second night, the guards opened Col. Eberly's door and took him to a room down the hall. They told him to drop his pants and then inspected his genitals to see if he was circumcised. Knowing the Iraqis had cut off the genitals of Iranian POWs, this petrified him.

158.    When Allied aircraft bombed the Biltmore on February 23, the guards dragged the prisoners onto a bus. The Arab prisoner who had suffered the savage beating outside Col. Eberly's cell was also thrown on the floor of the bus at their feet. In the dim light, Col. Eberly could see his brutal wounds. When the man started screaming again, the guards beat him with the truncheons. Then, they dragged him off the bus, and Col. Eberly could hear a chain being wrapped around the rear bumper. The bus moved forward approximately 100 feet and then

stopped. Again, Col. Eberly heard the chain noise, and then the guards threw the prisoner back on the bus. The prisoner was silent. Fear of similar treatment paralyzed the Allied prisoners.

159.    The bus took the POWs to the notorious civilian prison, Abu Gharib, nicknamed "Joliet." The next morning, the guards took the prisoners, including Col. Eberly, to a small courtyard between the cellblocks and forced them to sit crossed-legged in the sun with blankets over their heads. Col. Eberly asked to go to the toilet and then was placed near a guard. The armed civilian said, "You American." Col. Eberly asked him if he had ever been there and the guard responded, "No, but someday I will go to America and kill your family."

160.    His cell at Joliet was even smaller than previous cells – approximately five feet by four feet. The conditions were extremely unsanitary, resulting in severe gastro-intestinal problems. Here, the prisoners were also subjected to harsh treatment and witnessed severe beatings of another prisoner. This caused increased anguish and psychological unnerving.

161.    At no time did Iraq release Col. Eberly's name to the ICRC or any other organization to confirm his status as a POW.

162.    Knowing the uncertainty his family faced created great psychological pain and anguish for Col. Eberly, as his captors gave him no opportunity to notify them that he was alive.

163.    Col. Eberly continues to suffer mental torment from his facial scars and from the torture he endured as a prisoner in Iraq. Flashbacks are often triggered by seemingly unremarkable changes in his environment such as cold chills, the sound of the wind, or distant noises. He believes he is less tolerant now than before his inhumane treatment and that he avoids confrontation as a reminder of the Iraqi captors who tormented him daily with threats on his life.

164.    Col. Eberly suffers great continuing stress from helping his family, especially his son, cope with the trauma he and they endured from his time as a POW in Iraq.

## Lieutenant Colonel (Ret.) Jeffrey D. Fox

165.    Lt. Col. Jeffrey Fox was returning to his home base in Saudi Arabia when his aircraft was shot down over southern Iraq on February 19, 1991. He immediately used his radio to call for help, but he had to abandon the rescue attempt because he was quickly overtaken by Iraqi soldiers. These soldiers drove him away on a motorcycle.

166.    The two soldiers drove him to several bunkers, where Lt. Col. Fox went through interrogations by soldiers and civilians. Eventually, he was taken to a small room in a large building, where he was blindfolded, handcuffed, and tied to a chair. He could hear men walking around, and they began beating him. The first blow broke his eardrum and knocked Fox to the floor. They continued to beat him and ordered him not to yell in pain.

167.    Soon, the men took him to another building where others asked Lt. Col. Fox questions about his ethnic background. These people stripped off Fox's pants and examined his genitals to see if he had been circumcised. They then accused him of being an Israeli fighter pilot.

168.    Lt. Col. Fox was soon taken to the "Biltmore" prison. Fox was kept in solitary confinement and given two blankets as meager protection against Baghdad's freezing winter nights. He was fed one ladle of thin red soup – essentially greasy water – each day, sometimes with a piece of bread and minimal drinking water. His unsanitary living conditions, including a broken toilet at the back of his small, concrete cell, were standard for POWs at the Biltmore.

169.    Whenever the guards took him to the bathroom or an interrogation, they would beat him along the way, including with blows to the head and kicks to his groin. Fox describes recurrent beatings and interrogations, including beatings with a rubber mallet or baton and strikes

by hands on his neck and shoulders. He also describes kicks and strikes with a rubber baton to his right (injured) knee. No active medical care or treatment was given for his injuries.

170.    During one questioning session at the Biltmore, the interrogator asked Fox details of the bombing of a particular site. When he did not reveal them, guards put him in a truck and drove him to a room in a different building. They said they would ask him one question, and that if he did not answer it to their satisfaction, they would kill him. They then repeated the question about the bombing, he did not answer it sufficiently, and they fired a gun near his right ear. The guards then put him back in the truck and returned him to his cell. Subsequently, Fox experienced some hearing deficit and tinnitus in the right ear.

171.    Fox, as with other American and allied POWs, was held as a human shield to guard against prospective bombing by Allied forces. Allied forces, who did not know the location of the POWs, did bomb the Biltmore on February 23, and the POWs were moved to a civilian prison.

172.    At no point did Iraq release Lt. Col. Fox's name to the ICRC or any other organization to confirm his status as a POW.

173.    On his return to the United States, Lt. Col. Fox had a hearing deficit and tinnitus in his right ear, pain and decreased range of motion in his right knee, with swelling, and some loss of extension of the right elbow. He underwent surgery for right anterior collateral ligament reconstruction and for perforation of the right tympanic membrane, and he underwent physical therapy for his knee and treatment for diarrheal illness, secondary to giardia lamblia. A former marathon runner, Lt. Col. Fox to this day cannot run because of the permanent damage his captors inflicted upon his knee. In addition, he still experiences "ringing" in his right ear, and he has low iron problems, which he has been told may be due to the giardia he suffered in Iraq.

174.    Following his release from Iraq, he has experienced a severe drop in patience that has rendered him unable to tolerate disagreement, especially in the workplace. He believes that this lack of patience has had a negative impact on his career since leaving the U.S. Air Force and that it is attributable to his torture by Defendants.

### Chief Warrant Officer (Ret.) Guy Hunter

175.    Chief Warrant Officer Guy Hunter was flying in a twin-engine, two-seat plane for light attack, air control and reconnaissance over southern Kuwait with Lt. Col. Cliff Acree when the two were shot down on January 18, 1991. After ejecting from the plane, Iraqi soldiers were upon them almost immediately.

176.    The soldiers put Hunter in the back of a truck and took him to a nearby command post in Kuwait. After blindfolding him and tying his hands behind his back, they took him to an underground bunker, where they interrogated him. After this initial interrogation, the soldiers took Hunter outside, handcuffed him, and tied another blindfold around his head. They marched him around and beat him severely before forcing him to kneel on the ground. Warrant Officer Hunter thought he was about to be executed.

177.    Soon, Hunter and Acree were put in a truck and driven for one-and-a-half days. Their captors played the radio and beat the two prisoners in time to the music. At checkpoints during this trip, they were beaten before they were handed over to each set of captors, and then they were beaten by the new captors. Hunter was beaten unconscious at least four times during his first day of captivity. He later told Acree that he thought they "wore out six sets of beaters" that day. During this trip from Kuwait to Iraq, his captors cruelly tightened his handcuffs when he requested that they be loosened.

- 58 -

178.    During his first night in a holding cell, he underwent another interrogation. At this time, his handcuffs were cinched tighter. The pressure swelled his hands to the point that he could not use them.

179.    He remained in handcuffs for about five days, with only brief occasional breaks when he was allowed to use the bathroom. After this initial period, he was handcuffed every time he was moved and during every interrogation.

180.    After his night in the holding cell, a bus transported Hunter to Baghdad, where he was taken to an underground facility, which he understood to be the main intelligence center. Here, he was interrogated an additional two to three times. He was again beaten into unconsciousness. During these interrogations, his captors stuck a gun to his head and down his throat and threatened him with death in their attempts to draw information from him. They also repeatedly wrenched his handcuffed arms up, causing excruciating pain.

181.    Four times during his captivity, his captors held mock executions wherein they pushed his head to the side with a gun, paused for about ten seconds, and pulled the trigger.

182.    Within several days of his initial capture, Warrant Officer Hunter's captors forced him to make a video making statements about "peaceful Iraq" to be broadcast on international television. Before making the video, they hit him on the head and knocked him unconscious twice, and he feared he would be killed.

183.    Eventually, Hunter was taken to another prison. There, an Iraqi general made the prisoners line up and he told Hunter specifically that he would never go home, even after the war was over. Hunter described this experience as "bone-chilling."

184.    At the end of January 1991, Hunter's captors took him to the "Biltmore," where they kept him in solitary confinement in a concrete cell with almost no light and a non-

functioning toilet. They slowly starved him for three weeks. During this time, Hunter received only one small bowl of thin red soup and a little water each day.

185.    Hunter lost about thirty pounds due to the starvation diet he endured as a prisoner in Iraq. After approximately three weeks of this treatment, he took stock of his condition and determined that he would waste away and die within another three to four weeks if this treatment continued.

186.    In addition to his physical and psychological abuse, Hunter's eyes became infected and he developed running sores from the conditions of his captivity. He often had to pry his eyes open in the mornings with his fingers because they had sealed shut with pus from the infections. While in Iraq, he never received medical attention to correct these problems.

187.    Hunter was interrogated another three to four times while he was at the Biltmore. His captors hit him in the back of his head when they did not like the answers he gave, which was often. On February 23, they threatened that, during the next day's interrogation, for every unsatisfactory answer he gave, they would cut off a finger from his hands.

188.    That night, the Biltmore was bombed – a circumstance that saved Hunter from the extreme torture that he would have faced the next day. The POWs were then moved to another facility where their treatment improved slightly. Days later, just before his release, Hunter was allowed to bathe for the first time since his capture in order not to embarrass his captors by revealing his true condition at the time of his release. The next day, he was turned over to the ICRC.

189.    Hunter feared for his life about ninety percent of the time he spent as a prisoner in Iraq.

190.    Hunter suffered permanent nerve damage in his arms from the severe handcuffing that causes him pain to this day.

191.    Upon his release, he was in a "stupor" for about three years, and he believes that having gone through the ordeal as a POW has had serious lingering effects on the quality of his life.

192.    Even today, Hunter has nightmares arising from his captivity four or five times every week, including recurrent nightmares about hearing guards coming down a hallway to take him out of his cell.

193.    At no point during his forty-seven days in captivity did Iraq notify the ICRC or any other organization of Hunter's status as a POW.

### Specialist David Lockett

194.    Spc. David Lockett was driving with Spc. Melissa Coleman in a two-truck convoy that lost its escort and mistakenly crossed the Saudi Arabia-Kuwait border on January 30, 1991. Before the convoy could re-cross the border, Iraqi soldiers with AK-47 rifles assaulted Lockett's truck. Lockett suffered a gunshot wound to his abdomen in the ensuing melee. The soldiers then captured Lockett after he tried to escape.

195.    The soldiers drove Spc. Lockett and Spc. Coleman around that night and stopped to let different troops hit them. As they drove, the soldiers slammed Lockett's knees with the butts of their rifles.

196.    After the soldiers took the two Specialists to Basra, they put them through their first interrogation. They became very angry when Lockett told them nothing of strategic value. Lockett was tied to a chair, blindfolded, and had his hands tied behind his back. He also absorbed several blows to his head as the interrogators became increasingly furious with his

- 61 -

unsatisfactory answers. At one point, he could sense that one of the guards was mistreating Spc. Coleman. Lockett got his hands loose and managed to grab the guard's throat. The guard pulled a pistol on Lockett and threatened to kill him. Lockett released his grip. The guards then cracked his knees with their rifle butts and tied his hands tighter to avoid that possibility again. That night, Lockett was separated from Coleman and put into a prison cell in Basra.

197.    The next morning, the guards tried to remove the bullet from Spc. Lockett's abdomen without anesthesia. The pain was so intense that Lockett told them to leave it alone. Spc. Lockett did not receive any other medical attention for this injury for the rest of his time in Iraq.

198.    Lockett was soon transported to Baghdad, and was beaten along the way. Guards in the truck slapped him, slammed their rifle butts against his knees, and punched him in the stomach to exploit the injury to his abdomen.

199.    During an interrogation in Baghdad, Spc. Lockett revealed that he was married and had three children. His interrogators also asked Lockett for his home address, which they had already gained access to when they stripped him of his wallet at the initial capture. They threatened him with never seeing his wife and children again if he did not answer their questions.

200.    Spc. Lockett used anger to get himself through his time as a prisoner in Iraq and was not able to change this pattern upon returning to the United States. He believes that ordinary obstacles or small changes in a plan will frequently send him into rages that have had a debilitating effect on his family. The strains from Lockett's anger eventually proved too much for his marriage to sustain, and he was divorced shortly after his return from Iraq.

201.    Lockett continues to serve in the United States Army, but he has lost interest in progressing through the ranks.

202.    At no point did Iraq notify the ICRC or any other organization of Spc. Lockett's status as a POW, even though Lockett specifically requested the opportunity to inform his family that he was a POW in Iraq.

203.    Spc. Lockett's mother was extremely distressed by the uncertainty of the situation when her son was taken as a POW, but no news followed to confirm his status. Thinking he was dead, she suffered a nervous breakdown and eventually was forced to step down from her position as a registered nurse. Seeing this effect has caused Spc. Lockett great pain and guilt.

### Colonel H. Michael Roberts

204.    Iraqi troops shot down then-Capt. Mike Roberts' plane on January 19, 1991, and picked him up as soon as he parachuted to the ground. The soldiers took him immediately to a headquarters for the anti-aircraft artillery batteries in the area. Within a half-hour, his first interrogation began.

205.    If Capt. Roberts gave unsatisfactory answers or answered too slowly, his captors beat him with open hands, fists, and a club. He was blindfolded, so he could not tell who was in the room as this interrogation went on. His captors cut Capt. Roberts' head open with repeated blows from their rifle butts and burst an eardrum with an open hand to the side of his head. They also applied something akin to a cattle prod to the back of his neck, shoulders, and leg. This beating lasted all night.

206.    The Iraqi soldiers moved Capt. Roberts around in the first few days after he was shot down and put him through several interrogations. He was always handcuffed and blindfolded for these sessions, and the interrogations followed the pattern outlined in the previous paragraph. These beatings often concentrated on his right leg, to the point that his whole leg was black and he could not walk. On the second night, January 20, in addition to the

- 63 -

more typical beatings, Capt. Roberts' captors again shocked him on the neck and shoulders with an electrical device similar to a cattle prod. On the same night, he sat tied to a chair while an interrogator whispered, "You're a long, long way from Geneva now." He then said he would take Capt. Roberts outside and feed him to the wolves if he did not cooperate and that he would not return home after the war.

207.    Whenever the soldiers transferred Capt. Roberts to a new location, they took the opportunity to slam their rifle butts to his head and otherwise beat and kick him.

208.    On January 21, his captors tried to force Capt. Roberts to make a videotape denouncing the United Nations war effort and praising "peaceful Iraq." When he refused to make the tape, one guard slammed the bolt shut on his rifle, pointed the barrel at Capt. Roberts' head, and threatened to blow it off if he did not cooperate. He still refused, and his captors ordered a guard to take him outside and cut off his hand and leg. While he was still blindfolded, Roberts was led through what seemed like a doorway and to the outdoors. His captors kicked him all over his body and used a stick to beat the back of his head until he agreed to be videotaped.

209.    Capt. Roberts was moved to the "Biltmore" on the night of January 31. Guards at this prison held Roberts in a small concrete cell with a steel door and almost no light. A broken toilet in the back of the cell was the only toilet available to him, and horribly unsanitary conditions resulted. Capt. Roberts received a single cup of greasy water as food each day, plus minimal drinking water. Two thin blankets were all Roberts had as protection against the freezing winter nights and the concrete floor of his cell.

210.    Roberts lost thirty-five pounds due to the starvation diet he suffered during his time as a POW in Iraq.

211.    Interrogations of Capt. Roberts continued every couple of weeks, with physical abuse following each slow or unsatisfactory answer. Several times, interrogators pointed guns at Capt. Roberts' head and threatened to kill him for his lack of cooperation.

212.    Capt. Roberts developed severe intestinal problems after his transfer to the "Joliet" prison on February 23 because of the unsanitary conditions there.

213.    Capt. Roberts feared that he would die at the hands of his captors during his time as a POW in Iraq.

214.    At no point during his time in captivity did Iraq notify the ICRC or any other organization of Capt. Roberts' status as a POW. On one occasion, an Iraqi soldier tried to exploit the status of the Red Crescent (the sister organization of the Red Cross that covers countries in the Arab world) in an attempt to gain unauthorized information from Capt. Roberts. This soldier appeared at his prison cell in a military uniform without decoration, but with the Red Crescent patch on his arm. The soldier asked Roberts for the name and address of his family in the United States, so, he claimed, they could be notified of Roberts' whereabouts. When Capt. Roberts offered the address of his home base, the soldier got angry and demanded his family's address. When Roberts still refused, the soldier left without taking any address at all.

215.    Capt. Roberts' wife was eight months pregnant when he was shot down. He was greatly concerned about the uncertainty she endured while he was held in captivity, and he feared for the safety of his family in light of his captors' interest in learning his home address.

### Lt. Col. Russell Sanborn

216.    Iraqi soldiers shot down then-Capt. Russell Sanborn's single-seat aircraft over southern Kuwait on February 9, 1991. Within about twenty minutes, a group of Iraqi troops

picked Sanborn up. They shot weapons into the air and shot at his feet, as if in celebration of having captured a prisoner. Capt. Sanborn was in fear for his life.

217.    He was then taken to an underground bunker. Several hours later, the soldiers tied his hands behind his back, put a blanket over his head, and loaded him into a pickup truck. They drove for half an hour to another bunker, where a yelling and chanting crowd gathered outside.

218.    Inside the bunker was a corridor with roughly fifty soldiers lining the walls on each side. Capt. Sanborn was pushed down this gauntlet of Iraqi troops, under a blanket, and the troops took the opportunity to hit, kick, and strike him with hard objects that he assumed were rifle butts. They focused particularly on his head. When any of the tormentors knocked Capt. Sanborn to the floor, others swarmed and kicked him savagely. Capt. Sanborn thought he would be beaten to death.

219.    Once Capt. Sanborn reached the end of the hall, the soldiers tossed him into a room where he faced five or six high-level military officers. The officers threw him in the corner of the room and pulled the blanket off his head to reveal an apparently psychotic Iraqi civilian man, waiting to attack him. They then announced that, because Sanborn had killed the man's brother, they were going to allow the man to kill Sanborn. The officers then let the man attack Capt. Sanborn, whose hands were still tied behind his back, rendering him unable to defend himself effectively. After allowing this beating to continue for several minutes, which "seemed like an eternity" to Capt. Sanborn, the officers pulled the man away, replaced the blanket over Sanborn's head, and sent him back through the gauntlet of soldiers he had just left.

- 66 -

220.    After more punches, kicks, and rifle butts to his head on his way out of the bunker, Capt. Sanborn was put back into the pickup truck and driven to another bunker, where he was forced through a similar gauntlet of soldiers. This pattern then repeated itself a third time.

221.    The next day, soldiers drove Capt. Sanborn to Baghdad. Along the way, they stopped at five or six checkpoints, where various persons were allowed to punch him, kick him, and spit on him. During this trip, one soldier repeatedly rubbed the inside of Capt. Sanborn's leg, as if to threaten a sexual assault.

222.    Once in Baghdad, Capt. Sanborn was taken to a prison and put into a dark cell by himself. The only light came through a slit in the wall near the ceiling, and the small ray of light that came through was barely sufficient to allow Sanborn to tell whether it was night or day. His captors left Capt. Sanborn in this cell, with no change of clothes, no doctor, and no eating utensils. The sanitary conditions at this prison were horrendous. He eventually developed a rash on his groin and internal parasites.

223.    It was at this prison, two days after he was shot down over Kuwait, that Capt. Sanborn first received any food or water from his captors. His daily diet amounted to a ladle of greasy water with particles floating in it. He lost fourteen pounds in the twenty-six days he spent as a POW in Iraq. As he weighed about 155 pounds at the time of his capture, Sanborn did not have much weight to lose before his life was threatened by starvation.

224.    Capt. Sanborn was put through two interrogations at this prison. During the interrogations, he sat on a stool, blindfolded and with his hands tied behind his back. His interrogators beat him severely, both at the outset of the interrogation and during the questioning (whenever he failed to respond, responded too slowly, or gave an inadequate response). The guards used objects that Sanborn perceived to be blackjacks to beat his head and the rest of his

- 67 -

body, and they threatened his life constantly. They told him, "We control your life. We control everything about you. We control when you eat, when you live, when you die." The guards focused their blows on Sanborn's kidneys, his ribcage, and the back of his head and neck. They generally hit his face with an open hand.

225.    The guards also used a rubber hose to hit Capt. Sanborn's legs and back. These blows were excruciating and left welts that lingered. At times, the Iraqis put guns to Capt. Sanborn's head and told him he was about to die. They also smacked the sides of his head so hard they knocked him off his stool, loosened his teeth, and broke his eardrums. After his eardrum had been ruptured, he could not hear or understand the questions, and he was taken back to his cell.

226.    During his time in the cell, prison guards demanded that Capt. Sanborn stand whenever they came to see him. When he did not, they became angry and kicked him until he did stand. They used these and other tactics to dehumanize and degrade Capt. Sanborn generally.

227.    Capt. Sanborn repeatedly asked to see representatives of the Red Cross in an attempt to get word to his family that he was alive and where he was being held. Iraq denied these requests and never notified the ICRC or any other organization of Capt. Sanborn's status as a POW. Capt. Sanborn's captors demanded, however, to know his specific address in the United States, which he refused to divulge. This incident made him fear for the safety of his family.

228.    Lt. Col. Sanborn has his hearing checked every year, and it continues to decline eleven years after his interrogators burst his eardrums in 1991.

### Commander Lawrence Randolph Slade

229.    In the early morning hours of January 22, 1991, then-Lt. Lawrence Slade flew with Lt. Devon Jones, in an F-14 Tomcat in a multi-pronged strike on an airfield near Baghdad. A surface-to-air missile hit Slade's aircraft around 3:00 a.m., at which point the two ejected safely away from their plane's falling wreckage. Slade and Jones were separated. Jones fled North and was rescued the next day. Slade was not as fortunate.

230.    Shortly after daybreak, a Bedouin tribesmen, armed with a shotgun, and an Army soldier, armed with an AK-47 rifle, captured Lt. Slade and stripped him of everything but his flight suit. They then blindfolded and handcuffed Slade, with his hands behind his back, and he remained in that condition for the next two to three days. Slade was transported to Baghdad shortly after his capture. On one stop during this trip, as he was led for several hundred yards, blindfolded and handcuffed, from one compound back to the truck, many different people hit and kicked him repeatedly. After walking this gauntlet of blows, Slade was forcibly thrown off the curb and into the truck door, breaking his nose, chipping two teeth and splitting both lips. During this incident, he was struck from behind with a rifle and he fell forward on his face. All told, in this incident, he was hit approximately fifty times, with no attempt made by his captors to stop the violence directed at him.

231.    He was then taken into the "Bunker," a processing point for most of the Allied POWs taken early in the Gulf War, where he underwent his first real interrogations. In his second interrogation, his captors bound him to a chair and secured an additional blindfold over his eyes. The first time Lt. Slade pleaded ignorance to a question, he was hit so hard on the side of his head that he would have toppled over if someone had not been standing on the other side to catch his falling body. His interrogators then beat him with wooden bats or blackjacks all over his body from the neck down. His body was completely blue from these beatings, as if he had

been dipped in indigo dye. They hit him with their fists and hands from the neck up, and these blows resulted in his nose being broken a second time, several chipped teeth, and two ruptured eardrums. This beating lasted for several hours. One of the blows to his head caused blinding pain in his right ear and subsequent loss of hearing for several hours.

232.    Lt. Slade was soon moved to an army prison known to the POWs as the "Bungalows," where he remained for approximately two weeks. During this time, he was taken back to the "Bunker" occasionally for interrogations and for the production of coerced videotaped denunciations of the War.

233.    Before and after the interrogations, the physical and psychological violence continued. On one occasion, Slade's captors stuffed toilet paper down his flight suit and set it on fire. On another, they unzipped his flight suit from the waist down to examine his genitals. Because Lt. Slade can understand some basic Arabic, he knew they were trying to determine if he were Jewish. During this incident, Lt. Slade was fondled repeatedly by what he assumed were different people. He was accused of being Jewish by his captors and was threatened with death.

234.    On the night January 31, 1991, the Iraqis emptied the Bungalows and bussed the prisoners to a prison later termed the "Biltmore" by the POWs. Conditions there were miserable. Lt. Slade was kept in solitary confinement and was given two blankets as meager protection against Baghdad's freezing winter nights. He was fed one ladle of thin red soup – essentially greasy water – per day, sometimes with a piece of bread and minimal drinking water.

235.    This starvation diet produced severe weight loss during his time as a POW. He weighed about 180 pounds when he was shot down, but only 135 upon release.

236.    Lt. Slade's rectangular cell at the Biltmore spanned about twelve feet diagonally. It included one tall window that was sealed off, a foul and non-functioning toilet, and no running water. Concrete floors and walls surrounded the cell. The floor was dirty and had scrap pieces of nails strewn about. Large cockroaches, which became potential sources of food as time went on, infested the prison.

237.    Because the prisoners were not afforded even rudimentary beds, Lt. Slade slept only on the concrete floor during his time at the Biltmore. After a time, he lost feeling in his hips because of the weight of his body pressing against the hard floor.

238.    The interrogations here, carried out now by Iraqi secret police and no longer by soldiers, were more psychologically oriented, though physical violence continued. In contrast to previous interrogations, where Lt. Slade was forced to dissemble to avoid releasing valuable combat information, at this point he honestly did not know the answers to the questions posed to him. His refusal and inability to answer questions infuriated his questioners and drove them to desperate measures.

239.    After one long string of questions, one of his interrogators said, "Lawrence, you have answered 'I don't know' to the last ten questions. It's up to you now to decide what happens." When he still could not supply a satisfactory answer to the next question, his captors held a mock execution. The leader recited some poetry and asked if there was anything he wanted to say to Anna, his wife. Lt. Slade was dramatically affected by the reference to his wife. Until that point, none of his family members had been mentioned at all. His captors then told him to prepare to die, pushed a pistol against his head, and pulled the trigger. Fortunately, the pistol's chamber was empty. Lt. Slade indicates that, although this interrogation with its mock execution resulted in only approximately twenty open handed blows to his head, the combination

- 71 -

of the assault and the emotional effects of the mock execution instilled more fear than he had ever felt before. The resulting psychological effects were severe. The mock execution procedure was repeated on Lt. Slade three more times during his time in captivity.

240.    For Lt. Slade's last interrogation at the Biltmore, each prisoner was taken out of his cell individually. Slade was asked if he knew how to protect tanks in the desert and answered that he did not. His captors knocked him to the floor with kicks and punches.

241.    Along with other prisoners, Lt. Slade was held as a human shield to protect against bombing of strategic targets by Allied aircraft. On February 23, 1991, Allied forces (not knowing that the POWs were being held at this location) targeted the Biltmore, which was the Iraqi Intelligence Service Regional Headquarters, with four 2,000-lb. bombs. None of the POWs were seriously injured during that bombing, but the building was reduced to rubble, and the POWs were soon moved to a civilian prison, which they later referred to as "Joliet." The unconscionable use of American POWs as human shields, however, in flagrant disregard of the Geneva POW Convention, risked the lives of all Americans housed in this facility.

242.    At one point during his stay at Joliet, Lt. Slade was paired in a cell with a British Royal Air Force POW. The two looked out their cell's window and tried to communicate with an Iraqi prisoner across the courtyard. Three men soon entered the cell and beat and kicked the prisoners viciously for this effort at communication, breaking Slade's teeth, fracturing his vertebrae, and knocking him unconscious. The guards also engaged in a mock execution, pointing a gun at Slade, saying "you are now going to die," and pulling the trigger.

243.    In addition to his broken nose, ruptured eardrums, fractured vertebrae, and severe bruising, Slade also suffered torn pectoral muscles from the beatings at his captors' hands during the period of his captivity.

244.    At no point did Iraq release Lt. Slade's name to the ICRC or any other organization to confirm his status as a POW, nor did Iraq allow Slade to communicate with the outside world.

245.    Lt. Slade feared for his life "every single second" of his forty-three days as a prisoner under Iraqi control. He simply lived in terror.

246.    Lt. Slade's time in captivity may have inadvertently damaged his military career in that he was regarded as "golden" in the F-14 community. An unfortunate side effect was that he was not given the opportunity to compete for regular assignments with his peers. While he was ranked first out of twenty-two in the evaluation period before his shoot-down, later evaluations were either not observed or ranked him as one of one. Without an opportunity to prove himself, his progress slowed markedly for the rest of his military career.

247.    While Cdr. Slade and his wife Anna did not have children when the Gulf War started, they had planned on starting a family soon after it was over. The psychologically debilitating effects from his treatment in Iraq delayed this decision for five years following Slade's return to the United States.

### Major (Ret.) Joseph Small

248.    Maj. Joseph Small was flying a lightly-armed Bronco over central Kuwait when a surface-to-air missile hit his aircraft on February 25, 1991. The missile killed his backseater on contact, but Small safely ejected. A dozen Iraqi infantrymen awaited his parachute landing.

249.    The soldiers immediately loaded Maj. Small into an SUV and drove him north to a command bunker. One soldier in the truck aimed an AK-47 rifle at his face, one sat to his right, and another aimed an AK-47 at the back of his head.

250.    Maj. Small was interrogated briefly at the command bunker and then handed over to another group of soldiers. These soldiers tightly blindfolded him, bound his wrists behind his back, and transported him to a headquarters building in Kuwait City. Small was thrown to the floor in this building, and injuries sustained in his ejection "froze" his body to the point that he could not sit up or lie down without great pain. His wrists had begun swelling from the pressure of the tight cloth, but his captors afforded him no relief or medical care. He stayed in this position for about a half-hour before questioning began.

251.    Guards approached Maj. Small from all sides and began hitting his head, especially targeting his ears. They also kicked him repeatedly and began asking him questions about his mission. He gave only his name, rank and serial number. This episode lasted for less than thirty minutes, until he was taken to what seemed to be a more open room. There, Small's captors slugged him again and again. Soon, the atmosphere grew quiet. They then repeatedly whipped him with a strap. A blow to the back of his neck then knocked Small unconscious for a time.

252.    Soon, Maj. Small was driven to Basra, Iraq. He was slapped around on the ride. After undergoing a brief interrogation and spending a night there, soldiers put him in a car with

three other Iraqis, who drove him to Baghdad. He was blindfolded and his hands were handcuffed tightly behind his back. These handcuffs caused great pain to his wrists and shoulders during the long ride to the Iraqi capital. Eventually, this treatment caused a torn rotator cuff injury to his shoulder.

253.    After his first interrogation in Baghdad, Maj. Small was again blindfolded and led to the bathroom. His guards allowed him to walk into walls and to fall down stairs along the way.

254.    Maj. Small's captors gave him another beating as they put him into his cell, where he was kept in solitary confinement.

255.    During his time in captivity, Maj. Small's interrogators often threatened execution and told him he would be killed if he did not answer their questions. The spoken and unspoken threats of execution weighed heavily on Small the entire time he was in Iraq.

256.    When Maj. Small asked his captors about the status of his copilot, the only response he ever received was, "He's dead." Small did not know until later whether his copilot had died in the ejection or had been executed by the Iraqis. He suffers from "survivor's guilt" to this day.

257.    Iraq held Maj. Small as a human shield against the prospective bombing by Allied forces. He could hear anti-aircraft artillery firing right outside his prison cell in Baghdad and the impact of bombs dropping one quarter mile away. His continuing fear of loud noises originated from his proximity to these explosions in 1991. Had he been moved to a POW camp away from the theater of war, as required by the Geneva POW Convention, rather than being held as a human shield, he would, of course, not have had this experience.

258.    Maj. Small currently describes himself today as a person with a "short fuse," a condition he traces to his torture and the conditions of his confinement in Iraq.

259.    Since returning to the United States, Maj. Small's experiences have made him draw inward and further away from his teenage children at a time when they need parental support. He has also become overly emotional at times when he would not have before 1991. On one occasion, he was driving his young daughter Lauren around with balloons in the car when one of them popped. Maj. Small exploded in fear. His violent reaction has marked Lauren to this day and further driven a wedge between her and her father.

260.    At no point during his time in captivity did Iraq notify the ICRC or any other organization of Maj. Small's status as a POW.

### Staff Sergeant (Ret.) Daniel Stamaris

261.    U.S. Army Staff Sergeant Daniel Stamaris was shot down in a Blackhawk helicopter on February 27, 1991, and endured severe injuries in the crash.

262.    In his left leg, Stamaris suffered a broken and dislocated foot, which doctors later termed a "double dislocation"; a broken ankle; a broken tibia; a broken fibula; a compound fracture in his shattered femur, with bone sticking through his skin; and a torn posterior cruciate ligament in his knee. The crash also broke Stamaris' pelvis and several ribs and damaged internal organs.

263.    After crashing to the ground, Iraqi troops approached and stripped the prone Stamaris of his weapons, ammunition and other things he had in his pockets. They made no effort to give him medical attention as required by the Geneva GSW Convention. They also took the identifying "dog tags" from his neck and threw them away into the sand. Sgt. Stamaris interpreted this as a clear indication that they were going to kill him. However, the Iraqis left

him at this location, while taking the two other crash survivors with them. Stamaris believed that he had been left to die of his own injuries.

264.    An hour or so later, several members of the Iraqi Republican Guard came upon him. They saw the extent of his injuries, threw him onto a canvas that was lying nearby, and then loaded him onto their truck. The soldiers spat on him and threatened to castrate him. Stamaris thought his back was broken at the time. The pain he suffered in being roughly handled was excruciating, causing him to scream aloud. His captors did nothing to alleviate his pain and discomfort.

265.    After driving for a while, Sgt. Stamaris was put in an SUV, where he lay in the back with his head hanging on the tailgate. The truck drove and bumped around, causing him extreme pain. None of his injuries were stabilized by even makeshift medical equipment. At times, guns were held to his head, and Sgt. Stamaris feared for his life. During this trip, they stopped five or six times to "show him off." The SUV was old and had to be push-started after each display. The stopping and starting of the vehicle was thus extremely jarring and painful to Stamaris given the extent of his injuries.

266.    Later that night, Sgt. Stamaris was dropped on the side of the road and again left to die. He spent the night in his flight suit and an uninsulated rain jacket as the temperature dropped below 50° Fahrenheit. Stamaris did his best to keep his core temperature high enough to survive and avoid sliding deeper into shock. When he heard wild dogs in the distance, he thought they would find him and kill him. He tried to crawl to a nearby building to escape, but he was unable to do so.

267.    The next morning, regular Iraqi troops spotted Stamaris, approached, and told him the war was over. They then loaded him onto the top of an armored personnel carrier and drove

a short distance to Basra. Once they reached the outskirts of the city, they transferred Stamaris to soldiers who put him in the back seat of a car. Because he was too tall to lie down between the two back doors, his head stuck out the right side and the door remained open, periodically slamming against Stamaris' head as the car drove along. The car stopped once in the courtyard of a house, where an Iraqi major threatened to kill Sgt. Stamaris in revenge for the deaths of his two sons, who had been killed by Allied forces. Stamaris feared for his life, given the highly agitated state of the major. At other stops, soldiers and civilians pressed their guns to Stamaris's head and threatened to kill him.

268.    On the night of February 28, Stamaris was driven all night to Baghdad. There, he entered a hospital and received some limited medical attention to his injuries. After several days, he was transferred to a prison with other POWs and then released on March 5.

269.    Iraq did not notify the ICRC or any other organization of Sgt. Stamaris's status as a POW until after arrangements for his release had already been made.

270.    Stamaris has been diagnosed with Post-Traumatic Stress Disorder that is directly traceable to his experience as a POW in Iraq. He also suffers intermittent disturbing dreams that have arisen from his time as a POW there. Lingering physical effects include decreased mobility, intermittent but intense pain on the lower left side of his body and throughout his left leg, and a limp (from one leg now being about 1½ inches shorter than the other). Stamaris never knows how severe the pain will be nor when it will come. He has undergone multiple surgeries to address those and other ailments with limited success.

271.    After entering Iraq weighing about 165 pounds, Sgt. Stamaris lost about thirty-five pounds due to the malnutrition that he endured during his time as a POW and the aftereffects relating thereto.

## Captain (Ret.) Dale Storr

272.    On February 2, 1991, then-U.S. Air Force Capt. Dale Storr led two A-10 aircraft from Saudi Arabia into Iraqi airspace. On his return, his plane was shot down over Kuwait, just three miles from the Saudi border. His radio was disabled, such that his wingman could not receive any messages from him. He tried to reach the Saudi border but could not. He ejected from his burning plane shortly before it crashed into the ground. He heard it crash and saw the exploding fireball, which he actually parachuted through on his way to the ground. Seven Iraqi soldiers in a flatbed truck apprehended him about ninety seconds later.

273.    Several young soldiers began yelling at him in Arabic and forced him to kneel down. Capt. Storr feared that they were going to kill him on the spot. Instead, he was, at this juncture, only mildly beaten and kicked. As he was marched back to the truck, his captors hit him on the back of the head with a rifle butt, knocking him to the ground. They then threw him into the truck's bed.

274.    The first stop on Capt. Storr's truck ride was a small bunker, with many people milling around. He was briefly questioned there, while a group of forty to fifty people assembled outside.

275.    While walking up steps at this location after the interrogation, a man at the top of the stairs screamed at him and hit the back of his head, dropping him to his knees. As he fell forward, someone else kicked his face, and he fell back down the stairs he had just ascended. Men at the bottom brought him back up, where the crowd poked and slapped him repeatedly.

276.    Capt. Storr's next interrogation occurred in a nearby hut. The interrogator asked him some standard questions, but extended them to asking his home address. When Storr noted that, according to the Geneva Conventions, he could not be forced to reveal his United States

- 79 -

address, the interrogator replied that he was not a prisoner of war, but a war criminal who would be tried for his crimes. At this point, a man who had been silently sitting behind a nearby desk exploded from his chair, pulled out a Colt .45 pistol, cocked it, hit him in the head, and shoved the gun against Capt. Storr's head, while screaming at him in Arabic. "Tell me your address before he kills you," the interrogator said. Questions about Storr's mission followed. Storr answered vaguely, revealing nothing of strategic importance.

277. As Storr was taken to Basra, his drivers made one more stop at a house in Kuwait. The soldiers present in the house kicked, taunted, and poked him and tried to get him to say something in Hebrew. At least one soldier urinated on him.

278. At one point, guards led Capt. Storr down a hallway lined with Iraqi soldiers who beat him repeatedly. He then spent fifteen minutes outside when he saw an Iraqi news crew arrive. The guards had his hands tied, blindfolded him, and pushed him against a wall. Storr heard yelling and screaming and feared these measures were preparations for his execution. Instead, he was thrown into another truck and driven to Basra and then to Baghdad.

279. On the way to Baghdad, Capt. Storr was put in a barn and put through a basic interrogation. He was also given water that made him violently sick with vomiting and diarrhea. His drivers told him that Iraqi troops had shot down his wingman, which (unknown to Capt. Storr) was a lie.

280. Songs on the radio in the truck to Baghdad tended to repeat themselves. One that Capt. Storr heard often excited his captors greatly, and they would hit him while it played.

281. Storr spent roughly the next three days undergoing interrogations in an underground bunker in Baghdad. He was blindfolded, handcuffed, severely beaten and threatened with death during these sessions. Furthermore, when Storr gave answers that did not

satisfy his interrogators, they shocked him with an electrical device similar to a cattle prod. They shocked his ribs, his lower back, his abdomen, and his legs. His interrogator spoke perfect English and knew resistance techniques taught to U.S. military personnel. Others in the room hit him with what felt like a bundle of sticks, focusing especially on his right shoulder, knees, and other joints. Among other injuries, the severe blows to his face broke Capt. Storr's nose.

282. After one jolt to his head, Capt. Storr was knocked off his stool, which made his captors very angry. One of them dislocated his right shoulder by jerking his upper right arm to pull him upright for more beatings. They knocked Storr off his stool again and kicked him in the head, causing his blindfold to come partially off. The interrogators then retied the blindfold, spun him around, and slammed their hands against the sides of his head. These blows broke his right eardrum.

283. Capt. Storr deduced that one of his captors was a shorter man because of the quick gait he could hear along the concrete floor. This person kicked or hit Storr every time he walked by. In one episode, the man put his fingers at the bridge of Storr's nose and slammed his head against the concrete wall. Storr feared, at the time, that this guard would put his fingers through his head. In another instance, a guard lightly tapped what felt like a golf putter against Storr's knee, and asked him if the tapping hurt. When Storr answered that it did not, the guard slammed the "putter" against his knee, and then he repeated the process, going back and forth on Storr's knees. Storr described such incidents as typical of the abuse he suffered between interrogations.

284. Capt. Storr vomited at times during the interrogations, but he was not allowed to clean up or use the "water closet."

285. Subsequently, Capt. Storr was moved to the "Biltmore." Conditions there were miserable. Capt. Storr was kept in solitary confinement and was given two blankets as meager

protection against Baghdad's freezing winter nights. He was fed one ladle of thin red soup –

essentially greasy water – per day, sometimes with a piece of bread and minimal drinking water.

Capt. Storr weighed about 215 pounds when he entered Iraq, but left weighing 178 pounds due to

the starvation diet he was afforded at the Biltmore and elsewhere during his thirty-one day period

of captivity.

286.    Capt. Storr's rectangular cell at the Biltmore spanned about twelve feet

diagonally. It included one tall window that was sealed off, a foul and non-functioning toilet,

and no running water. Concrete floors and walls surrounded the cell. The floor was dirty and

had scrap pieces of nails strewn about.

287.    Storr's cell was so cold at night his feet would go numb and he had to rub them

vigorously to get the blood to flow through them. After about two weeks, he found he was

unable to "bring them back." Feeling in his feet partially returned only about six months after

his return to the United States. To this day, he suffers from numbness in his feet.

288.    Psychological violence continued for Capt. Storr as well. His captors regularly

chained an insane Iraqi prisoner to the door next to Storr's and beat him savagely. Storr also

asked to be held with other American prisoners and was told that they were all being killed. He

believed this to be true and believed that they would kill him, as well.

289.    Interrogations for Capt. Storr continued in this prison, and he was beaten up

regularly during these sessions. Eventually, his captors realized that Storr had been lying to

avoid giving up critical information because his stories did not match those allegedly given by

other POWs. They became very angry, whipped him repeatedly with a cat-o'-nine-tails, and said

that they would now be forced to execute him on February 23, 1991. Fortunately for Capt. Storr,

Allied planes bombed the prison on February 23 and disrupted the execution plans.

290.    Along with other prisoners, Capt. Storr had been held as a human shield to protect against bombing of strategic targets by Allied forces. The bombing of the Biltmore on February 23, and the prison guards' subsequent flight from the area, allowed Storr to communicate with other American POWs. It was at this time that he learned that his colleagues and family believed he had been killed, for at no time did Iraq notify the ICRC or any other organization of Capt. Storr's status as a POW. This revelation caused two concerns – the concern as to the grief his family and friends must have experienced and the concern that if the Iraqis learned that he was believed to be dead, they might feel that they could do anything to him without being held accountable.

291.    Capt. Storr was able to grab one blanket and a piece of bread he had saved as he left his cell. A prison guard soon grabbed him and knocked the blanket out of his hand. Storr could not walk well at this point; his feet were numb and his legs had been hurt when his cell collapsed. The guard told him, "Don't be sick," and then knocked the bread out of his hand.

292.    After the prisoners were transferred to "Joliet," another guard approached Capt. Storr and ripped off a makeshift bandage he had applied to his injured head, causing his wound to start bleeding again.

293.    Capt. Storr became extremely sick with giardia, an intestinal parasite that was allowed to infect the prisoners' water supply at Joliet. He was afforded no medical help to deal with the resulting violent vomiting and diarrhea, and was forced to use the corner of his cell as a bathroom. For at least three days, he asked for a mop and bucket to allow him to clean up, but he was given no such aid.

294.    Shortly after being moved to Joliet, the prisoners were prepared for release. Treatment improved at this juncture. Among other things, Capt. Storr was given soap and

allowed to clean himself up for the first time since his capture. He was turned over to the ICRC on March 4, 1991, thirty-one days after his initial capture.

295.    To this day, Capt. Storr continues to have nightmares about the treatment he endured as a POW in Iraq, including nightmares about being sent back to an Iraqi prison.

### Lt. Col. Robert Sweet

296.    On February 15, 1991, a surface-to-air missile shot down then-First Lieutenant Robert Sweet over about fifty conscripted soldiers of the Medina Republican Guard Division in southern Iraq, near the Kuwaiti border.

297.    The soldiers were upon Lt. Sweet immediately, beating him and striking him with rifle butts, including strikes to the head which left him black and blue. The mob mentality and lack of control by any authority figure made Lt. Sweet believe that he could easily be killed at the conscripts' hands. After about ten minutes of brutal beatings, some Iraqi officers arrived and took him to a bunker for questioning. Sweet refused to answer their questions.

298.    They then blindfolded Lt. Sweet and loaded him into a truck and began the two-day drive to Baghdad. As he and his captors got closer to the Iraqi capital, the frequency of the threats on his life for non-cooperation increased. When he arrived in Baghdad, Lt. Sweet's drivers handed him over to a set of internal police, who paraded him around the city on four separate occasions so civilians could take their turns at smacking and punching him.

299.    Soon, Lt. Sweet was taken to the "Biltmore" prison. Upon arriving, the guards tossed him out of the truck and down stairs for an interrogation. They put surgical tape over his eyes, clamped handcuffs tightly on his wrists, and tied him to a chair. They then spat on his face and beat him all over his body with pistols and something that felt like a radiator hose (both while in the chair and after being knocked to the ground). This beating lasted for a couple of

hours. The guards concentrated their shots on his left leg and left side of his torso, to the point that both were entirely black and blue and Sweet could not lie down on his left side. At times, the blows were so hard they knocked Lt. Sweet over in his chair and to the floor.

300.    Soon, his captors took Lt. Sweet to another room, where they forcefully removed the surgical tape over his eyes to reveal two men sitting in an office. They threatened to cut his stomach with a knife. The guards also beat up Lt. Sweet in an elevator on the first night of his stay at the Biltmore.

301.    On his second day at the Biltmore, the guards beat up Lt. Sweet again and put a gun to his head, demanding to know who had carried out a particular bombing mission. They told him he had one opportunity to yield some useful information, or they would kill him. This pattern repeated itself extensively. The guards often told him, "Now you die," or, "Now you go to hell."

302.    The guards interrogated Lt. Sweet several more times over the next two days. The usual pattern for these sessions included beatings, followed by questions, and then more beatings. They demanded to know, among other things, when the ground war would start. Lt. Sweet was beaten on numerous occasions, including at least five "severe" beatings. During one of the bearings, a guard burst Sweet's left eardrum (later diagnosed as a tympanic membrane perforation).

303.    As with other prisoners, Lt. Sweet was kept in solitary confinement in a dirty, eight-by-twelve-foot cell with very little light and a broken toilet. He received one bowl of broth, a piece of pita bread, and a cup of water as his daily meal. Lt. Sweet slept on the concrete floor each night with a thin blanket but no other insulation from the cold nights in Baghdad.

304.    Lt. Sweet lost about twenty pounds due to the starvation diet he suffered as a prisoner in Iraq.

305.    Upon transferring to the next prison, "Joliet," Sweet contracted several intestinal diseases, including giardia and salmonella, because of the unsanitary conditions to which the prison guards subjected the POWs at that prison.

306.    The day after arriving at Joliet, the guards forced Lt. Sweet to sit outside with his legs crossed from dawn until dusk. They would beat him if he moved. Sweet suffered nerve damage in his feet from sitting in that position for such an extended period.

307.    Lt. Sweet was kept in solitary confinement for almost the entire time he was a POW in Iraq.

308.    Sweet specifically requested to be allowed to write a letter to his family to let them know where he was. His captors denied this request. At no point did Iraq release Lt. Sweet's name to the ICRC or any other organization to confirm his status as a POW. Suspecting this, he was very concerned about how his mother was coping with the uncertainty of his status in Iraq.

309.    Since his return to the United States, Lt. Col. Sweet has suffered nightmares and anxiety that are directly attributable to the mistreatment he endured as a POW in Iraq.

### Lieutenant Colonel (Ret.) Jeffrey Tice

310.    A surface-to-air missile hit then-Maj. Tice's aircraft over Baghdad on January 19, 1991. While he was able to continue flying for over one hundred miles south toward Saudi Arabia, he eventually had to abandon his plane and eject within Iraqi territory. Bedouin tribesmen shot at him as he descended with his parachute. A dozen of them brandishing automatic weapons and rifles surrounded him about thirty seconds after he hit the ground.

311.    He spent the night with the Bedouins, and they paraded him from tent to tent. During such incidents, he was punched by numerous people and threatened with knives. In addition, he was forced to "play Russian roulette" (with a gun being placed to his head in a mock execution). The next day, the Bedouins hog-tied him and took him by truck to a nearby town where the English-speaking policeman sat him in a small room to await his interrogators.

312.    When three men arrived and began asking questions, Maj. Tice revealed his name, rank, and serial number, but nothing else. The two larger men then cuffed his hands behind his back, picked him up by his elbows, and drove him to Baghdad. The handcuffs tightened as he moved, so he could move very little on the four-hour drive to a residential area of Baghdad.

313.    There, Maj. Tice was blindfolded, transferred to an SUV, and taken to an interrogation bunker where his captors chained him to a chair. Maj. Tice was interrogated and beaten in thirty-minute sessions, with thirty-minute breaks interspersed, for the next two or three days. Because of his rank, Tice's captors thought he would have a tremendous amount of knowledge about future Allied military operations. His captors beat him into unconsciousness at several points during these interrogations. They beat him black and blue from the neck down and, after the first day of this, his interrogator demanded that he make a videotape denouncing the United Nations' invasion of Iraq. When he refused, the interrogator became more violent.

314.    Tice's captors then began to work on his head. They beat him so hard they dislocated his jaw twice and burst his left eardrum. They hit him with rubber hoses and with clubs. They also tied a wire from one ear to another to something like a car battery, and shocked him to the point that every muscle in his body contracted at once. Tice called this contraption

the "Talkman." The electric shocks broke several of his teeth, sent him into unconsciousness, and broke down his resistance.

315.    It became obvious to Tice that his interrogator was starting to lose patience. He told Maj. Tice that because no one knew where he was, he could be killed with impunity. Tice still refused to make the videotape. Another guard then put a pistol to Tice's head and pulled the slide back as the interrogator said that Tice could make the videotape or be shot. Knowing that some pistols have a safety mechanism that prevents their discharge when the barrel's tip feels pressure, Tice pressed his head as hard as he could against the gun. The guard then hit him with the pistol so hard that Tice and the chair to which he was chained fell to the ground. Maj. Tice lost consciousness and later woke up in the hallway.

316.    The guards then took Maj. Tice back to the interrogation room, where they beat him and administered the "Talkman" again. At this point, Tice lost control of his bodily functions. Eventually, he agreed to make the videotape. In the tape, he voiced a coded message which, when deciphered, would let the world know he was being tortured.

317.    Maj. Tice and other POWs were moved to a stockade on January 22. At this time, his handcuffs were removed for the first time in over three days. The blood flowing to his hands and feet caused excruciating pain. He could not eat or hear because his jaw was dislocated, many of his teeth were broken, and his eardrums were damaged. He never received any medical attention in Iraq for these injuries. Instead, he was interrogated every night and received regular "maintenance" beatings that preyed on his existing injuries.

318.    One night, when hearing started to return in his right ear, Maj. Tice was able to make contact with a British airman in the adjoining cell. When the guard heard them talking, he beat both of them and moved them apart.

319.    Soon Maj. Tice and other POWs were moved to the "Biltmore" prison. To Tice, the building had the air of a psychiatric prison, with thick walls and steel doors. Guards kept Maj. Tice by himself in a small cell with almost no light and a non-functioning toilet. While Baghdad's winter nights can become very cold, Tice was never given more than two thin blankets as protection against the freezing temperatures and the tiled floor of his cell.

320.    Tice lost forty-five pounds during the forty-six days of his captivity due to the starvation diet he endured during his time in Iraq. When Tice was given food, it was always in very small amounts. His daily diet consisted of four to six ounces of red liquid, which he speculated was the water that meat (for the guards) had been boiled in. He once went without water at the Biltmore for three days. The water he did receive often smelled like diesel fuel.

321.    At one point during his time at the Biltmore, Maj. Tice was taken to a television studio and put on the stage of an Iraqi talk show. When he refused to voice the statements they wanted, he was removed from the stage, thrown to the ground, kicked in the groin, punched, and hit in the head, shoulders, and ankles with a club and rifle butts.

322.    Maj. Tice and other POWs were held as possible human shields at strategic targets to protect against prospective bombing by Allied forces. After Allied aircraft bombed the Biltmore on February 23, guards placed a bag over Tice's head and took him to a bus, along with the other prisoners, to go to new quarters. When a guard caught him looking under the bag at the Biltmore, he struck Tice between the shoulder blades with the butt of his rifle and kicked him in the right shoulder, thus dislocating it and knocking him to the ground. The guard then jerked him up by his right arm to put him on the bus, where he and the other POWs were forced to sit huddled shoulder-to-shoulder, with their backs to the outer sides of the bus. During this bus ride,

Maj. Tice and the other POWs were tormented by guards who walked up and down the aisle, striking the POWs repeatedly with boots, fists, and rifle butts.

323. After driving for several hours, the bus arrived at the civilian prison known to the POWs as "Joliet." On the afternoon of the first day at this prison, the guards ordered Maj. Tice out of his cell and forced him to his knees in the courtyard, with a blindfold and hands cuffed behind his back. He was forced to stay in this position for three to four hours. When he moved, the guards struck him with a baton.

324. Intestinal parasites he ingested from the unsanitary conditions at Joliet caused Maj. Tice great distress and pain.

325. At no point did Iraq release Maj. Tice's name to the ICRC or any other organization to confirm his status as a POW. Indeed, his name was not even released when the Iraqis were forced to account for POWs after the ceasefire. This caused a tremendous amount of concern for Maj. Tice's family. His name was finally released when he was actually turned over to the Red Cross on March 5, 1991.

326. Lt. Col. Tice suffers from lasting nerve damage to his hands from the handcuffs being clamped so tightly on his wrists. Tice also has muscle and nerve damage that continues today below his left shoulder blade – a four-square-inch patch below his left shoulder blade itches constantly. Also, Tice suffers from temporal mandibular joint syndrome, a condition related to the multiple dislocations of his jaw that results in very loud popping and cracking when he chews food.

327. During the first year after Lt. Col. Tice's return to the United States, he frequently awoke in the night in cold sweats with nightmares that were traceable to his mistreatment in Iraq.

### Lieutenant (Ret.) Robert Wetzel

328.    Lt. Robert Wetzel and Lt. Jeffrey Zaun were shot down in western Iraq on

January 17, 1991. After parachuting to the ground, the two evaded detection for about 1½ hours

before Iraqi soldiers captured them.

329.    Lt. Wetzel had broken his collarbone, vertebrae, and both arms when he ejected,

and medics drove him to an airport infirmary for treatment. The next day, he was driven all day

to Baghdad and taken to another hospital where he spent about a week. Each night he was

handcuffed to a bed. In the hospital, Lt. Wetzel was told to move his right arm around, but felt

scraping that he attributed to bone chips. In fact, screws that the Iraqi doctors had inserted in his

arm had gone through the bone and were scraping the inside of his shoulder joint. Wetzel

received no follow-up treatment for this problem. Because it was too painful to move his arm, it

froze, and he required another surgery and several months of physical therapy in the United

States to correct the problem. Also, due to his starvation diet, his bones had healed minimally,

and he needed a bone graft in the United States to aid their recovery.

330.    Soon he was transferred to the "Biltmore" prison with the other POWs. Here, Lt.

Wetzel stayed by himself in a cold, dark cell with almost no light coming through a tiny window

at the top. Each day the guards gave him little food, which amounted to a small bowl of greasy

water, a piece or two of pita bread, and minimal drinking water. Wetzel slept on the concrete

floor of this cell and had only two thin blankets as a bed.

331.    Lt. Wetzel lost approximately twenty-five pounds due to the starvation diet he

endured during his time as a POW in Iraq.

332.    Lt. Wetzel's first interrogation at this prison happened about a week after his

arrival. After the questions began, Wetzel responded with his name, rank, and serial number.

His broken right arm was in a sling, and he was blindfolded, but underneath the cloth he could see a man holding a heavy leather whip. The guard hit him with it for about ten minutes. The interrogator asked some more questions. Wetzel answered some and said he did not know the answers to others. When he pleaded ignorance, the guard whipped him repeatedly to the point that his right arm became numb. Another guard extinguished a burning cigarette on his hand. The interrogation lasted almost two hours.

333.    At his next interrogation, Lt. Wetzel could again see the man with the whip underneath his blindfold, but he tried to keep the interrogator talking on his terms to avoid both revealing strategic information and being whipped. When he stopped talking, several guards hit his head repeatedly with their hands. At one point, the guards also stripped off his pants to see whether he was circumcised, trying to determine if he was an Israeli pilot.

334.    After being moved to "Joliet" prison, Lt. Wetzel – like most, if not all, of his fellow prisoners – developed giardia from the lack of proper drinking water and other unsanitary conditions.

335.    At no point did Iraq release Lt. Wetzel's name to the ICRC or any other organization to confirm his status as a POW. This failure severely affected Lt. Wetzel as he considered how his family must be taking the news that he had been either captured or killed. He was particularly concerned about his fiancée. They had planned for a March 2, 1991 wedding (as he had been scheduled to return from his duties oversees in February), and he hated to think of the misery that she must be enduring, including the agony of likely not knowing whether he was dead or alive.

336.    After his release, he confirmed that he had been designated as MIA the entire time of his captivity and that, as such, his family had to endure the hardship of not knowing whether

he was dead or alive. He further learned that they, in fact, believed he was likely dead since his bombardier-navigator, Jeffrey Zaun, had appeared in a videotape that was broadcast internationally and he (Lt. Wetzel) had not. Knowing the pain his family had endured increased Lt. Wetzel's own post-captivity suffering.

337.    Lt. Wetzel also experiences wider mood swings than he did before he was tortured as a POW. In addition, he is more sensitive to noise and commotion and more emotionally sensitive now than before he was captured in Iraq.

### Commander Jeffrey Zaun

338.    Then-Lt. Jeffrey Zaun and Lt. Robert Wetzel were shot down in western Iraq on January 17, 1991. After parachuting to the ground, the two evaded detection for about 1½ hours before Iraqi soldiers captured them.

339.    After taking Lts. Zaun and Wetzel to an airport infirmary for the night, their captors put the two in the back seat of an SUV, blindfolded and handcuffed them, and drove them to Baghdad. They then separated the two and handcuffed Lt. Zaun to a gurney at an air force base infirmary.

340.    Lt. Zaun spent the second night of his captivity at the Air Force Base. The following morning, Lt. Zaun was interrogated by Iraqi Air Force officers who neither threatened nor abused him. Later the same day, Lt. Zaun was taken from the infirmary by people he assumed to be secret police or intelligence forces. The secret police fastened a blindfold so tightly that Lt. Zaun could feel his eyes throbbing. In addition, his captors did not engage the holding mechanism on the handcuffs, knowing that, without this mechanism engaged, the handcuffs would ratchet tightly and cause a painful loss of circulation in his hands. When the handcuffs were removed several days later, Lt. Zaun's hands remained numb for some weeks.

During questioning, Lt. Zaun's interrogators asked him tactical questions about his mission and punched him in the throat when he gave unsatisfactory answers. They also hit him in the head with an open hand and threatened to kill him. Lt. Zaun noted that by their blows to his head and throat, his interrogators were able to inflict significant pain without leaving visible marks of their work. This effectively terrorized Zaun because he realized that they were highly skilled in torture techniques. He also thought if the Iraqis' blows to his throat continued, the swelling would restrict his ability to breathe.

341.    Sometime during his first two days with the secret police, Lt. Zaun's interrogators unzipped his flight suit, from the bottom up, to inspect his genitals to determine whether he had been circumcised. Questions regarding Lt. Zaun's religious faith were raised throughout his tenure as a POW. Most of these interrogations involved the Iraqis trying to demonstrate that Lt. Zaun was Jewish. During one interrogation, his captors claimed to have captured a large number of Israelis. They said that they would ask these Israeli POWs if they recognized him. They intimated that Lt. Zaun should admit being Jewish because the captured Israelis, who looked after themselves, would have an incentive to condemn Lt. Zaun. If these (presumably fictional) Israelis said that they recognized him, he would be executed.

342.    Lt. Zaun remained handcuffed and blindfolded for several days. More interrogations followed. In the fourth interrogation at this location, Lt. Zaun's interrogators faced him brandishing a pistol. They told him that he had committed crimes against the Iraqi people and that they were going to kill him. Then they said he would be allowed to save his own life by making a videotape denouncing the Allied invasion of Iraq. By this time, Iraqi threats and behavior had given Lt. Zaun the impression that at some point, and with some excuse (such

as refusing to make the videotape), his captors would execute him. Lt. Zaun agreed to make a tape.

343.    His captors then put Lt. Zaun in the back of an SUV with another prisoner. During transit, Zaun beat himself in the face to make himself an unattractive candidate for international broadcast. The Iraqi soldiers had him make a videotape anyway. When being taped, Lt. Zaun tried to alter their script, sound insincere, and otherwise make clear that he was acting under coercion. In the weeks that followed, Lt. Zaun suffered great distress at having been humiliated and forced to denounce his country for a television presentation. While making the video, Lt. Zaun thought the Iraqis might execute him immediately afterwards as they would have no further use for him.

344.    After making the videotape on or about January 22, Lt. Zaun was taken to what appeared to be an Iraqi army base. The treatment that Lt. Zaun received from the soldiers, who held him for the next week, was far better than any treatment he received before or after. The soldiers followed what seemed to be standard procedures. Lt. Zaun was not interrogated during this period. He was fed three times per day, given adequate water, and allowed to relieve himself at reasonable intervals. During the first several days, each of the POWs was taken separately to the courtyard and allowed to exercise. Lt. Zaun was visited by a doctor and a dentist.

345.    On the night of January 31, after about a week at the Iraqi Army compound, Lt. Zaun was sleeping when guards quickly entered, hit him in the stomach and head, blindfolded him and rushed him onto a bus. After a trip lasting several hours, Lt. Zaun's new guards removed him from the bus and hit him several times before putting him into a cell at a facility that the POWs would later call the "Biltmore." He thought he would be killed that day. There was no light in this cell, and the effect of being placed in the dark cell was very disorienting.

The temperature was between thirty-five and fifty degrees. Lt. Zaun was provided with two blankets which, together, did not cover his body. For the next 3 ½ weeks, until the facility was bombed on February 23, Lt Zaun experienced first stage hypothermia; that is, his shivering was continuous except for those periods when he was taken from his cell for interrogation in a heated room. The cell was approximately twelve feet deep, eight feet wide, and eight feet high. Lt. Zaun surmised that the cell had been designed for sensory deprivation. The walls, floor, and ceiling were made of red ceramic tile. There was a light in the room which the Iraqis turned on approximately three or four times, for several hours at a time, during Lt. Zaun's 3 ½ weeks at this facility. The only daylight came through a translucent window, high on the back wall, that was mostly blocked by a set of steel louvers. With this dim light, he could see scratch marks on the wall made by previous prisoners who had apparently tried to count their days of captivity. He could also see a foul, broken toilet at the back of his cell with no water but excrement in the bowl. Lt. Zaun slept on the floor of this cell with two blankets as meager protection against the concrete and the freezing winter nights. The guards did not feed Zaun that night or the next day.

346.    Feeding for Lt. Zaun, such as it was, resumed the third day of his stay at the Biltmore. Lt. Zaun and the other prisoners were fed once each day. With the exception of two days, when he was given extra bread, Lt. Zaun was fed exactly one cup of broth and two pieces of pita bread each day.

347.    Lt. Zaun lost approximately thirty pounds during the forty-six days he was held as a POW. Lt. Zaun's weight loss and subsequent weakness were due to a diet that was designed to be insufficient.

348.    Lt. Zaun was interrogated several times in his first few days at this new prison, and he often worried that he would be killed. The new interrogators were less professional and

- 96 -

more brutal than the ones he had encountered earlier. The interrogators asked him many questions about Allied flight strategy and capabilities, and often hit him to punish him for unsatisfactory answers. At one point, he heard someone run in the room and pull a rifle bolt shut. The interrogator said, "Don't shoot him," and following this attempt at intimidation, the interrogation continued. On another occasion, a guard put what felt like a gun or a finger to the blindfolded Lt. Zaun's head and said, "We're going to kill you." Another guard slipped behind him and clapped his hands together behind Zaun's head to simulate the crack of a pistol.

349.    Later, when Lt. Zaun attributed the Gulf War's origin to Iraq's invasion of Kuwait, a guard threw a ceramic cup at Zaun's head and screamed that Kuwait was part of Iraq.

350.    In another interrogation, a guard stood one foot on Lt. Zaun's knuckles as he rested his hand on the armrest of the chair to which he was tied. In this session, the interrogators asked him again if he was from Israel, and announced that they would kill him. When asked why, they said other POWs had told them more. Once, while he was being taken to an interview, a guard pushed him against a wall and stuck a pistol under his chin, threatening to kill him on the spot.

351.    At one point, Lt. Zaun was removed from his cell and shaved. He interpreted this as an indication that he was going to be videotaped again. When put back in his cell, he punched himself in the eyes repeatedly to cause bruising and swelling in an attempt to avoid having to make a second videotape. He then yelled for the guard and claimed he had fallen. A man came to his cell and examined him briefly. From the professional manner in which this man examined his injuries, Lt. Zaun inferred that he was a doctor who was on duty somewhere else in the building. This "doctor" seemed suspicious over Zaun's explanation for the injuries. He asked if Zaun had been receiving his two pieces of pita bread and soup. Zaun concluded from this

question that the starvation diet was planned to break the health and resistance of the prisoners. Like the interrogators' blows to the throat, the diet was intentionally formulated to cause pain and weakness.

352.    Lt. Zaun was correct in surmising that he was being shaved in preparation for an interview. The next morning, he was taken from his cell down to a room in which the Iraqis had set up a camera and seated what appeared to be an interviewer. Upon seeing Lt. Zaun's injured face, a tall officer, who appeared to be in charge of this taping, asked what had happened. Lt. Zaun said that he had fallen. The officer ordered Lt. Zaun taken back to his cell. Lt. Zaun continued to beat his face for several days until he was confident that he would not be removed for another interview.

353.    Near the end of his stay at the Biltmore, the guards repeatedly beat an Iraqi prisoner near Lt. Zaun's cell. Zaun was forced to listen to the impact of their blows and the prisoner's agonized screaming.

354.    The guards also taunted Lt. Zaun by telling him that his mother must be very upset at his condition as a POW in Iraq. Lt. Zaun was also told that "they think you are dead and you are going to be." Lt. Zaun was dramatically affected by this taunting, and he worried greatly about what his family must be experiencing.

355.    On the night of February 23, Allied forces targeted the Biltmore with four 2,000-lb. bombs. While the prisoners' wing survived, another part of the building collapsed. The force of the first blast blew the steel blinds off of the bolts that held them in the window. Lt. Zaun climbed out of his cell, up the face of the building, and onto the roof. After some time, perhaps an hour, Lt. Zaun was able to gain entry into the building through a broken window. Lt. Zaun made his way down a staircase and into the hallway outside the POWs' cells where he

announced that he was loose and looking for the keys. Shortly thereafter, he was recaptured. While the guards were searching for the keys to the other POWs' cells, Lt. Zaun was handcuffed and removed from the building alone. Twice, while Lt. Zaun was being taken from the building alone, guards asked him who he was, and upon hearing his reply, hit him with enough force to knock him to the ground and, Lt. Zaun believes, to cause him briefly to lose consciousness. Lt. Zaun and the other POWs were soon moved to a civilian prison known to the prisoners as the "Joliet."

356.    When a number of prisoners were put in the same cell on their first night at this new prison, only Lt. Zaun still had his handcuffs clamped on his wrists. Once again, the Iraqis did not engage the locking mechanism on the handcuffs. Lt. Zaun is convinced the guards knew how the handcuffs functioned and deliberately set them so that movement of any kind would cause them to tighten more and more. When the senior-ranking POW, Col. Eberly, pointed this out to the guards, they tried to break the handcuffs off with a chisel and hammer. Meanwhile, another guard stared at him and made a gesture that suggested Lt. Zaun would be raped. When chiseling did not open the handcuffs, and Lt. Zaun's wrists had started to bleed from missed blows with the hammer, another guard emerged with a key to open the cuffs. Once again, Lt. Zaun's thumbs were numb for several weeks.

357.    While at Joliet, prisoners were no longer starved. The climate, while still cold, was not as extreme and Lt. Zaun's hypothermia abated – *i.e.*, Lt. Zaun's shivering stopped.

358.    Lt. Zaun developed intestinal problems from the unsanitary conditions at Joliet. The symptoms included vomiting and diarrhea. Lt. Zaun was forced to use the corner of his cell as a bathroom and had to use his hands to sweep up the mess.

359.    On the morning after the POWs arrived at Joliet, they were made to sit for several hours underneath blankets out in the prison courtyard. While most remained seated, several (but, not Lt. Zaun) were removed for interrogations. During this time, Lt. Zaun was caught attempting to slide closer to one of the other POWs in the courtyard and trying to peer through a hole in his blanket. Each offense resulted in a forceful kick in his back.

360.    On one occasion while being held at Joliet, one of the guards came to Lt. Zaun's cell with a bullet. He asked Lt. Zaun if he wanted to die by that single bullet. Lt. Zaun resisted answering, but the young guard pressed the question. Lt. Zaun does not remember how he resolved the situation.

361.    On February 28, Lt. Zaun and other prisoners were loaded onto a bus to be taken to another prison. One guard, noticing that Lt. Zaun had not kept his head down, began pulling tufts of hair from the back of Lt. Zaun's head. The first three or four times the guard did this, Lt. Zaun made an effort not to react. Because the guard seemed intent on continuing this harassment, Lt. Zaun resolved to "react" with a whine the next time the guard pulled hair out. This whine apparently satisfied the guard, who discontinued the harassment.

362.    At no point did Iraq release Lt. Zaun's name to the ICRC or any other organization to confirm his status as a POW.

363.    After Cdr. Zaun's return to the United States, he suffered a lingering fear, usually of nothing in particular. This feeling lasted approximately five months and was directly traceable to his torture by Iraq.

## FAMILY MEMBER PLAINTIFFS

364.    The following specific information as to Family Member Plaintiffs is presented following the alphabetical order of the POW Plaintiffs but grouping all family members of each POW Plaintiff together.

### Mrs. Cynthia Acree

365.    Cindy Acree was at home on January 18, 1991, when two Marine officers arrived at her door. They explained that her husband, then-Lt. Col. Cliff Acree, had gone out on a mission on January 18 and had never returned. No one had witnessed his disappearance, and he was officially listed as missing in action.

366.    Mrs. Acree was a self-described "basket case" over the next two days, during which she received no further information regarding her husband. She did not sleep for at least those first two days. At the time, she imagined Lt. Col. Acree lying dead in his destroyed aircraft or trying to escape Iraqi soldiers in the desert. Three days after his capture, she learned that her husband had at least survived the crash, as an audiotape of him being interviewed on Iraqi TV had appeared on CNN. In the videotape of the same interview she saw on January 21, Lt. Col. Acree appeared to be exhausted and to have a broken nose. While he gave a brief statement on tape, he did not denounce the United States government or the Allied war effort. Mrs. Acree assumed (correctly) that he had paid dearly to maintain that stance.

367.    Over the next several weeks, Iraq did not notify the ICRC or any other organization about Lt. Col. Acree's status as a POW, nor did it allow the ICRC access to the POWs. Iraq's refusals made Mrs. Acree even more fearful about her husband's health and location. Her anxiety was heightened on January 21, when Radio Baghdad reported that Iraq intended to locate POWs in and around likely Coalition bombing targets.

368.    Knowing nothing about her husband's condition was extremely difficult for Mrs. Acree, and she had tremendous fears about what the Iraqis might have done to him after the videotape was made. She was knowledgeable as to torture techniques practiced by Iraq and Saddam Hussein, and she feared that her husband's status as the commanding officer of his squadron and as someone in possession of classified information on the war effort would place him in particular jeopardy. Knowing his extreme loyalty to the Marine Corps, she feared he would resist his captor's demands to the point of being killed.

369.    Mrs. Acree had other worries as well. Even before being captured, her six-foot, three-inch husband was quite lean and she worried that a systematic starvation plan would quickly devastate his long, lean body.

370.    Fearing that her husband and other POWs were being starved, tortured or worse, Mrs. Acree was unable to sit back and wait. She soon turned her attention to trying to bring Lt. Col. Acree and the other captives home. She reviewed provisions of the Geneva Convention, spoke with former POWs, and contacted numerous governmental representatives, including military intelligence officers, to seek advice on how she could help. With the approval of the Department of Defense, she started a letter-writing campaign to the Iraqi ambassador to the United Nations demanding identification and humane treatment of Allied captives. She established an organization dedicated to the POWs' safe return and was the anonymous but driving force behind their mission.

371.    Because Lt. Col. Acree was captured at the outset of the Gulf War, his period of captivity was one of the longest of any Gulf War POW. With media representatives camped outside her home for days at a time, the stress on Mrs. Acree was enormous as she tried to balance her desire to take action against the need to withhold from the press any information that

might be used by Iraq against her husband. More than once, local police were called in to control journalists who had harassed Mrs. Acree or trespassed on her property.

372.    During the Gulf War, rumors of terrorists operating in the United States caused military families to fear that terrorists might commit acts of vengeance upon them. Mrs. Acree was especially fearful of becoming a victim as her husband's capture had been featured in international news with her first and last name, the name of her town and her home address clearly displayed. Early in her husband's captivity, neighbors noticed a car with unfamiliar occupants parking repeatedly on their street a few doors down. As a precaution, a local police officer taught Mrs. Acree how to load and fire her husband's pistol.

373.    Eventually, to the extreme relief of Mrs. Acree, her husband did return, but the pain for the Acree family was not over. She reports that, physically and emotionally, the man who returned from captivity was not the man she had married.

374.    Upon his return to the United States, Col. Acree did not want his wife to touch or hold his hands because they were numb from the nerve damage and seeing her hand on his while being unable to feel it was distressing to him. It deeply saddened Mrs. Acree to be deprived of this simple human contact with her husband.

375.    During her husband's captivity Mrs. Acree also feared she might never have the children they had dreamed of having. The Acrees' plans to start a family had been interrupted by Lt. Col. Acree's deployment to the Gulf. At thirty-seven years of age, Mrs. Acree realized that time was running out. Even when her husband did return after the war, their waiting continued as doctors cautioned that, for a healthy child, they must wait until her husband's body had overcome the effects of starvation. She finally gave birth to their two sons when she was aged thirty-eight and forty-two.

376.   Life has become more difficult for the Acrees as they have struggled to deal with the effects of Col. Acree's experience in Iraq. Before his torture by Iraq, Col. Acree was gregarious and a "jokester." Now, he is much more withdrawn and serious, and he does not look forward to traveling for family vacations. Mrs. Acree also has more concern over the safety of her loved ones than she did before the Gulf War.

377.   Mrs. Acree has helped her husband through four extremely difficult surgeries to correct problems that resulted from the beatings (including the fractured skull) he endured as a POW in Iraq. Every surgery has brought back vivid memories of his beatings and she has had to watch helplessly as he relives this torment. The beatings disfigured him and every surgery to reconstruct his nose has changed his appearance. After each surgery, his nose continues to change in size and shape and Mrs. Acree says her husband looks very different than he did before the Gulf War. To this day, he has very little sense of smell and often asks his wife to smell food to confirm to him that it is safe to eat. Food tastes bland to him now and she has had to adjust her cooking techniques to compensate. His (still crooked) nose has now collapsed for the fifth time, and his breathing is impaired. He snores frequently and often wakes Mrs. Acree multiple times in one night, disrupting sleep for both of them. When her husband is hungry, he becomes edgy and irritable if he must wait to eat. Mrs. Acree does everything she can to ensure dinner is ready when he arrives home from work each day.

378.   In addition, she and other family members must deal with Col. Acree's permanent hearing loss. He cannot hear them if they call from another room. Rather, they must be physically close to him to communicate. Because he cannot hear them approach, they sometimes startle him, which can be extremely upsetting to all. For example, Mrs. Acree once caught her husband off guard in the garage. He sprang from the bench, grabbed his neck as if he had been

struck there, and shuddered convulsively. He looked and acted terrified. It upset Mrs. Acree terribly to cause this effect in her husband, and she struggles to avoid repeats of such incidents. Col. Acree's neck injury flares up numerous times each year. During these painful bouts his movement is severely restricted, often to the point of being bedridden. Mrs. Acree and their two young sons must stay away during these times and any lifting or strenuous activity by Col. Acree is not possible. He also suffers from posttraumatic headaches that cause the same incapacities.

379.   Mrs. Acree has also worked very hard to help Col. Acree deal with the continuing anxiety he maintains from his time as a POW. At times, unexpectedly, her husband reacts to sights and smells that would be unremarkable to most people. These effects continue to this day and she does what she can to help him avoid these circumstances. With two young boys, this is not always possible as they often move unpredictably. She has learned that his feelings run especially close to the surface each January, when the anniversary date of his capture approaches.

380.   Both she and her husband have incurred costs in seeking medical assistance to deal with the physical and emotional damage that resulted from Col. Acree's torture by Iraq.

381.   In addition to the decreased quality of life that she, her husband, and their two young sons have had to suffer, Mrs. Acree also worries that her husband's life may be cut short as a result of the lingering physical and emotional damage caused by his torture. She is especially concerned for their young sons.

382.   Mrs. Acree sums up her situation by stating that life was indeed difficult when her husband was being held captive but that these challenges have paled in comparison to those she faced in the eleven years since his return.

**Mrs. Leigh Berryman**

383.    On January 27, 1991, U.S. Marine Corps personnel informed Leigh Berryman

that her husband, then-Capt. Craig Berryman, had been shot down over Iraq several hours before.

The sparse information that surrounding pilots were able to gather indicated that he had probably

not survived his airplane's crash to the desert floor, and this was reported to Mrs. Berryman.

384.    Still, Mrs. Berryman refused to give up hope that her husband was alive

somewhere in Iraq. As a weapons tester for the United States Army during this time, she threw

herself into her work on the Army base, feeling that she was making some contribution to getting

her husband home. She also declined to participate in interviews with the news media in case

Capt. Berryman was being held as a POW and his captors had plans to use any personal

information they could find against him. But as time went on, receiving no news of her

husband's condition kept her in a constant state of agitation and worry. Iraq did not alleviate

Mrs. Berryman's concern by notifying the ICRC or any other organization of Capt. Berryman's

status as a POW.

385.    When Capt. Berryman returned to the United States, he and his wife had some

difficulty readjusting to life in a more normal context. Capt. Berryman was more introspective

and withdrawn than he had been before he was tortured by Iraq. The resulting lack of

communication almost caused the Berrymans to divorce; only significant effort by both of them

saved their marriage.

386.    While acknowledging that all people change as they grow older, Mrs. Berryman

maintains that that her husband is remarkably different from the person she married in 1987. He

is much more quiet, serious, and at times cynical than he was before he was captured and

tortured at the hands of his captors. Mrs. Berryman has become more accustomed to her "new" husband as time has gone on, but she believes that his Iraqi captors took her first one away.

387. Mrs. Berryman was also left to deal with some of the more mundane details of her husband's return. The dysentery he contracted from the unsanitary conditions of the prisons in which he was held in Iraq did not quickly recede when he came back to the United States. For almost two years afterward, he endured severe intestinal trauma that made regular dinners or other social gatherings difficult, if not impossible.

388. Also during this time, Capt. Berryman felt compelled to discuss his experiences as a POW with his wife two to three times each night – in the middle of the night. At times, especially in the early years after his return, Mrs. Berryman has had to go to lengths to make his home environment as unthreatening as possible to allow his mind to relax. While Mrs. Berryman loves her husband and has always accommodated his needs, these issues caused significant stress and strain to a relationship which was already made more difficult by the emotional distance Major Berryman's Iraqi captors caused.

### Mrs. Gail Stubblefield

389. Mrs. Gail Stubblefield was at home February 27, 1991, when U.S. Army officers approached her house to explain that her son, Staff Sergeant Troy Dunlap, had been killed after his helicopter had been shot down and crashed in the Iraqi desert.

390. Mrs. Stubblefield later learned, however, that her son had not died in the crash, but had been taken as a POW by Iraqi troops. This assuaged her mind somewhat, but she still had serious concerns. Because Mrs. Stubblefield's husband had served in Vietnam, she was aware of what American POWs in that country had suffered, and she was concerned that Sgt. Dunlap might be undergoing similar treatment. Images of Allied POWs that had previously been

broadcast on CNN also preyed on Mrs. Stubblefield's mind. Nightmares haunted her, and she incessantly worried that Sgt. Dunlap was being tortured in Iraq. Mrs. Stubblefield watched CNN constantly for any news of her eighteen-year-old son. She did not eat well as she wondered if her son would ever return from Iraq.

391.    Because Sgt. Dunlap was the only American POW from Mrs. Stubblefield's home region of southern Illinois, the local media swarmed to interview his family members. There was little Mrs. Stubblefield could tell them, however, as Iraq never notified the ICRC or any other organization of Sgt. Dunlap's status as a POW. This did not stop her from trying to contact her son, though. Mrs. Stubblefield repeatedly called her local Red Cross chapter and her Congressman to send a message to Sgt. Dunlap. Iraq also did not allow these messages to reach her son.

392.    When Sgt. Dunlap returned to the United States, Mrs. Stubblefield felt that her son was "not the same person" who had gone to serve in the Gulf War. He was withdrawn for almost a year after coming back, and Mrs. Stubblefield could tell a marked difference in the way he handled himself.

### Mr. Ronald Dunlap

393.    Mr. Dunlap was working in Kentucky when he learned on February 27, 1991, that his brother, Staff Sergeant Troy Dunlap, had been shot down in a violent helicopter crash. Because the helicopter had hit the desert floor at 150 miles per hour, and because Sgt. Dunlap's identifying tags and some personal belongings had been recovered, the news delivered by U.S. Army officers was that Sgt. Dunlap had died in the crash.

394.    Mr. Dunlap was extremely distraught at the news that his younger brother had been killed in the crash. He and his brother had been very close, as they were only eighteen

months apart in age. As they grew up, the two almost always did things together. They played baseball and basketball on the same teams, attended car races, and went fishing. When Sgt. Dunlap enlisted in the United States Army, he tried to convince his older brother to do the same. Mr. Dunlap resisted, but he followed his younger brother's career closely. The two have gone on vacation trips together and try to take time from work to spend with each other. In addition, the Dunlap family often gathers together for holidays.

395.    For a while, Mr. Dunlap tried to deny to himself that his brother had been killed. He took two weeks off from work to be with his mother while they waited for any available news. Shortly thereafter, they did hear that Sgt. Dunlap was not dead, but had been taken as a POW. This made Mr. Dunlap feel better, at first. Then he wondered if his brother's Iraqi captors would kill him or brutally mistreat him. Mr. Dunlap's stepfather had served in Vietnam and sometimes told his children about the torture American POWs were forced to endure there. Mr. Dunlap was aware of what might be in store for his brother, and he worried that he might never return from Iraq. The Dunlap family watched CNN constantly to glean any available news about Sgt. Dunlap. Iraq never notified the ICRC or any other organization of Sgt. Dunlap's status as a POW.

396.    When Sgt. Dunlap returned to the United States, Mr. Dunlap noticed that his brother was extremely reticent and unwilling to discuss his experiences there. When others raise the subject today, Sgt. Dunlap simply walks away or otherwise avoids the conversation. Mr. Dunlap wondered if his brother would ever be the same after being tortured in Iraq, but has found that their relationship has slowly been repaired after Sgt. Dunlap has readapted to a more normal life in the United States.

### Mrs. Barbara Eberly

397.    Barbara Eberly is the spouse of Colonel David Eberly, who deployed to the Gulf region in August 1990. Shortly after he departed, she enrolled their son in his first semester of college. With Iraqi forces threatening to continue their invasion into the Saudi peninsula, Mrs. Eberly expressed confidence in her husband's professional expertise but had great concern for the danger posed by Saddam Hussein's treatment of the people of Kuwait. The situation affected their son, Timm, who was away at college, and he and Mrs. Eberly spoke almost daily. In early October, recognizing how distraught he was, she brought him home.

398.    Throughout the Fall, she was exposed to the reported accounts of the atrocities by the Iraqi soldiers in Kuwait.

399.    On January 19 around 9:30 p.m., U.S. military officials notified Barbara Eberly that her husband was missing-in-action and had not returned to his airbase in Saudi Arabia. The message was simple: "No chutes were sighted, no radio contact was received." Mrs. Eberly feared the worst – that her husband was dead.

400.    Late on the night of January 24, news media reported that Col. Eberly was alive and being held as a POW. The next morning, she saw her husband's angry face on a televised news report showing an Iraqi propaganda video. Since the government of Iraq did not provide any information to the ICRC or other agency on POWs, this was the only information she ever received on her husband's condition.

401.    Upon seeing the distorted image of her husband, Mrs. Eberly's distress at the prospect of his death quickly transformed to the anguish about the kind of inhumane treatment he was likely enduring at his captors' hands. She imagined correctly that he was cold and hungry, and she felt guilt that she was warm and had food to eat. A *Newsweek* magazine story that same

week described Iraqi soldiers' brutal mistreatment of Iranian prisoners and further compounded her fears that her husband would be physically and mentally tortured. Mrs. Eberly also worried that, as the senior officer, Col. Eberly might be killed to set an example.

402.    Col. Eberly's apparently harsh mistreatment, as reflected in the Iraqi propaganda video, forced his wife to be extremely concerned for her own safety and the safety of their son. She believed that potential terrorist sympathizers could have learned his home address and might target his family.

403.    Although Colonel Eberly was repatriated following the cease-fire, his torture has had a permanent affect on Mrs. Eberly. She sought professional counseling and was diagnosed with depression by a psychiatrist. Nightmares continue to replay the experience in her mind, and the daily stress of helping her son cope with the effects of Col. Eberly's torture by the Defendants has interfered with her ability to lead a normal life.

### Mr. Timm Eberly

404.    Timm Eberly is the son of Colonel David Eberly, who deployed to the Gulf region in August 1990. Shortly after his father left, he entered his first semester of college. With Iraqi forces threatening to continue their invasion into the Saudi peninsula, Mr. Eberly had great concern for his father. He sought counseling and in early October was granted a medical withdrawal from the university. He returned to his parents' home at that time.

405.    Throughout the fall, he was riveted to the reported accounts of the atrocities by the Iraqi soldiers in Kuwait.

406.    Mr. Eberly learned on January 19 that his father had been shot down over enemy territory. While he maintained faith that his father was still alive, he was greatly distressed with the thoughts of what he might be going through. His overwhelming desire to believe his father

was alive was at odds with his mother's belief that no one could survive such a crash. Because the Government of Iraq did not provide information on the status of the POWs to the ICRC or to any other organization, Col. Eberly's family had no hard facts to confirm his condition.

407.    Mr. Eberly was severely distressed by his own helplessness with respect to his father's situation and the knowledge that Col. Eberly was somewhere in Iraq, likely without food or water and worrying about them. Mr. Eberly had heard terrible true stories of torture and atrocities against American POWs in the Vietnam War, and he worried greatly that his father might be undergoing similar torture in Iraq.

408.    Late at night on January 24, Mr. Eberly heard a news report that mentioned his father was not dead, but was in fact a POW in Iraq. On January 25, he saw a videotape of his father and became concerned about the treatment he was receiving as a prisoner. Mr. Eberly received no other word from or about his father until after he was released on March 5, 1991.

409.    On March 10, Mr. Eberly joined other family members in welcoming Col. Eberly and the other POWs back home. With great pride, but also with concern, he watched his father's emaciated body limp down the stairs from the airplane. Photographs of their reunion reflect his severe anguish over his father's condition.

410.    Later that evening, his father took off his shirt and Mr. Eberly saw the shrunken, almost childlike version of his father's former self. Mr. Eberly compared his father's body to the film character "E.T." when the alien was dying at the end of the movie. To this day, Mr. Eberly still has haunting mental images of his father's emaciated body upon his return from captivity.

411.    Although Col. Eberly did return home after the cease-fire, Timm Eberly has been forever changed. He has been under professional counseling and treatment by psychologists and psychiatrists. His diagnosis includes depression, panic attacks, social anxiety disorder,

characteristics of schizophrenia, and Post-Traumatic Stress Disorder. He still has severe depressive episodes and has attempted suicide. Frequently, he suffers from panic attacks triggered by news reports of military force deployments or events in Iraq.

412.    Timm Eberly is under continuing mental health treatment. However, now at age 29, he still lives at home with his parents and is often unable to summon the emotional strength to get up in the morning. He has been unable to complete his education and is unable to hold a job. The extremely high cost of his psychiatric treatment and medicine is not covered by insurance and adds to his anguish.

### Dr. Robert Fox

413.    Lt. Col. Fox's youngest brother, Robert Fox, was in medical school when U.S. Air Force personnel came to his door to inform him that his brother had been shot down on February 19, 1991. He suspected that his brother was dead.

414.    For the next two weeks, he found himself besieged by reporters seeking comment on his brother's potential status as a POW. While he came to believe that Lt. Col. Fox had survived the ejection from his aircraft, he did not know what had happened to him after that. Iraq did not notify the ICRC or any other organization of his brother's status as a POW. A flood of thoughts, including the possibilities of his brother being captured, tortured, or killed, entered his mind and would not leave.

415.    He cancelled a segment of his medical school rotations to return home to help support his father during this ordeal.

416.    Since Lt. Col. Fox's return to the United States, Robert has seen his brother become a more solitary person as a result of his torture by Iraq. When Jeffrey Fox left a job as a commercial pilot at Southwest Airlines, he first went to Robert's house to stay for a while and to

decide how he would explain his quick departure to the rest of his family and friends. Robert has been greatly saddened at the effect of the torture on Jeffrey.

417.    Robert has been close with his brother Jeffrey his entire life. Lt. Col. Fox often helped Robert out with money, and he largely furnished his youngest brother's house when he was in medical school. Robert stayed with Lt. Col. Fox while he studied for his medical board exams, and their time together gave them a chance to grow even closer as brothers and friends.

### Mr. Terrence Fox

418.    Terrence Fox was a Major in the U.S. Air Force when his brother, Lt. Col. Fox, was shot down over Iraq on February 19, 1991. A military chaplain and a wing commander pulled him out of a briefing session in Arizona to inform him of his brother's crash.

419.    While Mr. Fox knew that Lt. Col. Fox had survived the ejection from his aircraft, he did not know what had happened to him after that. However, he did know that anything was possible, including capture, torture, and death, and these thoughts tormented his mind. At no point did Iraq relieve Mr. Fox's uncertainty by notifying the ICRC or any other organization of his brother's status as a POW.

420.    Since Lt. Col. Fox's return from his torture in Iraq, it has caused Mr. Fox great distress to observe his brother move away from the life he might have had if he had never been subjected to the torture he endured in Iraq. He has noted that his brother is simply not the same person as he was prior to his service in the Gulf War.

421.    Mr. Fox is close to his brother Jeffrey, and the Fox family is very tight as a whole. Mr. Fox speaks to his brothers and sisters routinely, and they all band together when one of them has a problem.

422.    The Air Force offered an early retirement to Mr. Fox after sixteen years of service. His brother's experiences of torture – and the subsequent effects of that torture on him and the rest of his family – soured Mr. Fox on the prospects of a military career, and he accepted the Air Force's offer.

### Mrs. Patricia Borden

423.    On February 19, 1991, Patricia Borden learned that her brother Lt. Col. Jeffrey Fox had been shot down over Iraq the day before. For her, a time of "hell" began on that day.

424.    As Mrs. Borden grew up in a military family, and her own husband had deployed to the Gulf region, she understood the responsibilities and risks inherent in military service. But before Lt. Col. Fox was captured, she maintained a general sense that the Geneva Conventions would protect her brother from harm outside of that which always exists in combat.

425.    With no news of Lt. Col. Fox's condition after February 19, however, Mrs. Borden was left to wonder what his captors were doing to her brother. Iraq did not notify the ICRC or any other organization of Lt. Col. Fox's status as a POW, so the uncertainty in Mrs. Borden's mind was never resolved during the entire time her brother remained in Iraq. Video footage and photographs of other POWs tormented Mrs. Borden, however, and made her believe that Lt. Col. Fox was going through horrific treatment in Iraq, assuming he was even alive.

426.    At the time of this family crisis, Mrs. Borden's mother was already seriously ill (having suffered a stroke) and could not comprehend much of what was happening to her son, nor fully communicate with her children. As a result, Mrs. Borden took on the extra responsibility of essentially becoming the matriarch of the Fox family, and the rest of the family looked to her for strength and support, which she gave.

427.    When Lt. Col. Fox returned, Mrs. Borden was stunned at how thin he was.

428.    Even today, when Mrs. Borden sees pictures of a desert, she shudders to imagine what Lt. Col. Fox went through as a POW in Iraq.

429.    It has pained Mrs. Borden greatly to see Lt. Col. Fox struggle with his life and career outside the military since he has returned to the United States. She realizes that his life was permanently affected by his torture in 1991, and she has been greatly saddened by the effect it has had on him.

430.    Mrs. Borden, who is one year younger than her brother Jeffrey, was very close with him before he deployed to Saudi Arabia, and continues to be so. They talk once or twice a week, and Mrs. Borden has assumed the role of a confidant to her brother.

### Mrs. Nancy Gundersen

431.    Nancy Gundersen, the sister of Lt. Col. Jeffrey Fox, made plans with the rest of her family to see him in Tucson, Arizona, for Christmas of 1990 when they learned he would deploy to Saudi Arabia for the Gulf War early the next year. Lt. Col. Fox arrived in Saudi Arabia on January 6, 1991, and was shot down over Iraq and captured as a POW on February 19.

432.    After learning of Lt. Col. Fox's shoot-down from her sister, Mrs. Gundersen became distraught at the knowledge that he was missing in action and might not return home.

433.    While Iraq did not notify the ICRC or any other organization of Lt. Col. Fox's status as a POW, Mrs. Gundersen scoured the newspapers and called media organizations herself in attempts to learn her brother's whereabouts. Mrs. Gundersen later came to believe that he had survived the crash, but she did not know what he might be enduring after his parachute landing.

434.    The uncertainty of this situation rendered Mrs. Gundersen extremely distraught – unable to concentrate at work and unable to sleep at night. Even before Lt. Col. Fox was captured, Mrs. Gundersen saw videotapes of the POWs who had clearly been beaten or otherwise

severely mistreated. She was also aware, from reading media accounts, of Iraq's use of torture against Iranian POWs during the previous decade. This made her concern over her brother's situation all the worse, as she felt certain that the Iraqis were torturing her brother. She worried constantly about his safety. At the same time, she was tormented by anger and a feeling of utter helplessness that she could do nothing to help him.

435.    Even after Lt. Col. Fox's return to the United States following his release, Mrs. Gundersen's fears have continued. When her husband received an excellent career opportunity in Israel in 1995, she was very wary of living there, and the struggle over the decision of whether to go caused a great strain on her marriage. Mrs. Gundersen and her family arrived in Israel just after Israeli Prime Minister Yitzhak Rabin had been assassinated. They spent two years in Israel, but she was miserable while she was there. When she heard explosions, she often thought about what her brother had endured as a POW several years before. To this day, she has an extreme fear of traveling as a result of the anxiety inflicted upon her by her brother's ordeal in Iraq.

436.    Since her brother's return, Mrs. Gundersen has also been distressed to watch the effects of her brother's brutal POW experience on his spirits and career. She worries about him greatly, and continues to try to help him in every way she can.

437.    Four years younger than Lt. Col. Fox, Mrs. Gundersen has remained close with her brother, as has the rest of the Fox family. They get together each year in Massachusetts, and talk regularly on the telephone.

### Mr. Timothy Fox

438.    Timothy Fox learned on February 19, 1991, that his brother, Lt. Col. Jeffrey Fox, had been shot down over Iraq the day before. Timothy, also a Lieutenant Colonel at the time, was then stationed in Seoul, South Korea, but happened to be back in the United States for a

conference at the time. He immediately flew to Massachusetts to be with his family, after receiving emergency leave.

439. Because Timothy was a military aviator himself, he knew what might await his brother after he landed in Iraqi hands. He was concerned about severe mistreatment and this concern preyed on his mind while his brother remained in Iraq. Iraq never notified the ICRC or any other organization of Lt. Col. Jeffrey Fox's status as a POW, so Timothy did not know where, or under what conditions, his brother was being held.

440. Timothy was eventually required to return to Seoul, even though his brother remained missing. After his brother was released, he managed to secure another two-week leave to be reunited with his brother upon his brother's return to the United States.

441. Timothy has noticed a marked change in Jeffrey since his brother returned to the United States. He believes that Jeffrey is more solitary around non-family members and that he has difficulty tolerating even mild and routine exercises of authority. Timothy has suffered from seeing Lt. Col. Fox so affected by his torture.

442. Timothy and his brother Jeffrey are part of a very close-knit family. They are only a year apart in age. They were close as children and remain so today.

### Mrs. Mary Hunter

443. Mary Hunter had been married to her husband, Chief Warrant Officer Guy Hunter, for fourteen years and had three children when she learned, on January 18, 1991, that he had been shot down over Iraq. Mrs. Hunter was sitting on her back patio when Marine officers approached her house to deliver the news.

444. Mrs. Hunter was devastated. She quickly became consumed with searching CNN for any news that her husband was alive. Several days later, she saw him on a videotape that his

Iraqi captors had forced him to produce. Warrant Officer Hunter looked very tired or drugged. He had bloodshot eyes and looked as if he had been wasting away. Besides this limited view of her husband, Mary Hunter received no other word of his condition while he remained a POW in Iraq, and she continued to fear for his life. At no point did Iraq notify the ICRC or any other organization of Warrant Officer Hunter's status as a POW.

445. After reading news accounts of Iraq's threat to use American POWs as human shields against Allied bombing, Mary Hunter became extremely distressed that her husband might be killed by friendly fire. This exacerbated her fears concerning the possible torture her husband was enduring. The mounting and ceaseless fear caused Mrs. Hunter to lose almost thirty pounds over the seven weeks of this ordeal. She also suffered from severe headaches and sleeplessness that required medical attention.

446. Mrs. Hunter accepted an invitation to be interviewed on the Today morning show. She wanted to be a source of strength for younger wives of American servicemen who had never experienced war, and she thought she could send a message to her husband. Subsequently, she decided to make no further public appearances due to concerns that any statement she made could have repercussions for her husband. Her anxiety deepened.

447. Upon Warrant Officer Hunter's return to the United States, Mary Hunter was greatly saddened to see what his damaged body had endured. He had lost thirty pounds off a lean frame, and green and brown bruises covered his skin. Mrs. Hunter has worked in the medical field and has seen dead patients and the results of autopsies, but it still bothered her deeply to see him in such a condition.

448.    Since then, Guy Hunter has continued to suffer with almost daily nightmares that keep his wife awake at night. She continually tries to soothe his nerves, but this is an ongoing task that has plagued the family since the Gulf War ended in 1991.

### Mrs. Laura Reeves

449.    Laura Reeves, formerly Laura Hunter, came home from her seventh-grade class on January 18, 1991, to encounter her mother, who was crying, and her aunt who told her that her father, Chief Warrant Officer Guy Hunter, was missing in action, having been shot down over Iraq.

450.    The weeks and days following this news passed in a blur for Ms. Hunter. She watched, in fear and confusion, as the chaos of reporters, military officers, friends, and family came and went, hour after hour.

451.    She took on extra responsibilities around the house to help her mother with her younger siblings, but she often feared that someone would break into the house with her father gone. Ms. Hunter also received unwanted extra attention from classmates, school administrators, and the media as a result of her father's disappearance. While reporters stalked her school in hopes of an interview with Ms. Hunter, her school's principal would not let her talk to them between classes and offered time with school counselors to her if she needed it.

452.    During this time, Ms. Hunter often woke up in the middle of the night thinking her father was dead, after which she would cry herself to sleep. She often was haunted with thoughts of what his captors might be doing to him if he were still alive. At other times, she assumed she would never see him again.

453.    When Ms. Hunter did see her father on television as he was being released, her first thought was: who did that to his head? While his hair had been gray before, it was now stark white, and he was so thin after his ordeal in Iraq that she could barely recognize him.

454.    After Warrant Officer Hunter returned to the United States, the family tried to return to normal, as if nothing significant had happened over the preceding months. But Ms. Hunter noticed a distance between herself and her father. She was afraid to get close to him again, for fear he might leave again and not return. During the first two to three years after he returned, Ms. Hunter's relationship with her father continued to suffer the after-effects of his torture. She was afraid to go near her father for quite some time. Knowing only her own family, Ms. Hunter thought this behavior was normal.

455.    Ms. Hunter bravely bore the brunt of the situation almost solely on her own shoulders. While she and a school friend did speak to a school guidance counselor about a "friend" with circumstances like Ms. Hunter's, she chose not to open up to others about her own feelings and experiences. Since she grew up strongly valuing courage, she did not think it was appropriate to complain about matters such as this or to seek help from others.

### Mr. William (Ray) Hunter

456.    Ray Hunter was nine years old and in the third grade when his father was shot down and first reported as MIA. Like his mother and sisters during those following days, he was constantly tormented by thoughts that he would never see his father again. Mr. Hunter felt fear and confusion at the thought of going on without a father in his life anymore.

457.    Great demands were also placed on his mother during this time, both emotionally in dealing with her own despair and in dealing with the torrent of reporters, friends and family

that continually came and left. As a result, Mr. Hunter felt alone and afraid, like there were no adults to be with and take care of him and his sisters anymore.

458.    He still vividly remembers how changes in his family life during the weeks following his father's disappearance and capture hit him especially hard. He remembers with great fondness, for example, how his mother used to take special care in preparing the family meals, and how much it hurt when his mother could no longer make the family's meals due to her overwhelming concern for her husband's safety.

459.    Mr. Hunter got no relief away from his home either. His grades collapsed because he could not concentrate at school. He was also teased and tormented by other children at his school. They would tell him that his father was already dead and would ask him, "Why don't you just give up on him?" He got into many fights at school with other children as a result.

460.    When he first saw his father alive on the CNN news broadcast, Mr. Hunter was extremely disturbed and agitated. He remembers to this day feeling horrified at the sight of his father's bruised appearance, and he had never seen his father look so tired in his life.

461.    He also saw his father's black eye, and remembers believing that it could not have been caused by an ejection – Mr. Hunter had been in fights himself, and he knew what kinds of damage blows could do. Even at that young age, he was old enough to comprehend that his father had likely been beaten and tortured to extract the videotaped statements.

462.    When his father first returned home after his release, Mr. Hunter was further forced to contemplate and face the horror of what his father's captors had done. He remembers how his father was "incredibly skinny," and he understood that this was the result of the systematic starvation and other torture that had been inflicted upon him while in captivity.

463.    It took Mr. Hunter years before he could start to feel like things were beginning to return to the way they had been before his father had been tortured. His grades were continually below his ability, and they did not fully improve until he reached the eighth grade. His feelings of isolation continued for years after his father's return.

464.    Ray Hunter currently enjoys a good relationship with both his parents. But, at the same time, he believes that his relationship with his parents would have been much closer growing up if the course of his family's life had not been impacted by his father's torture and the aftermath it brought to him and the family.

### Ms. Mary Elizabeth (Lily) Hunter

465.    Lily Hunter was in first grade when her father, Guy Hunter, was shot down over Iraq on January 18, 1991. Her mother, Mary Hunter, sat each of her children down individually and explained what had happened. At that young age, Ms. Hunter did not have a clear grasp of what war even was, but she understood that her father would not return quickly.

466.    Until this point, Ms. Hunter had a very close relationship with her dad. He took a special interest in her, as she was his youngest child, and she describes herself at that time as being "Daddy's little girl." He read to her for an hour each night and would spend about the same time with her on homework questions she had. If she ever needed anything or became upset, she often turned to her dad to calm her down, and he did.

467.    This changed when her father was taken from her. Ms. Hunter had an extremely difficult time while her father was missing in action. She understood neither what was happening to him nor how he might return. She remembers being "horrified" at seeing the bruised and bloody faces of other POWs on television and in the media. She remembers that the television was "always" turned to CNN because of her mother's hope that some relevant news

would be released. By not notifying the ICRC or any other organization of her father's status as a POW, Iraq prevented Ms. Hunter from knowing whether her father was alive or whether he would ever be returned safely.

468. Other issues at home made life very hard for her while her father was away. She also had to adjust to decreased supervision and attention, as her mother was dealing with outsiders and her own emotions, while trying to fulfill two parental roles. Adults at home whispered that her father was probably already dead in conversations she was not meant to hear. An assortment of adults constantly filled her house to help out with daily tasks that her mother was too busy or distraught to complete. With commotion she was not used to, even sleeping became difficult for Ms. Hunter. Classmates taunted her by telling her that her dad was being held as a human shield. School became an unbearable torment, and she created maladies – like self-induced vomiting – so she could seek refuge in the nurse's office and catch up on rest she had missed at home.

469. When her father returned to the United States, Lily Hunter's ordeal was not over. She was shocked when she saw images of her father on television upon his return. His dramatic weight loss and visible bruises made him look like a different person. And when he actually came home, it seemed as if a different person had walked into the house. Lily was scared to go near her father and had great difficulty learning how to approach him after the torture he endured in Iraq. The bedtime stories she and her dad shared before he was a POW never happened again after he returned, and she was unable to confide in or rely emotionally upon her father like she used to before he was tortured.

470. While Ms. Hunter became better able to carry on a normal relationship with her father when she entered middle school, several years later, things have never returned entirely to

normal for her since her father was tortured in Iraq. To this day, she is traumatized by the treatment he had to endure.

## Mrs. Patricia Roberts

471.    Then-Capt. Mike Roberts' wife, Patty Roberts, was stationed with her family in Spain and was eight months pregnant when she learned that her husband had been shot down over Iraq on January 19, 1991. She was told that his wingman did not see a parachute and that her husband was likely dead. She did not sleep for three days after the initial notification, and her stress was magnified by concerns over the health of her baby.

472.    Mrs. Roberts saw a videotape of her dazed husband broadcast on international television three days later. He did not look healthy, and his demeanor told her that something was dreadfully wrong. In fact, Mrs. Roberts passed out upon seeing the videotape. As Iraq did not notify the ICRC or any other organization of Capt. Roberts' status as a POW, this tape was the only evidence Mrs. Roberts had that he had survived his crash. While initially relieved, the uncertainty about his fate was severely debilitating to Mrs. Roberts. She worried greatly about the treatment that Capt. Roberts might endure at the hands of his Iraqi captors.

473.    The insecurity became so difficult over these three days that, in her desperation, Mrs. Roberts found herself thinking about suicide. However, she persevered, knowing that her children were relying upon her, now more than ever.

474.    Mrs. Roberts felt vulnerable in Spain while Capt. Roberts was being held as a POW in Iraq. In addition to anxiety over how her two children (aged 11 and 15) were handling the stress of their father's captivity, she had to worry about the health of her unborn child, to whom she gave birth on February 21 (while her husband was still in captivity). She feared greatly for her children's safety, knowing it was possible that terrorists might have learned their address and planned an attack. She also felt that she must keep news of her pregnancy out of the

press, lest that information be used against her husband or that it put her and her children in greater peril.

475.   Mrs. Roberts reports that there has been strain on their marriage as a result of the lingering effects of the POW experience on her husband.  Among other things, Lt. Col. Roberts does not like to talk about the experience.

476.   Because of her husband's experiences as a POW, Mrs. Roberts fears traveling and avoids it whenever possible.  She has lingering concerns about security and lives in fear, including the fear that those who tortured her husband could still "come after" him and their family.

### Mrs. Starr Barton

477.   Mrs. Starr Barton was fifteen years old and living with her family in Spain on January 19, 1991, when U.S. Air Force officers approached the Roberts household to explain that her stepfather, then-Capt. Michael Roberts, had been shot down over Iraq several hours before. Mrs. Barton watched her mother, eight months pregnant at the time, fall to her knees in grief when she heard the news.

478.   Mrs. Barton was immediately thrust into a more adult role than she had occupied before.  She wondered if her mother and yet-unborn brother would be okay and, she began to take on more responsibilities around the house.  As the Roberts family lived thirty miles away from the Air Force base in Spain, many daily duties were left to Mrs. Barton to take care of while her mother scoured the media for any sign of Capt. Roberts.  The worst of these for Mrs. Barton during this time was mail collection.  Because of the slow speed of the mail coming from American service members in Saudi Arabia, Capt. Roberts' letters continued to arrive in Spain even after he had been captured as a POW.  Mrs. Barton brought these letters home from the

base and knew the intense pain they would cause her mother. She worried greatly about her
mother's health throughout this time.

479.    Mrs. Barton learned that her stepfather had survived his shoot-down when he
appeared in a coerced videotape that was broadcast on CNN. She was thrilled to learn that he
was alive, but the image of Capt. Roberts on television horrified her and made her feel helpless
to do anything about it at the same time. He looked confused and tired, and Mrs. Barton also
suspected that what Capt. Roberts was going through in Iraq might be worse than death. Living
in a military environment, she was somewhat aware of what other POWs in other wars had
endured even before this event traumatized her own family. Still, Mrs. Barton was also naïve
about the miseries warring states might inflict on their POWs. After January 19, she read books
about the subject voraciously and learned perhaps more than she wanted to know. She could not
help considering the worst-case scenarios.

480.    The experience affected Mrs. Barton greatly. She was constantly on edge as she
awaited news that would assuage her mind, and she could not sleep regularly. One day in her
Geometry class, she fell asleep on her desk and awoke screaming after dreaming that she was
falling and about to die.

481.    After seeing the videotape on CNN, Mrs. Barton heard nothing about Capt.
Roberts' condition, and she wondered if he continued to survive the treatment he was undergoing
in Iraq. Iraq never notified the ICRC or any other organization of Capt. Roberts' status as a
POW. Knowing nothing about Capt. Roberts' condition was extremely difficult for Mrs. Barton.

482.    When Capt. Roberts returned, it took some time for the Roberts family to get back
to normal. Mrs. Barton was horrified at seeing his physical condition upon his return. Even
today, she thinks about this experience almost daily.

483.    Mrs. Barton has been very close with her stepfather since he married her mother in 1987. She has lived with him as family and since 1987 he has fulfilled every paternal role for her, including paying her tuition for college. When Mrs. Barton was married in 1997, she enjoyed her first dance at the reception with Lt. Col. Roberts. Mrs. Barton now has little contact with her biological father, and her own son treats Lt. Col. Roberts as his natural grandfather.

### Mrs. Anna Slade

484.    Navy officers arrived at Mrs. Anna Slade's front door around 8:00 a.m. on January 22, 1991, to tell her that her husband, then-Lt. Lawrence Slade, had been shot down over Iraq several hours before. While military personnel had seen his plane go down and had seen at least one parachute emerge, no one could tell Mrs. Slade whether her husband was still alive.

485.    About five days later, a Casualty Assistance Calls Officer contacted Mrs. Slade to let her know that an Iraqi-made videotape of several POWs, including Lt. Slade, might appear on CNN later that day. She immediately tuned in to watch and had mixed emotions after seeing his face. He was alive, at least when the videotape was made, but his face was swollen and he looked very scared. The first thought that came to her mind after she saw the video was that her husband might be experiencing what the American POWs in Vietnam went through, including the physical and mental torture that they had endured. The prospect was very painful to her.

486.    The news media called Mrs. Slade regularly seeking comment about her husband. She tried to keep family information out of the press to avoid giving her husband's captors any information they could use against him. This was especially critical for Mrs. Slade, as her husband's father and brother had been on an airplane that was hijacked in 1985 and had testified in federal court against the hijackers. Were such information to become public, it could prove dangerous for her husband while he was in captivity.

487. Mrs. Slade tried to send letters to her husband through the Red Cross, but Iraq did not allow the letters to reach him. Nor did Iraq notify the ICRC or any other organization of Lt. Slade's status as a POW, so Mrs. Slade was kept in a constant state of uncertainty over his condition.

488. Mrs. Slade could not sleep well and lost a significant amount of weight while her husband was being held as a POW in Iraq. Normal activities such as eating became an afterthought to enduring each day without him.

489. When Lt. Slade came back to the United States, he suffered nightmares, and Mrs. Slade woke him up many times to shake him out of horrific dreams. But, otherwise, the two tried to go on with their lives. Superficially, this approach worked for a while, but problems began to surface. Mrs. Slade discovered that she felt an overpowering need to prove that if her husband disappeared again she would be able to live a normal life. After the torture Lt. Slade had endured, even the most terrible prospects now seemed to be reasonable possibilities, and subconsciously Mrs. Slade wanted to be prepared. At times, she also listened too closely to others' characterizations of her husband as a hero, and she tended to put him on a figurative pedestal while minimizing her own contributions to their partnership. Lt. Slade perceived her behavior as distance and detachment, when in fact it was a psychological defense mechanism against a similar incident in the future.

490. Lt. Slade's torture in Iraq also caused the Slades to delay starting a family for several years. After moving to his first shore-based tour of duty, a common time during a Navy career to start a family, the memories of his torture were still too vivid, and the Slades spent those years reconnecting. Upon Lt. Slade's return to a subsequent sea-based tour, Anna was again painfully reminded of the possibility of his capture and torture as he began combat

missions over Bosnia. After a five-year delay, and after having been married for over eight years, the two had their first child. This delay was a direct result of Lt. Slade's experience in Iraq, specifically his mistreatment while he was a POW.

491.    At times, the mere fact of Cdr. Slade's time as a POW causes tensions in friendships the Slades make with others. The idealization of both of the Slades in these friends' eyes has been – and continues to be – debilitating to the friendship relationships in much the same way that the Slades' marriage suffered when Mrs. Slade idealized her husband.

492.    Mrs. Slade also suffered as her husband's career failed to reach the heights that had been expected of him. Her commitment to his career, and his unexpectedly not being given chances to compete for regular assignments with his peers, resulted in tremendous disappointment when her husband's career progress slowed. After fourteen years of marriage, to Cdr. Slade and the Navy, this loss was not insignificant.

### Mrs. Leanne Small

493.    When Leanne Small's doorbell rang on February 26, 1991, she expected to greet maintenance workers she had called to do house repairs. Instead, two Marine officers entered to tell her that her husband, Major Joseph Small, had been shot down over Iraq the day before.

494.    A number of factors suggested that Maj. Small had died in his crash. In an OV-10 Bronco aircraft (the type of plane piloted by her husband), when only one person survives being shot down, it is usually the one in the front seat who is killed. Because Maj. Small had occupied that front seat and because other pilots in the area of the shoot-down reported seeing only one parachute emerge from the plane, Mrs. Small drew the natural conclusion that her husband was dead.

495.    Because Iraq did not notify the ICRC or any other organization of Maj. Small's status as a POW, Mrs. Small was left to suffer with this belief the entire time her husband was held captive in Iraq. She was forced to contemplate raising three children on her own and a life with no partner. She also had to deal with the difficult tasks of informing her young children that their father was missing and helping them cope with this situation.

496.    Her desperation built over the following days. Finally, after nine days, she received a call saying that the Red Cross had been provided with her husband's Social Security number from his Marine identifying tags. She was told not to raise her hopes too high, however, because the Iraqis could be playing a cruel trick. This possibility further tormented Mrs. Small and kept her from resolving the crisis in her own mind.

497.    After Maj. Small returned, Mrs. Small noticed definite changes in her husband. He had developed a shorter temper and become more high-strung as a result of his torture by Iraq. These changes put a strain on their marriage, which Maj. and Mrs. Small have overcome only with significant effort. The changes in Maj. Small also put a strain on their children, and Mrs. Small feels that some anxiety persists in her children to this day as a result of the strained relationship with their father upon his return from Iraq.

### Mr. David Storr

498.    David Storr was serving in the Gulf War as a Marine Corps flight Captain when he learned that his brother, Capt. Dale Storr, had been shot down over Iraq. After he returned from a morning air strike on February 2, 1991, his company's commanding officer and executive officer broke the news to him that Dale's plane had hit the ground with no apparent ejections. The officers explained, and David knew, that Dale's survival in that situation was likely impossible.

499.    David Storr was immediately given two weeks of emergency leave to return home. He and his other brother, Doug, who was also a military aviator, both returned to Spokane, Washington, to support their mother and sister during this time. David Storr was convinced throughout this period that Dale had died when his plane was shot down. He spent most of his time in Spokane in a delicate balancing act between preserving a veneer of hope for his mother and sister that Dale may well have survived and trying to prepare them for what he felt was the near certainty that he had been killed.

500.    After about three weeks of trying to settle his family members' emotions this way, however, David found the total absence of official news on Dale more and more curious. Meanwhile, unofficial rumors started to emerge. While he dismissed most of these as unfounded, he listened closely to shadowy reports of a tall pilot who had been shot down and was now being held as a POW. Not many Allied airmen had been shot down, and many of them had been accounted for in one way or another. While the chance that his brother could be alive was obviously a welcome thought, the new possibilities of what awaited him as a POW haunted David. He was aware of what American POWs in Vietnam had undergone and was aware of Iraqi abuses of POWs in prior conflicts, and he was worried that Dale could suffer the same treatment.

501.    Underlying this distress was a family history that made David's mother especially weak in the face of losing her son to the Gulf War. She had gone through a similar scenario years before when her husband piloted B-52 bombers in Vietnam. David's father had died of cancer in 1988. Now his mother had cancer, and her sons were in the dangerous position of defending American interests from the sky. David remembered watching his mother crying in their kitchen when he was a child, and he did not want to put her through that situation again

without as much family support as possible. After two weeks, he requested extra time from his commanding officer to take care of his mother.

502.    David and Dale Storr have always been close brothers. All of the Storr children bonded together as their father fought in Vietnam. David and Dale also shared a room through junior high school and high school and attended college together, only one year apart. Since Dale has returned to the United States, David has noticed that his brother has become more distant and emotionally detached from others. David is wary of approaching the subject of his brother's captivity too directly for fear of stirring up old emotional injuries that are difficult to heal.

### Mr. Douglas Storr

503.    Doug Storr, an Air Force pilot himself, was actively involved in military operations in the Persian Gulf when he learned that his brother, Capt. Dale Storr, had been shot down over Iraq on February 2, 1991. After landing for a stop-over in Germany, then-First Lieutenant Storr was pulled aside from the rest of his crew by an Air Force senior officer and led to an awaiting staff car. Because Doug Storr's father was also an Air Force pilot and combat veteran, he was intimately familiar with the protocol associated with notifying family members of those missing or lost in combat. Immediately, he knew something was terribly wrong when he saw an Air Force chaplain get into the rear of the staff car to help console him when the news of his brother's fate was conveyed. The first thought that entered his mind was, "Which one?" Doug Storr's other brother, David, was also an aviator engaged in operations in the Persian Gulf. These military personnel then explained to him that Dale Storr's official status was Missing in Action (MIA), Whereabouts Unknown. However, off the record, these officers suggested that the only reasonable conclusion to be drawn from the circumstances surrounding the incident was

that his brother died either when his plane was struck by the Iraqi missile or when the aircraft crashed to the desert floor, as his wingman had reported the aircraft impacted the ground without an ejection.

504.    Doug Storr and his brother David were immediately sent home to Spokane, Washington, where they might serve as some comfort to their mother and younger sister, Diane. Whether they could actually do so was questionable, because while their mother and sister held out great hope that Dale had survived the shoot-down, Doug and David "knew" – beyond a shadow of a doubt based on the then-classified information surrounding the shoot-down – that he was dead. For thirty-three days, the two brothers maintained a façade of hope and encouragement for their mother, sister, and close family friends while privately trying to help each other deal with what they believed to be Dale's certain death.

505.    They became intimately familiar with the MIA protocol and the details of dealing with a military family member who has been lost to combat. While their mother watched CNN for any shred of information about Dale, Doug Storr tried to decide how he was going to arrange a funeral, get his brother's personal effects returned from his home base in Louisiana, and face his inevitable return to duty in the Persian Gulf. He and his mother had been witness to similar situations several times before during the Vietnam War. However, they had always been fortunate to be the ones consoling rather than the ones being consoled. It was painful for Doug Storr to watch his mother re-live these incidents alone without the support of his recently deceased father.

506.    Doug Storr could not bring himself to watch the news during this period. Because he was convinced of his brother's fate, he thought the only news that could be relevant to Dale would be an item describing how his body had been found dead in Kuwait. Instead, he watched

movies and sought to mask his sadness at losing his brother to the war. He also had to cover those feelings while attempting to remain optimistic while doing several television, radio, and newspaper interviews with the local media. At no point did Iraq give him reason to think that his brother Dale had not been lost by notifying the ICRC or any other organization of Capt. Storr's status as a POW. Even after his mother called to tell him that Dale was alive and coming home, he was so convinced that could not be true that he did not believe it until he actually saw his brother on the television screen.

507.   Doug and Dale Storr are five years apart in age, and have always been very close as brothers. They look very much alike and have always felt a bond because of that. Also, Doug and Dale pursued similar career paths in the Air Force, and because of this, Doug Storr has always been able to look to Dale as a model for how he should carry himself as a pilot – even more so after their father's death. When Doug Storr went through the Air Force's year-long pilot training school, Dale was able to help immensely because he had been an instructor charged with training Air Force student pilots only a year before.

508.   Doug Storr continues to have great difficulty telling the story of his brother's disappearance in the desert, as it evokes great pain to recount the long period when he thought his brother would never return. Doug Storr cannot tell his own story about this ordeal in Dale Storr's presence without tremendous apprehension for fear of losing his composure in front of his role model and mentor.

### Ms. Diane Storr

509.   Diane Storr worried greatly when the Gulf War swept all three of her brothers into harm's way in 1990. She learned on the morning of February 2, 1991, when her brother Capt. David Storr called the Storr house in Spokane, Washington, that another brother, Capt. Dale

Storr, had been shot down over Iraq several hours before. About twenty minutes later, Air Force officers came to the door to repeat the same news.

510.    Ms. Storr's whole life was put on hold while she waited for news of the brother to whom she felt she had been the closest. Dale had always been protective of Ms. Storr and supported whatever she decided to do. He often told her not to worry what others might think, but to pursue her dreams despite them. It was in this context that Ms. Storr thought of Dale, and she desperately prayed for his safe return.

511.    Without knowing the context of Dale's crash, she was more hopeful than her brothers that he might have survived. Ms. Storr watched the television news and listened to the radio incessantly, thinking her brother might appear at any time. When the videotapes of other Allied POWs appeared on CNN, she knew that Dale would be suffering the same apparent mistreatment if he were a POW as well. Ms. Storr hoped that he was alive but could not imagine his being tortured that way. She would have preferred that he die from being shot out of the sky rather than suffer a slow, painful death. Ms. Storr did not sleep well during this period because of her constant anxiety. Not knowing anything concrete about Capt. Storr's condition was very difficult. Iraq did not alleviate her concern by notifying the ICRC or any other organization of Capt. Storr's status as a POW.

512.    Ms. Storr also had to watch the effect of this period on her mother and other two brothers who had returned home from the war. David and Doug, who normally joked about everything, were very serious and became angry with little provocation. Two weeks before Dale was released, when Doug was heading back to Saudi Arabia, he told Ms. Storr that he would be returning soon for Dale's funeral.

513.    After returning to the United States, Dale stayed with Ms. Storr for about a month. He suffered frequent and severe nightmares during which he screamed so loudly that he awoke her in a different part of her house. Ms. Storr felt helpless because she could do nothing to calm her brother's fears. The experience has made Ms. Storr much more concerned about all of her brothers as they fly, whether on military missions or commercially.

### Mr. Arthur Sweet

514.    Arthur Sweet was at home with his family on February 15, 1991, when U.S. Air Force personnel approached to tell them that his son, then-Lt. Robert Sweet, had not returned from his flight mission over Iraq. His status was listed as "Whereabouts Unknown."

515.    For the next nineteen days, Mr. Sweet received no information regarding his son's status. The resulting insecurity was excruciating to him. Iraq did not notify the ICRC or any other organization of Lt. Sweet's status as a POW while he was a captive. Mr. Sweet did not know if his son was alive or dead.

516.    While he knew that the U.S. military was doing everything it could to secure his son's release, the uncertainty regarding his son's condition caused Mr. Sweet severe anxiety. The first stories of possible mistreatment of Allied POWs that were circulated throughout the news media only intensified Mr. Sweet's concern. Mr. Sweet's stress was caused by the fear and anguish of not knowing what had happened to his son and alternatively wondering how his captors were treating him if he were still alive. He also had great anxiety for the effect this was having on his wife, his younger son, and their extended family.

517.    A psychologist indicated that the stress absorbed by Michael Sweet, Rob's younger brother, caused depression that appeared a few years later and forced him to take nine years to complete a six-year college education. Michael's second through fourth years of college

yielded only failed and dropped courses. Mr. Sweet paid for tuition, housing, and living

expenses for the additional three years at a cost of about $27,000. During that time, Mr. and

Mrs. Sweet agonized over whether Michael would recover from his depression, and they

experienced additional anxiety.

### Mrs. Mary Ann Sweet

518.    Mary Ann Sweet was at home when U.S. Air Force officers approached her house

on February 15, 1991, to notify her that her son, then-Lt. Robert Sweet, had not returned to his

home base after a mission over Iraq.

519.    After this notification, Mrs. Sweet was desperate to hear news of her son's

condition, but she heard nothing until his release, as Iraq did not notify the ICRC or any other

organization of Lt. Sweet's status as a POW.

520.    Mrs. Sweet's blood pressure rose and stayed high as a result of the ordeal caused

by not knowing whether her son was dead or alive. She sustained damage to her kidneys as a

result and today has only thirty to thirty-five percent usage in each kidney. If her kidneys decline

to fifteen percent of normal functioning, she will require dialysis.

521.    As Mrs. Sweet watched the news and saw images of other POWs, she became

convinced that her own son was being beaten while in Iraqi hands. She knew that Lt. Sweet had

been trained well and had a very strong will. She only hoped it would be enough to sustain him.

522.    Perhaps the most difficult part of this ordeal for Mary Ann Sweet happened well

after Lt. Sweet returned to the United States. Her other son, Michael, was a high school

sophomore during the Gulf War and did not talk very much about the experience as it was

happening to his brother. Three years later, though, when Michael was in college, he endured a

severe clinical depression that lasted about thirty months and was traced to observing his

brother's trauma from Iraq. While Michael was able to conquer that disorder, Mary Ann Sweet felt at the time that she had lost two sons to the same cause.

### Mr. Michael Sweet

523.   Michael Sweet was a high school sophomore when he learned that his brother, Lt. Robert Sweet, had been shot down over Iraq in January 1991. All he and his family were told was that the wreckage of Rob's plane had been found and that the second pilot was dead.

524.   Michael Sweet endured severe emotional stress while his brother was missing in action in Iraq. The most difficult part for him was not knowing whether his brother was alive or would ever return. He became "obsessed" with the situation, and thoughts about his brother were constant and inescapable. He found that, each day, a little bit of hope drained away. The ceaseless longing for any news at all, as Michael Sweet describes it, "eats away at your soul." Iraq chose not to alleviate this suffering by notifying the ICRC or any other organization of Lt. Sweet's status as a POW.

525.   It also pained Michael Sweet to see the effect of his brother's MIA status on his parents. He watched his mother go through a substantial amount of emotional stress, including watching her hair turn gray "almost overnight" as a result.

526.   The most significant impact of his brother's captivity and torture in Iraq was to come two to three years later. During his second year of college, Michael Sweet suffered a severe clinical depression that lasted for roughly 2½ years. During this time, he experienced periods where he slept fifteen to seventeen hours a day, and he failed almost every class he took at West Virginia University during this time. The time is essentially lost to him, as the depression overwhelmed and colored everything he did.

527.    Michael Sweet has always been close with his brother and had been following in his footsteps when Lt. Sweet was taken as a POW in 1991. He was enrolled in his high school's Air Force ROTC program at that time and had hoped to attend a military academy for college. However, based upon his brother's experience and the impact it had on his family (especially his mother), he decided to abandon his plans for a military career.

### Mrs. Jacqueline Curtin Wetzel

528.    Lt. Robert Wetzel had been engaged to his fiancée, Jacqui Curtin, for almost a year when he was shot down over Iraq on January 17, 1991. Shortly after Lt. Wetzel's parents heard their son's plane had been hit, they relayed the news to Ms. Curtin's best friend from college, whose husband had been a bombardier in Lt. Wetzel's training squadron but was still on base in Virginia Beach, Virginia. The friend and the bombardier came to her house to tell her what had happened so she would not have to absorb the news alone. A few hours later, military personnel came to her door to deliver the same news.

529.    Ms. Curtin and Lt. Wetzel had been planning to get married on March 2, 1991. As Lt. Wetzel began a six-month tour of duty in August 1990, even before Iraq had invaded Kuwait, he planned to be back home by mid-February with just enough time to finish preparations for the March wedding. Needless to say, these plans were put on hold while Ms. Curtin awaited news of her fiancé's return.

530.    Lt. Wetzel's disappearance was a great distress to Ms. Curtin as no military or news media reports could confirm what had happened to him. While his bombardier-navigator, Lt. Jeffrey Zaun, had appeared on a coerced videotape and on the cover of *Newsweek* magazine, there was no sign of her fiancé. Seeing the images of Lt. Zaun's face shocked Ms. Curtin. On one level, they made her hopeful that Lt. Wetzel had escaped. At the same time, she also felt

great fear and concern because Lt. Wetzel was nowhere to be seen and she recognized the possibility that he had been killed. Because the Iraqis had thrust a number of other Allied POWs before video cameras for international broadcast, it did not seem to Ms. Curtin that they were holding any back. Eventually, these images became unbearable to see, and she had to stop watching the news entirely. Whereas before Ms. Curtin had been planning a wedding, she now had to think about postponing or canceling that wedding and preparing for a funeral instead. Meanwhile, Iraq never resolved these questions for Ms. Curtin by notifying the ICRC or any other organization of Lt. Wetzel's status as a POW.

531.    Ms. Curtin's father is a history buff who had often told his children about POWs in other wars and, occasionally, the terrible things that happened to them at their captors' hands. Images of tortured POWs haunted Ms. Curtin as she hoped that her fiancé was escaping a similar fate.

532.    During this period, Ms. Curtin suffered sleeplessness to the point that she needed prescribed medication to combat it. Incessant nightmares about the Iraqi desert plagued her when she did fall asleep. Mrs. Wetzel describes herself during this time as a "zombie," unable to focus on anything but her fiancé's possible return. The time between the war's end and her fiancé's release was particularly difficult, as she could no longer entertain fantasies about Lt. Wetzel's evading capture through the desert and had to face the reality that answers about where he had been were probably just around the corner.

533.    Mrs. Wetzel finds that she does not allow herself to become as close to other people as she used to be. The chance of losing someone she loves, which seems all too possible now, is often too great for her to risk emotional connections.

534.    Lt. Wetzel and Mrs. Wetzel dated for two years before their engagement in March 1990. He listed her as a beneficiary on a U.S. Navy insurance policy that he executed before deploying to the Persian Gulf in 1990. Their marriage – which had to be postponed from March 2, 1991 – took place as soon after his return as they could reasonably proceed, on June 1, 1991.

### Mr. William Wetzel

535.    U.S. Navy personnel woke Lt. Robert Wetzel's father, Bill Wetzel, at 3:00 on the morning of January 18, 1991, to tell him that his son had not returned from his flight mission over Iraq. Mr. Wetzel and his wife, Kathleen, then undertook the difficult task of calling the rest of their children – all of whom were extremely close to their brother Bob – to tell them the news.

536.    Some members of the Wetzel family gathered together in Vero Beach, Florida, and they soon traveled to New Jersey to support one another through this excruciating time.

537.    Lt. Wetzel's capture in Iraq hit his father especially hard. Mr. Wetzel soon lost any hope that his son had survived his plane's shoot-down or the ensuing treatment he might have endured at the hands of his Iraqi captors, if he had survived the crash. Seeing his son's bombardier-navigator, Lt. Jeffrey Zaun, on television and on the cover of *Newsweek* magazine only reinforced his belief that his son had died in Iraq and would not return. Mr. Wetzel became so detached from his own feelings that he does not even recall flying to New Jersey to be with the rest of his family.

538.    Having lived through World War II, Mr. Wetzel had heard stories of POW camps that reinforced his feeling that his son might have already died at the hands of his Iraqi captors, even if he survived the attack on his aircraft.

539.    Iraq did not notify the ICRC or any other organization of Lt. Wetzel's status as a POW. The resulting uncertainty was crushing for Mr. Wetzel, as all other indications were that

his son had indeed died. To this day, Mr. Wetzel becomes very emotional if anyone asks him about Lt. Wetzel's flying or even how his son is doing. Questions about Lt. Wetzel inevitably bring Mr. Wetzel back to the haunting sensation he felt when he did not know if he would ever see his son again. This reaction has not abated since 1991.

### Mr. James Wetzel

540.    Jim Wetzel was living in Washington, D.C., when he learned that his brother, Lt. Robert Wetzel, had been shot down over Iraq on January 18, 1991. He soon gathered with the rest of his family at his sister's house in New Jersey.

541.    Mr. Wetzel, along with the rest of the Wetzel family, experienced extreme stress during the week he spent in New Jersey. He often could not sleep and had nightmares, especially after he heard news reports of a downed American pilot being beaten to death by civilians in Iraq. Long periods of seemingly futile waiting were broken by brief glimpses of other POWs and reports of a rescued American pilot who turned out not to be Lt. Wetzel. Because Iraq did not notify the ICRC or any other organization of Lt. Wetzel's status as a POW, the uncertainty about his condition was not lifted until he was released.

542.    The image of Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, on CNN and *Newsweek* magazine greatly disturbed Jim Wetzel. While he was grateful that Lt. Zaun was alive, he was extremely concerned by the absence of information on his brother. He recognized that Lt. Wetzel might have been tortured and/or killed, but he could learn nothing for sure.

543.    Mr. Wetzel took an active role in trying to learn what his brother was going through and how he might be brought home. He met with Eugene "Red" McDaniel, a POW from the Vietnam War who had written a book about his experiences, to seek advice on what to

expect over the coming months. He also met with then-Congressman Pete Peterson, another Vietnam War POW, who also offered helpful advice.

544. Lt. Wetzel and his brother, Jim, have always been close. They lived together as adults when Lt. Wetzel was stationed in Virginia Beach, Virginia, and Jim Wetzel was scheduled to be the best man in Lt. Wetzel's wedding on March 2, 1991 – a wedding that had to be postponed because of Lt. Wetzel's captivity in Iraq. Because Jim Wetzel lived in Washington, D.C., at the time, he was also available to help his brother when Lt. Wetzel was in the Bethesda Naval Hospital for two months following his return to the United States.

### Mr. Edward Wetzel

545. Mr. Edward Wetzel received a phone call at 4:30 on the morning of January 18 from his mother, informing him that his brother, Lt. Robert Wetzel, had been shot down over Iraq several hours before. He gathered together with other family members at his sister Anne's house in New Jersey as they waited and hoped for word of their brother's survival. Because Iraq did not notify the ICRC or any other organization of Lt. Wetzel's status as a POW, he and the rest of the Wetzels were left in a state of uncertainty. Two days after Lt. Wetzel was shot down, a story about an American pilot being stoned on the streets of Baghdad appeared in the local newspaper. Mr. Wetzel imagined it was his brother and that he might eventually have to go to Iraq to recover his brother's body.

546. About a week later, Mr. Wetzel returned home and to work. As time went on, Lt. Wetzel's absence had a numbing effect on Ed Wetzel. His concentration at work waned, and he became more socially withdrawn. He also lost sleep, gained weight, and drank alcohol more than he had before. He often had nightmares where he would see Lt. Wetzel in a low pit or being dragged through Iraqi streets as he tried to shield himself from stones being hurled at his face.

- 145 -

The nightmares often ended with Ed Wetzel witnessing the crushing of Lt. Wetzel's skull and his burial. Because he felt very isolated in his hometown of Metuchen, New Jersey, he visited his brother Jim in Washington, D.C., on weekends.

547.   Waiting for news became difficult to bear, so Mr. Wetzel soon took a more active role in trying to secure his brother's safe return. He and his brother Jim attended a rally to support the Gulf War troops in Washington. They also met with a pilot who had been a POW in Vietnam and had flown an earlier model of their brother's airplane. This gentleman encouraged them and told them that Lt. Wetzel had the proper training and was well prepared for what he might undergo in Iraq. Then-Congressman Pete Peterson from Florida, another Vietnam POW, also met with the Wetzel brothers and gave them encouraging words, offering them help if they ever requested it. Mr. Wetzel also went to the local chapter of the Red Cross and filled out all the paperwork necessary to send a message to his brother if such an opportunity became available. He also tried to enlist in the Army, hoping he would be able to use the opportunity to scour Iraq for his lost brother. Knowing his motives, the Army turned down his application.

548.   Mr. Wetzel spoke with a therapist several times in an effort to deal with the grief he felt at possibly losing his brother to captors in Iraq. He also attended a support group for people with family members involved in the Gulf War.

549.   Mr. Wetzel was horrified to see Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, on the cover of *Newsweek* magazine. He saw Zaun's swollen and lacerated face and wondered if his brother were still alive or if he were too disfigured to be shown to an American audience.

550.    On March 4, Mr. Wetzel received a call from family members who said they had seen grainy footage on CNN that might have shown Lt. Wetzel being released to the Red Cross in Iraq. Other viewings confirmed this, much to his relief.

551.    Mr. Wetzel is very close with his brother Bob. They e-mail each other roughly twice each day. As Ed Wetzel is one year older than his brother and repeated the second grade, the two went through their school years in the same class and played on the same sports teams as they grew up – factors which contributed to the close bond they have long shared.

### Ms. Margaret Wetzel

552.    Margaret Wetzel received a call from her parents at 4:00 a.m. on January 18, 1991, telling her that her brother Lt. Robert Wetzel had been shot down over Iraq several hours before. Ms. Wetzel and her husband traveled to her parents' home and then to her sister's house in New Jersey to offer emotional support to her family as they absorbed the news.

553.    This period was extremely difficult for Ms. Wetzel, as she suffered both with the loss of her brother and with watching the experience's effect on her parents. She could see her father aging before her eyes as the stress of losing his son wore on him severely. While Ms. Wetzel's mother handled the situation somewhat better, at times she also began to crack under the strain. Not knowing whether Lt. Wetzel was alive or dead was a particular stress to all of them. At no point did Iraq provide any relief to Ms. Wetzel or her family by notifying the ICRC or any other organization of Lt. Wetzel's status as a POW.

554.    Ms. Wetzel was aware of the torture American POWs had undergone in previous Wars, including Vietnam. Images in her mind from previous conflicts, as well as the images of Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, on television and in *Newsweek* magazine, made her concern and anxiety that much worse. Ms. Wetzel was horrified at seeing Lt. Zaun's

face and was very worried that if her brother were not dead, he was being beaten so badly that Iraq was afraid to present his face to an international audience. Imagining the possibility that Lt. Wetzel was alive and being tortured was nerve-wracking to her. Ms. Wetzel also feared that he was being held in solitary confinement with no medical treatment for injuries from this ejection.

555.    Lt. Wetzel and his sister Margaret have always been close, even despite their large gap in years. For a time in her early twenties Ms. Wetzel lived at home and spent a lot of time with the young Bob. The two speak regularly on the telephone and keep up as well on the web site that chronicles the Wetzel family's daily activities.

556.    Ms. Wetzel has found that it is very hard to forget her brother's experience and completely put it behind her. She has much more compassion for military families as a result of this event.

### Mr. Paul Wetzel

557.    Paul Wetzel was living in Aspen, Colorado, when the county sheriff knocked on his door at 2 a.m. on January 18, 1991, to tell him that his brother, Lt. Robert Wetzel, had been shot down over Iraq. He immediately flew to Vero Beach, Florida, to be with his parents, and then went with them to New Jersey so the family could gather together at his sister's house there.

558.    Mr. Wetzel feared for the worst, as all the information provided to his family indicated that Lt. Wetzel had not survived his shoot-down. When Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, appeared on a videotaped broadcast on international television, and then on the cover of *Newsweek* magazine, the uncertainty preyed on Mr. Wetzel's mind. While he knew his brother might have survived the crash, he was concerned that, if he had survived, he might then be undergoing torture at his captor's hands (since Mr. Zaun appeared to have been beaten).

559.    Mr. Wetzel watched the uncertainty take its toll on all of his family members. He was extremely distraught at the idea of what his brother might be going through, and he lived in a state of denial for weeks. Mr. Wetzel's consumption of alcohol increased significantly. He often had nightmares about bad things happening to his brother, and sleep was generally difficult to come by during this period. Occasionally he broke down and cried uncontrollably while Lt. Wetzel was missing in action. Just the mention of the Gulf War, which was obviously commonplace during the war itself, was enough to set off these crying episodes. Mr. Wetzel's relationships with other people he cared about during this time suffered. Because the house he lived in during this time was without a telephone, he felt cut off and isolated even from his own family.

560.    Mr. Wetzel is very close to his brother Bob as are the rest of his family members. They regularly gather together at holidays, speak often on the telephone, and have regular family reunions. They also keep in touch through the family web site (a password-protected area where the family exchanges information and converses regularly).

561.    Mr. Wetzel sees his brother often, as they live nearby each other in Colorado. They frequently help each other with home repair or improvement projects, and Mr. Wetzel and his wife are also godparents to Bob's son David.

### Mrs. Kate Farber

562.    Lt. Robert Wetzel's sister, Kate Farber, learned that her brother had been shot down when family members called her in the early morning hours of January 18, 1991. Soon, the entire Wetzel family got together for mutual support at the New Jersey home of Mrs. Farber's sister, Anne Kohlbecker.

563.    During the entire period of Lt. Wetzel's captivity, Mrs. Farber was extremely depressed at the prospect of his torture or death. At first, she did very little but think about her brother and watch television news to receive any possible word of his status. She made telephone calls and wrote letters to media organizations to see if they had any news of Lt. Wetzel that they had not yet released to the public, but the attempts were fruitless. At no point did Iraq alleviate Mrs. Farber's uncertainty by notifying the ICRC or any other organization of Lt. Wetzel's status as a POW. Mrs. Farber relied on her religious faith to maintain hope, but at times she felt sure that Lt. Wetzel was dead. She spent forty days not knowing the truth and being totally consumed by the situation.

564.    When Mrs. Farber saw the *Newsweek* magazine cover featuring Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, she immediately comprehended that her brother was likely either dead or that, if he had survived the crash, he was likely being tortured and abused by his captors.

565.    Mrs. Farber had read books on American POWs' experiences in Vietnam, and she was aware of the horrific treatment they received. She suspected that similar torture was being inflicted upon Lt. Wetzel in Iraq (because she clung to the hope that he was still alive). Meanwhile, the lack of any news media mention of her brother reinforced her agony. She experienced similar reactions each time an American POW appeared in coerced videotapes on CNN.

566.    While Lt. Wetzel was held captive in Iraq, Mrs. Farber had difficulty eating and looked forward to becoming tired enough to sleep so she could escape the pain of consciously hoping for her brother's return.

567.    Mrs. Farber is close to her brother and has greatly appreciated the opportunity to spend time with him since his return to the United States. She and the rest of the Wetzel family speak on the telephone with him regularly and keep updated on his life through a web site that the family updates daily to stay in touch.

### Mrs. Anne Kohlbecker

568.    Anne Kohlbecker received a call early on the morning of January 18, 1991, from her sister, Kate, telling her that their brother, Lt. Robert Wetzel, and his bombardier-navigator had just been shot down over Iraq.

569.    The Wetzel family soon gathered at Mrs. Kohlbecker's house in New Jersey to support one another and search for news about Lt. Wetzel. Mrs. Kohlbecker, a stay-at-home mother at the time, was consumed with thoughts as to her brother's prospects for survival in Iraq.

570.    Not knowing what had happened to Lt. Wetzel was the worst part of the experience for Mrs. Kohlbecker. Because Iraq did not notify the ICRC or any other organization of Lt. Wetzel's status as a POW, Mrs. Kohlbecker was afforded no relief from this uncertainty during the entire time of his captivity. Seeing the image of Lt. Zaun's swollen face on the cover of *Newsweek* magazine further upset Mrs. Kohlbecker as she longed to know anything that would resolve the insecurity she felt. During her brother's captivity, she coped with this uncertainty by attending services and rallies to support those who were serving in the Gulf War and by participating in support groups for people with family in the war.

571.    After Lt. Wetzel returned to the United States, it took Mrs. Kohlbecker several months to resume a normal pattern of life and to recover from the horrible knowledge that her brother might have died from the abuse at his captors' hands.

572.   Mrs. Kohlbecker often visited Lt. Wetzel with her own family when he lived in Virginia and after his Navy assignments moved him to Mississippi and Colorado. Lt. Wetzel and his family also usually visit Mrs. Kohlbecker each summer, and they remain close today. She checks the Wetzel family's website twice a day to keep up with her family, and she speaks with her brother Bob regularly on the telephone.

### Mrs. Sally Devin

573.   Lt. Wetzel's youngest sister, Sally Devin, received a phone call from another sister at 5:00 a.m. on the morning of January 18, 1991, informing her that her aviator brother had been shot down over Iraq. Mrs. Devin and the rest of the Wetzel family then gathered at her sister Anne Kohlbecker's house in New Jersey to support each other in the initial stages of that difficult period.

574.   Iraq never notified the ICRC or any other organization of Lt. Wetzel's status as a POW. Mrs. Devin describes the period of Lt. Wetzel's captivity as "six weeks of hell" for her as she received no word of her brother's whereabouts. While news and videotapes of some other POWs in Iraq emerged, Mrs. Devin heard nothing about Lt. Wetzel. After seeing Lt. Wetzel's bombardier-navigator, Lt. Jeffrey Zaun, on a coerced videotape and on the cover of *Newsweek* magazine, Mrs. Devin was horrified. She assumed her brother's absence from any media accounts meant that he was either dead or had been beaten at least as badly as his flying partner Zaun had, rendering him unfit for use as a propaganda tool for the Iraqi government.

575.   Seeing the effect of this experience on her father was especially hard on Mrs. Devin. He seemed to age several years in a matter of weeks, as he quickly lost hope that his son could have survived both the crash and ejection from his aircraft and then captivity at the hands of Iraqi forces.

576.    Mrs. Devin coped with the situation by being with people who were going through similar, if not identical, situations, and participating in support groups for those with family members in the Gulf War.

577.    Mrs. Devin is very close with her brother Lt. Wetzel, as is her entire family. They often gather together at holidays, speak regularly on the telephone, and participate in Internet chats on the family's web page almost every day.

### Mr. Calvin Zaun

578.    On January 18, 1991, a U.S. Navy assistance officer and a chaplain came to the house of Calvin and Marjorie Zaun to inform them that their son, then-Lt. Jeffrey Zaun, had not returned on time from a mission flying over Iraq.

579.    Calvin Zaun did not hear any news to confirm whether his son was dead or alive for several days. Eventually, the family was told by reporters that Lt. Zaun had been heard on an audiotape and seen on a videotape, both of which had been released by Iraq. The family was asked to identify Jeff's voice, which Mr. Zaun did. Days later, CNN broadcast the videotape that Lt. Zaun's Iraqi captors had forced him to make. The image of his son that he saw on television frightened Mr. Zaun, and he wondered how much worse the mistreatment was going to get for his son. That was the last Mr. Zaun would hear from or about his son until Lt. Zaun was released over a month later.

580.    Iraq did not notify the ICRC or any other organization of Lt. Zaun's status as a POW. Not knowing where Lt. Zaun was or what was happening to him was very difficult for Mr. Zaun. He did not know if his son was dead or if he was being tortured, such that he might be better off dead.

581.    Mr. Zaun did not work for almost two months as he waited for word of his son's status – good or bad.

582.    Mr. Zaun felt better when he heard that Allied forces were bombing bridges rather than buildings, as the possibility that Lt. Zaun was being held as a human shield against Allied bombing caused him great stress. This feeling contributed to the sense of helplessness he felt in general, that there was nothing he could do to help get his son out of Iraq and into safe hands.

583.    Mr. Zaun has also felt frustrated at his inability to communicate with his son since Lt. Zaun's return to the United States. While Lt. Zaun sustained some significant physical injuries in Iraq, he did not discuss them freely because he did not want them to interfere with his military career. Unfortunately, this reticence extended to his family as well. Mr. Zaun believes that the long-lasting effects of Lt. Zaun having been tortured in Iraq have created a divide between the two that is difficult to cross.

### Mrs. Marjorie Zaun

584.    On January 18, 1991, U.S. Navy personnel came to the home of Marjorie and Calvin Zaun to deliver the news that their son, then-Lt. Jeffrey Zaun, had not reported back to his aircraft carrier on schedule.

585.    Several days passed before Mrs. Zaun learned for the first time that her son had not been killed upon being shot down, when she heard his voice in an audiotape that had been released from Iraq. Thereafter, she saw the recorded image of his swollen face on television. Mrs. Zaun was very frightened to see the tape, which CNN broadcast on international television, because it was obvious to her that her son had been beaten. His voice did not even seem to be his own. The dominating thought in her mind was that the mistreatment could – and likely would – get even worse from that point forward.

586.    Marjorie Zaun and her husband wrote many letters to their son, but Iraq did not allow the ICRC to deliver the letters. Iraq also did not notify the Red Cross or any other organization of Lt. Zaun's status as a POW.

587.    Before Lt. Zaun was captured, he had written a letter to his parents and had asked a member of his flight squadron to deliver it if he did not return from a mission. After he had been missing for some time, Lt. Zaun's letter was delivered to his parents. This upset them greatly. While Mrs. Zaun never gave up hope, this letter nevertheless contributed to the already-growing feeling in her mind that Iraq would not allow her son to leave the country alive, if in fact he were still alive. His clothes and personal items had also been sent home. These events weighed heavily on her, and she was treated for insomnia and given sleeping pills, so as to allow some rest from the emotional burden.

588.    Since Lt. Zaun returned to the United States, Mrs. Zaun has felt like a veteran of the Gulf War herself and her nerves have remained frayed and fragile. When a plane crashed in Virginia shortly after his return, she was concerned to the point that she made her daughter track Lt. Zaun down because she was worried her son was on the plane. For years, ever since her son's torture by Iraq, she has been haunted with the fear that she would lose her son.

589.    Marjorie Zaun has found it difficult to communicate with Lt. Zaun since he returned from Iraq. When he came home, he did not want to share anything about his experiences in Iraq or the lingering injuries he sustained. For example, Mrs. Zaun learned about problems her son was having with a wrist injury only when she overheard a telephone discussion in which he mentioned it to someone else. Mrs. Zaun noticed that her son was jumpy and considerably shaken up by the experience shortly after his return. He especially did not like being called a hero for being tortured by Iraq. She believes that this aversion drew him further

- 155 -

inward and away from people who could help him recover from the experience. She also believes that Iraq's torture of her son has created a gap between them. She and her husband have suffered significantly as a result.

### Ms. Linda Zaun Lesniak

590.    Ms. Linda Zaun Lesniak first heard on January 18, 1991, that her only sibling, then-Lt. Jeffrey Zaun, had been shot down when Navy officers came to her parents' home, where she was living at the time, to give them the news. While the officers stressed that Lt. Zaun was MIA, Ms. Zaun Lesniak's parents believed that this meant that their son had been killed.

591.    A few days later, Ms. Zaun Lesniak received a phone call at work requesting her to return home. Navy officers were at her house again, this time hoping that either she or her parents could positively identify, as Lt. Zaun's, one of the voices of the POWs that was being broadcast on CNN. Ms. Zaun Lesniak was certain that she had heard her brother's voice and, shortly thereafter, his face was broadcast along with the statement that was aired earlier. When Ms. Zaun Lesniak first saw her brother's face broadcast on international television, the shock was so great that for a period she could not breathe. She would suffer similar panic attacks on a daily basis during her brother's captivity.

592.    After recovering from her initial shock, it was clear to her that Lt. Zaun was being mistreated. She could not help but wonder if he would have been better off dead than alive and undergoing torture at the hands of his Iraqi captors. She was bombarded with public displays of her brother's face, causing her extreme emotional trauma. These displays included the haunting image of her brother's face that first appeared on the cover of *Newsweek* magazine's February 4, 1991 issue. While commuting to work one morning, Ms. Zaun Lesniak saw that the woman

sitting next to her was reading a newspaper that displayed the same picture of her brother's face on the front page, and she became so disturbed that she started screaming.

593.    Every day, Ms. Zaun Lesniak was concerned that the media exposure would have repercussions on Lt. Zaun while he was in captivity. Seeing images of her brother's face made it obvious to her he was being mistreated, and she feared the treatment would become worse if his captors had information obtained by the media to use against him. Additionally, it was reported that the POWs would be used as human shields to protect against prospective bombing of strategic targets by Allied aircraft.

594.    The videotape that Lt. Zaun was coerced into making was the only proof Ms. Zaun Lesniak had of her brother's whereabouts or that he was alive at some point, for Iraq did not notify the ICRC or any other organization of Lt. Zaun's status as a POW. The mental anguish that Ms. Zaun Lesniak suffered as a result of her brother's condition exacerbated and required her to seek additional medical treatment for the mood disorder from which she still suffers.

595.    Ms. Zaun Lesniak and her brother have always had a close relationship. In fact, the primary reason that Ms. Zaun Lesniak went to and graduated from college was because of her brother's example and encouragement. The Zauns get together regularly for the holidays and family gatherings, and what is more, Ms. Zaun Lesniak considers her brother to be one of her best friends. He has always made her laugh, though much less so since he has returned – and she misses it. She perceives her brother to be more serious, intense, and work-oriented than he was before he was tortured by Defendants, and it has changed their relationship.

## CAUSES OF ACTION

596.    The torture of American POWs, and the resulting mistreatment and injury to their

families, as set forth in this Complaint, constitute the torts of assault, battery and intentional

infliction of emotional distress under state law.  Plaintiffs' claims satisfy each of the elements of

these torts as defined by applicable state law.  The torture of American POWs as set out in this

Complaint involved numerous acts of the officials, employees or agents of the Government of

Iraq intending, in a most brutal way, to cause a harmful or offensive contact with a person or an

imminent apprehension of such a contact, in fact putting the American POWs in imminent

apprehension.  Similarly, the torture set out in this Complaint presents numerous acts of the

officials, employees or agents of the Government of Iraq intentionally causing harmful or

offensive contact where such contact occurred.  And with respect both to the American POWs

and their family members, there is ample evidence of extreme and outrageous conduct by

officials, employees or agents of the Government of Iraq intentionally or recklessly causing

severe emotional distress.  Indeed, the very act and purpose of the continuing torture of

American POWs by the Government of Iraq was to create a total climate for the POWs that was

one of constant and severe emotional distress.  This climate of fear of torture and death was

based in turn on severe physical and mental abuse delivered by their captors in order to serve

objectives of the Government of Iraq in its continuing war of aggression.  This climate of

constant fear of death and torture, amid constant pain and mental anguish for the POWs, along

with the failure properly to effectuate notice as is implemented by provisions of the Geneva

Convention Relative to the Treatment of Prisoners of War, forced propaganda tapes by injured

POWs, refusal to permit the ICRC to inspect the prisoners' conditions and a public

announcement by Iraq that POWs would be used as human shields, in turn intentionally and

recklessly created severe and enduring emotional distress for family members of the American POWs.

597.    Defendants are also liable to Plaintiffs through Section 1606 of the FSIA.  This cause of action, in conjunction with the Restatement (Second) of Torts, applies the common law of the states, see, e.g., Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003) (holding that the common law of the states, as reflected in the Restatement, rather than District of Columbia law, applied to the claims for intentional infliction of emotional distress against Iraq under FSIA).  In the alternative, Defendants are liable to Plaintiffs through Section 1606 of the FSIA or the applicable state law.

598.    Defendants are also liable to Plaintiffs through the "Flatow Amendment" to the FSIA, 28 U.S.C.A. § 1605 Note, which when read in conjunction with Section 1606 of the FSIA creates a federal statutory cause of action for "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism" in their individual capacity, or their capacity as a private individual, "while acting within the scope of his or her office."  Section 1606 of the FSIA translates this individual or personal liability into liability of the state through both respondeat superior and the direct effect of the language of § 1606 which plainly provides:  "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."

599.    Defendants are also liable to Plaintiffs as a result of the Supreme Court of the United States' ruling in Sosa v. Alvarez-Machain, 124 S. Ct. 2739 (2004), which makes available a federal common law cause of action for torture committed in violation of specific and universally-accepted international legal norms in cases against terror states brought under § 1605(a)(7) of the FSIA.  The prohibition on torture is one of the clearest examples in

- 159 -

international law of a universal, definable and obligatory norm. Thus, for example, § 702 of the Restatement (Third) of the Foreign Relations Law of the United States (1987), provides: "A state violates international law if, as a matter of state policy, it practices, encourages, or condones . . . torture . . . ." Restatement (Third) at 161. Comment a to this section adds: "This section includes as customary law only those human rights whose status as customary law is generally accepted . . . and whose scope and content are generally agreed." Id. at 161-162.

600.    Defendant Saddam Hussein and the John Doe Defendants are also liable to the POW Plaintiffs under the Torture Victim Protection Act, which creates a cause of action against the individual torturers, or those responsible for the torture, while acting "under actual or apparent authority, or color of law, of any foreign nation . . . ." 28 U.S.C. § 1350 Note. In addition, Section 1606 of the later-enacted FSIA extends this liability of individuals to liability for terror states which have lost their immunity at the time the torture occurs, thus rendering Defendants the Republic of Iraq and the Iraqi Intelligence Service liable to the POW Plaintiffs.

601.    Plaintiffs also reserved the argument before the Supreme Court of the United States, and before the Court of Appeals for the D.C. Circuit, with respect to the direct operation of § 1605(a)(7) and the "Flatow Amendment" of the FSIA in creating singly or jointly a federal statutory cause of action against non-immune terror states for covered actions, including torture. It is believed that both the text and the legislative history of these provisions clearly indicate a Congressional intent to create such a cause of action from these provisions, as was long assumed by this Court, and neither the D.C. Circuit nor the Supreme Court have foreclosed this possible cause of action.

602.    The acts complained of in this Complaint are clearly and broadly understood as wrongful, tortious, extreme, and outrageous; indeed, in the case of the torture of prisoners of war,

as even giving rise to personal criminal responsibility. While neither jurisdiction nor cause of action in this case is predicated on the 1949 Geneva Conventions, these Conventions clearly illustrate the broad consensus as to the fundamental wrongfulness of the acts of torture inflicted against Plaintiffs. The 1949 Geneva Convention Relative to the Treatment of Prisoners of War (known widely as the "Third Geneva Convention," "The POW Convention" or the "GPW Convention") is one of the most widely adhered international conventions in the World. At present, there are over 192 states party to this Convention. See Geneva Conventions of 12 August 1949 and Additional Protocols of 8 June 1977: Ratifications, Accessions and Successions, http://www.icrc.org/Web/eng/siteeng0.nsf/html/party_gc (last visited Mar. 31, 2006). Not only is the Republic of Iraq a High Contracting Party bound by this Convention – Iraq acceded to the POW Convention on February 14, 1956, and the Convention is still in force for them, see U.S. Dept. of State, Treaties in Force 450, 451 (Jan. 1, 2000) – but this Convention is also generally regarded as representative of customary international law. Several of many provisions of this Convention grossly violated by Iraq in its torture and related mistreatment of American POWs illustrate the wrongful and outrageous nature of Iraq's actions in this case. These include Article 13 which provides that "[p]risoners of war must at all time be humanely treated. . . . [and] [l]ikewise, prisoners of war must at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity. . . "; Article 17 which provides "[n]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind. . . "; Article 19 which provides "[p]risoners of war shall be evacuated, as soon as possible after their capture, to camps situated in an area far enough from the combat zone

- 161 -

for them to be out of danger. . . "; Article 26 which provides "[t]he basic daily food rations shall

be sufficient in quantity, quality and variety to keep prisoners of war in good health and to

prevent loss of weight or the development of nutritional deficiencies. . ."; Article 69 which

provides "[i]mmediately upon prisoners of war falling into its power, the Detaining Power shall

inform them and the Powers on which they depend, through the Protecting Power, of the

measures taken to carry out the provisions of the present Section. . . ."; Article 70 which provides

"[i]mmediately upon capture, or not more than one week after arrival at a camp, even if it is a

transit camp . . . every prisoner of war shall be enabled to write direct to his family . . . and to the

Central Prisoners of War Agency . . . a card . . . informing his relatives of his capture, address

and state of health . . ."; and Article 71 which provides "[p]risoners of war shall be allowed to

send and receive letters and cards. . . ."

    603.    As further confirmation that the acts of Defendants toward the Plaintiffs in this

case are clearly and broadly understood as wrongful, tortious and outrageous, American service

members who were wounded, injured or sick when captured by Iraq were additionally entitled to

the protections of the 1949 Geneva Convention for the Amelioration of the Condition of the

Wounded and Sick in Armed Forces in the Field, known widely as the "GWS Convention." Iraq

is also a High Contracting Party to this widely adhered Convention, having acceded to the

Convention also on February 14, 1956. See Geneva Conventions of 12 August 1949 and

Additional Protocols of 8 June 1977: Ratifications, Accessions and Successions,

http://www.icrc.org/Web/eng/siteeng0.nsf/html/party_gc (last visited Mar. 31, 2006). This

Convention too continues in force today for Iraq. See U.S. Dep't of State, Treaties in Force 450,

451 (2000). Article 12 of this Convention provides "[m]embers of the armed forces . . . who are

wounded or sick, shall be respected and protected in all circumstances. They shall be treated

humanely and cared for by the Party to the conflict in whose power they may be, without any

adverse distinction founded on sex, race, nationality, religion, political opinions, or any other

similar criteria. Any attempts upon their lives, or violence to their persons, shall be strictly

prohibited; in particular, they shall not be . . . subjected to torture . . . ; they shall not willfully be

left without medical assistance and care, nor shall conditions exposing them to contagion or

infection be created. . . ."

604.    Of particular importance in indicating how outrageous Defendants' torture of

American POWs was, and is, in relation to contemporary standards of civilized international

behavior, Article 130 of the POW Convention and Article 50 of the GWS Convention define

"torture or inhuman treatment" and "wilfully causing great suffering or serious injury to body or

health" as "grave breaches" of the laws of war. Such grave breaches give rise to personal

criminal responsibility for perpetrators. Indeed, Article 129 of the POW Convention and Article

49 of the GWS Convention even provide that "[e]ach High Contracting Party shall be under the

obligation to search for persons alleged to have committed, or to have ordered to be committed,

such grave breaches, and shall bring such persons, regardless of their nationality, before its own

courts. . . ."

605.    Moreover, Article 131 of the POW Convention and Article 51 of the GWS

Convention provide in common with respect to grave breaches of the Convention, as set out in

Articles 130 and 50 respectively, that "[n]o High Contracting Party shall be allowed to absolve

itself or any other High Contracting Party of any liability incurred by itself or by another High

Contracting Party in respect of [such] breaches . . . ." The grave breaches referred to in the

preceding Article in both Conventions include, among others, "torture or inhuman treatment"

and "willfully causing great suffering or serious injury to body or health."

606.    Article 12 of the POW Convention also makes it clear that "[p]risoners of war are in the hands of the enemy Power, but not of the individuals or military units who have captured them. Irrespective of the individual responsibilities that may exist, the Detaining Power is responsible for the treatment given them. . . ."

607.    Jean Pictet, the great authority on humanitarian law, writes in his classic work J. Pictet, Humanitarian Law and the Protection of War Victims (1975): "Amongst the practices condemned [by the Geneva Conventions], torture as a means of extracting information seems the most odious and dangerous. It inflicts unspeakable suffering on the individual and is a serious affront to the dignity of man, forcing him to perform acts or make statements against his will and even reducing him to the level of a slave of an age of barbarism. . . ." Pictet, at 35.

### RELIEF REQUESTED

608.    **WHEREFORE**, Plaintiffs, as determined by their individual facts as specified herein, and in recognition of the depraved and outrageous conduct of Defendants, respectfully request the following relief to be entered against all Defendants, The Republic of Iraq, the Iraqi Intelligence Service, and President Saddam Hussein, in his official capacity as President of the Republic of Iraq and individual capacity, and John Does 1-100, jointly and severally:

(a) General and specific compensatory damages (including pain and suffering) in excess of Twenty Five Million Dollars ($25,000,000.00) as to each and every POW Plaintiff;

(b) General and specific compensatory damages (including solatium) in excess of Five Million Dollars ($5,000,000.00) as to each and every Family Member Plaintiff;

(c) Costs of this suit;

(d) Reasonable attorneys' fees; and

(e) Such further relief as the Court may deem just and proper.

609.   **PLAINTIFFS FURTHER RESPECTFULLY REQUEST** the following additional relief to be entered against Defendants, the Iraqi Intelligence Service and President Saddam Hussein in his official capacity as President of the Republic of Iraq, Saddam Hussein in his individual capacity, and John Does 1-100, jointly and severally:

(a) Punitive damages in excess of Three Hundred Million Dollars ($300,000,000.00), to be shared equally between all POW Plaintiffs. Plaintiffs have expressed an intention that, if feasible, a substantial amount of any such punitive damages should go to a Foundation for the general assistance of American and allied POW/MIAs and their families; and

(b) Such further relief as the Court may deem just and proper.

Respectfully submitted,

John Norton Moore
D.C. Bar # 179697
307 Yoakum Parkway
Suite 3-1618
Alexandria, VA  22304
(703) 751-7798
(202) 429-3902 – fax

Stephen A. Fennell
D.C. Bar # 290379
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-8082
(202) 429-3902 - fax

Attorneys for the Plaintiffs

Dated April 20, 2006